**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

RADIO MUSIC LICENSE COMMITTEE,
INC.,

        Plaintiff,

    v.

GLOBAL MUSIC RIGHTS, LLC,

        Defendant.

Civil Action No. 16-6076

**DEFENDANT GLOBAL MUSIC RIGHTS, LLC'S
MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS OR TO TRANSFER VENUE**

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II. FACTUAL BACKGROUND ................................................................................. 8

    A.  Three PROs Reign Over the Music Rights Industry ................................................. 8

    B.  Global Music Rights Shakes Up the PRO Industry ................................................. 9

    C.  RMLC Abandons Negotiations with GMR ................................................. 10

III. PENNSYLVANIA LACKS PERSONAL JURISDICTION OVER GMR ................................ 12

    A.  No General Personal Jurisdiction: GMR Does Not Have the Required
        Minimum Contacts with Pennsylvania ................................................. 12

    B.  No Specific Personal Jurisdiction: GMR Does Not Have the Required
        Minimum Contacts with Pennsylvania ................................................. 13

        1.  GMR Has Not "Purposefully Directed" Its Activities to
            Pennsylvania ................................................. 13

        2.  RMLC's Claims Neither Arise Out of Nor Relate to Any GMR
            Contact with Pennsylvania ................................................. 16

        3.  Exercising Jurisdiction Would Be Unfair and Result in Substantial
            Injustice ................................................. 17

    C.  The Clayton Act Does Not Confer Personal Jurisdiction over a Domestic
        Non-Corporate Entity ................................................. 17

IV. VENUE IS NOT PROPER IN THIS DISTRICT ................................................. 19

    A.  Venue Is Improper Because No Event Giving Rise to RMLC's Claims
        Occurred in This District and GMR Is Not Subject to This Court's
        Personal Jurisdiction ................................................. 19

    B.  Venue Is Improper Because GMR Is Neither a "Corporation" Nor a
        Foreign Entity ................................................. 20

V.  THE COMPLAINT FAILS TO STATE A CLAIM BECAUSE RMLC HAS NOT
    PLAUSIBLY ALLEGED HARM TO COMPETITION ................................................. 20

    A.  The ASCAP and BMI Consent Decrees Are Not a Competitive Baseline
        from Which to Measure Harm to Competition ................................................. 21

    B.  Higher License Fees Do Not Constitute Harm to Competition ................................ 23

    C.  GMR's Alleged Challenged Conduct Stimulates Competition, Increases
        Efficiency, and Supports Innovation ................................................. 24

    D.  RMLC Does Not Plausibly Allege That GMR Has Foreclosed Potential
        Competitors ................................................. 28

    E.  RMLC Does Not Plausibly Allege Consumer Harm ................................................. 29

# TABLE OF CONTENTS
## (continued)

Page

F.     RMLC's Alleged "Injury" Stems from the Competition-Enhancing Aspects of GMR's Conduct ....................................................................... 30

VI.    THE COMPLAINT FAILS TO STATE A CLAIM BECAUSE RMLC DOES NOT ADEQUATELY ALLEGE MARKET POWER ................................................... 31

A.     RMLC Fails to Allege Direct Evidence of Market Power ................................... 32

B.     RMLC Does Not Allege Indirect Evidence of Market Power ............................ 34

     1.     RMLC's Market Is Implausibly Narrow.................................................. 34

         a.     Licenses to "Unique" Copyrighted Works May Be Reasonably Interchangeable ....................................................... 34

         b.     Licenses to "Essential" Copyrighted Works May Be Reasonably Interchangeable ....................................................... 39

         c.     Licenses to Different PROs' Repertories Are Reasonably Interchangeable by Radio Stations for the Same Purpose ........... 41

     2.     RMLC Does Not Allege Cognizable Barriers to Entry .......................... 43

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Advo, Inc. v. Phila. Newspapers, Inc.*,
    51 F.3d 1191 (3d Cir. 1995)..................................................................44

*Allen-Myland, Inc. v. IBM Corp.*,
    33 F.3d 194 (3d Cir. 1994)..............................................................36, 40

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*,
    592 F.3d 991 (9th Cir. 2010) ...............................................................25

*Am. Mfrs. Mut. Ins. Co. v. Am. Broadcasting—Paramount Theatres, Inc.*,
    446 F.2d 1131 (2d Cir. 1971)...............................................................33

*In re Application of the Cromwell Group, Inc.*,
    Case No. 1:10-cv-5210-DLC (MHDx) (S.D.N.Y.) ...............................11

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990)........................................................................20, 30

*In re Auto. Refinishing Paint Antitrust Litig.*,
    358 F.3d 288 (3d Cir. 2004)............................................................17, 18

*B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*,
    909 F. Supp. 162 (S.D.N.Y. 1995) .......................................................35

*Barr Laboratories, Inc. v. Abbott Laboratories*,
    978 F.2d 98 (3d Cir. 1992)..............................................................24, 44

*Black v. JP Morgan Chase & Co.*,
    Civ. A. No. 10-848, 2011 WL 4102802 (W.D. Pa. Aug. 10, 2011) .......................................13

*Blizzard Entm't Inc. v. Ceiling Fan Software LLC*,
    941 F. Supp. 2d 1227 (C.D. Cal. 2013) ...............................................36

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ...............................................................23

*Broadcast Music, Inc. v. CBS, Inc.*,
    441 U.S. 1 (1979).............................................................................8, 9

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007)....................................................31, 32, 34

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
    140 F.3d 494 (3d Cir. 1998)................................................................42

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ................................................................................ 30, 31

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ........................................................................................ 15

*CAE Inc. v. Gulfstream Aerospace Corp.*,
    Civ. A. No. 15-924-LPS, 2016 WL 4497057 (D. Del. Aug. 26, 2016) ............. 26, 28

*Cameli v. WNEP-16 The News Station*,
    134 F. Supp. 2d 403 (E.D. Pa. 2001) ................................................................ 50

*Carell v. Shubert Org., Inc.*,
    104 F. Supp. 2d 236 (S.D.N.Y. 2000) ................................................................ 36

*CBS, Inc. v. ASCAP*,
    400 F. Supp. 737 (S.D.N.Y. 1975), *rev'd on other grounds by* 562 F.2d 130
    (2d. Cir. 1977) ................................................................................................ 35

*Connors v. R & S Parts & Servs., Inc.*,
    248 F. Supp. 2d 394 (E.D. Pa. 2003) ................................................................ 48

*Data General Corp. v. Grumman Sys. Support Corp.*,
    36 F.3d 1147 (1st Cir. 1994) ............................................................................ 29

*E'Cal Corp. v. Office Max, Inc.*,
    No. Civ. A. 01-3281, 2001 WL 1167534 (E.D. Pa. Sept. 7, 2001) ....................... 51

*EVCO Tech. & Dev. Co. v. Precision Shooting Equip., Inc.*,
    379 F. Supp. 2d 728 (E.D. Pa. 2005) ................................................................ 47

*Farina v. Nokia*,
    578 F. Supp. 2d 740 (E.D. Pa. 2008), *aff'd*, 625 F.3d 97 (3d Cir. 2010) .............. 4, 14

*Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*,
    312 F. Supp. 2d 379 (E.D.N.Y. 2004) ............................................................... 36

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
    658 F.2d 139 (3d Cir. 1981) ..................................................................... 26, 27, 43

*Gehling v. St. George's Sch. of Med., Ltd.*,
    773 F.2d 539 (3d Cir. 1985) ............................................................................ 15

*Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*,
    386 F.3d 485 (2d Cir. 2004) ...................................................................... 31, 44

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*,
  960 F. Supp. 701 (S.D.N.Y. 1997) ...............................................................................36, 40

*Global Music Rights, LLC v. Radio Music License Comm., Inc. et al.*,
  Case No. 2:16-cv-09051-BRO-AS (filed Dec. 6, 2016) (C.D. Cal.) ................................49, 52

*Goldlawr, Inc. v. Heiman*,
  369 U.S. 463 (1962)...................................................................................................16

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011)...................................................................................................12

*Gurglepot, Inc. v. New Schreve, Crump & Low LLC*,
  No. C13-6029-RBL, 2014 WL 2744283 (W.D. Wash. June 17, 2014)..................................14

*Harrison Aire, Inc. v. Aerostart Int'l, Inc.*,
  423 F.3d 374 (3d cir. 2005) .......................................................................................23, 32

*Head USA, Inc. v. Sorensen*,
  No. 3:06-cv-983 (MRK), 2006 WL 3703646 (D. Conn. Dec. 13, 2006) ...............................14

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
  466 U.S. 408 (1984)...................................................................................................15

*United States ex rel. Hollander v. MTD Prods., Inc.*,
  Civ. A. No. 09-5507, 2011 WL 3501749 (E.D. Pa. Aug. 9, 2011).........................................50

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  516 F. Supp. 2d 324 (D. Del. 2007), *aff'd*, 602 F.3d 237 (3d Cir. 2010) ...............4, 16, 18, 20

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
  547 U.S. 28 (2006).....................................................................................................37

*IMO Indus., Inc. v. Kiekert AG*,
  155 F.3d 254 (3d Cir. 1998)..........................................................................................15

*Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*,
  812 F.2d 786 (2d Cir. 1987)..........................................................................................44

*Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*,
  No. 13 C 1129, 2013 WL 4599903 (N.D. Ill. Aug. 29, 2013)................................................39

*Jacobs v. Bayha*,
  Civ. A. No. 07-237, 2011 WL 1044638 (W.D. Pa. Mar. 18, 2011) .......................................10

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*JBL Enters., Inc. v. Jhirmack Enters., Inc.*,
   698 F.2d 1011 (9th Cir. 1983) ............................................................41

*Johnson v. SmithKline Beecham Corp.*,
   724 F.3d 337 (3d Cir. 2013)...............................................................18

*Jumara v. State Farm Ins. Co.*,
   55 F.3d 873 (3d Cir. 1995)....................................................45, 47, 51

*Lake Assocs., LLC v. DNZ Prods. LLC*,
   886 F. Supp. 2d 1203 (D. Or. 2012) ...................................................14

*Lannett Co. v. Asherman*,
   Civ. A. No. 13-2006, 2014 WL 716699 (E.D. Pa. Feb. 24, 2014) .........................................47

*Lawlor v. National Screen Service Corp.*,
   270 F.2d 146 (3d Cir. 1959)...............................................................27

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)...........................................................................23

*Lexmark Int'l, Inc. v. Impression Prods., Inc.*,
   816 F.3d 721 (Fed. Cir. 2016)............................................................37

*Liggett Grp., Inc. v. R.J. Reynolds Tobacco Co.*,
   102 F. Supp. 2d 518 (D.N.J. 2000) ....................................................51

*Lockheed Martin Corp. v. Boeing Co.*,
   390 F. Supp. 2d 1073 (M.D. Fla. 2005) .............................................39

*LogoPaint A/S v. 3D Sport Signs SI*,
   163 F. Supp. 3d 260 (E.D. Pa. 2016) .................................................45

*Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*,
   846 F. Supp. 374 (E.D. Pa. 1994) ................................................16, 17

*Mathews v. Lancaster Gen. Hosp.*,
   87 F.3d 624 (3d Cir. 1996)..................................................................21

*McCullough v. Zimmer, Inc.*,
   382 F. App'x 225 (3d Cir. 2010) ........................................................21

*McManus v. Tato*,
   184 F. Supp. 958 (S.D.N.Y. 1959) .....................................................18

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*McTernan v. City of York*,
    577 F.3d 521 (3d Cir. 2009)..................................................................10

*Mediacom Communications Corp. v. Sinclair Broadcast Group, Inc.*,
    460 F. Supp. 2d 1012 (S.D. Iowa 2006) ...............................................37

*Meyers & Sons Corp. v. Clipps, Inc.*,
    No. 00 CIV. 7191(HB), 2001 WL 125586 (S.D.N.Y. Feb. 13, 2001)....................14

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
    838 F.3d 421 (3d Cir. 2016)..................................................31, 32, 34

*Nat'l Cable Television Ass'n v. BMI*,
    772 F. Supp. 614 (D.D.C. 1991) ..........................................................33

*Nova Design Techs., Ltd. v. Walters*,
    No. 10-7618, 2011 WL 5084566 (E.D. Pa. Oct. 25, 2011) ................4, 14

*O'Connor v. Sandy Lane Hotel Co.*,
    496 F.3d 312 (3d Cir. 2007)..................................................................13

*Orange Theatre Corp. v. Rayherstz Amusement Corp.*,
    139 F.2d 871 (3d Cir. 1944)..................................................................17

*Ostella v. IRBSearch, LLC*,
    Civ. A. No. 12-7002, 2014 WL 3843880 (E.D. Pa. Aug. 5, 2014).........46

*Paddock Publ'ns, Inc. v. Chi. Trib. Co.*,
    103 F.3d 42 (7th Cir. 1996) ..................................................24, 27, 30

*Paramount Pictures Corp. v. Nissim Corp.*,
    Nos. 2:14-cv-04624-ODW(ASx), 2014 WL 5528455 (C.D. Cal. Nov. 3, 2014)...................14

*Parker v. Viacom Int'l, Inc.*,
    605 F. Supp. 2d 659 (E.D. Pa. 2009) ...................................................43

*Pastore v. Bell Tel. Co. of Pa.*,
    24 F.3d 508 (3d Cir. 1994)....................................................................31

*Patterson v. FBI*,
    893 F.2d 595 (3d Cir. 1990)....................................................................9

*Penda Corp. v. STK, LLC*,
    Nos. Civ. A. 03-5578, 03-6240, 2004 WL 2004439 (E.D. Pa. Sept. 7, 2004) .......................50

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002)..................................................................32

*Plotnick v. Computer Scis. Corp. Deferred Comp. Plan for Key Execs.*,
    Civ. No. 14-cv-303 (KM), 2015 WL 4716116 (D.N.J. Aug. 7, 2015) ...................................49

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)..................................................................34

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010)..................................................24, 25, 26, 27

*Radio Music License Comm., Inc. v. SESAC, Inc.*,
    29 F. Supp. 3d 487 (E.D. Pa. 2014) ....................................................33

*Radio Music License Comm., Inc. v. SESAC, Inc.*,
    Civ. A. No. 12-cv-5807, 2013 WL 12114098 (E.D. Pa. Dec. 23, 2013) .................................8

*Ramsey v. Devereux Found.*,
    Civ. A. No. 16-299, 2016 WL 3959075 (E.D. Pa. July 22, 2016)............................................5

*Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*,
    148 F.3d 1356 (Fed. Cir. 1998)..................................................4, 13, 14

*Remick v. Manfredy*,
    238 F.3d 248 (3d Cir. 2001)..................................................................12

*Ricoh Co. v. Honeywell, Inc.*,
    817 F. Supp. 473 (D.N.J. 1993) ...........................................................47

*Satnam Distribs., LLC v. Commonwealth-Altadis, Inc.*,
    140 F. Supp. 3d 405 (E.D. Pa. 2015) ...........................................34, 41, 44

*Schoonmaker v. Highmark Blue Cross Blue Shield*,
    Civ. A. No. 09-cv-703, 2009 WL 3540785 (E.D. Pa. Oct. 30, 2009)....................................47

*Smith v. HireRight Solutions, Inc.*,
    Civ. A. No. 09-6007, 2010 WL 2270541 (E.D. Pa. June 7, 2010) .........................................46

*Smith v. Network Solutions, Inc.*,
    135 F. Supp. 2d 1159 (N.D. Ala. 2001)..................................................38

*Spinelli v. Nat'l Football League*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) ......................................................42

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Stoney Creek Technologies, LLC*,
    364 B.R. 882 (Bankr. E.D. Pa. 2007) ...................................................................10

*Synthes, Inc. v. Knapp*,
    978 F. Supp. 2d 450 (E.D. Pa. 2013) ..................................................................47

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961)............................................................................................24

*Taylor & Francis Grp., PLC v. McCue*,
    145 F. Supp. 2d 627 (E.D. Pa. 2001) ..................................................................20

*Theatre Party Assocs., Inc. v. Shubert Org., Inc.*,
    695 F. Supp. 150 (S.D.N.Y. 1988) ..............................................................36, 44

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
    959 F.2d 468 (3d Cir. 1992) ...............................................................................37

*Travelers Ins. Co. v. Blue Cross of W. Pa.*,
    481 F.2d 80 (3d Cir. 1973)..................................................................................32

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
    964 F.2d 1022 (10th Cir. 1992) ..........................................................................36

*United States v. Baker Hughes Inc.*,
    908 F.2d 981 (D.C. Cir. 1990).............................................................................39

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)......................................................................................32, 35

*Vavro v. Albers*,
    Case No. 2:05-cv-0321, 2006 WL 2547350 (W.D. Pa. Aug. 31, 2006)...............40

*Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*,
    75 F.3d 147 (3d Cir. 1996)..................................................................................12

*Vt. Juvenile Furniture Mfg., Inc. v. Factory Direct Wholesale, Inc.*,
    317 F.R.D. 16 (E.D. Pa. 2016).....................................................................46, 48

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014)..........................................................................14, 15, 17

*Weber v. Basic Comfort*,
    155 F. Supp. 2d 283 (E.D. Pa. 2001) ..........................................................45, 46, 51

### TABLE OF AUTHORITIES
#### (continued)

**Page(s)**

*White v. B.A.C. Home Loans Servicing, L.P.*,
  Case No. 4:10-cv-2137-CAS, 2011 WL 1483919 (E.D. Mo. Apr. 19, 2011) ........................40

*Whitehurst v. Showtime Networks, Inc.*,
  Civ. A. No. 1:08-CV-47, 2009 WL 3052663 (E.D. Tex. Sept. 22, 2009) .............................36

*Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*,
  810 F.2d 243 (D.C. Cir. 1987)...................................................................................22

*World Skating Fed. v. Int'l Skating Union*,
  357 F. Supp. 2d 661 (S.D.N.Y. 2005).........................................................................17

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)................................................................................................17

**STATUTES**

15 U.S.C. § 4...............................................................................................................31

15 U.S.C. § 12.........................................................................................................3, 18

15 U.S.C. § 22.............................................................................................4, 17, 18, 20

17 U.S.C. § 101.............................................................................................................9

28 U.S.C. § 1391(b)....................................................................................................19

28 U.S.C. § 1391(b)(1)....................................................................................19, 45, 46

28 U.S.C § 1391(b)(2)................................................................................................19

28 U.S.C. § 1391(b)(3)................................................................................................19

28 U.S.C. § 1391(c)(2)....................................................................................19, 45, 46

28 U.S.C. § 1404(a)................................................................................................45, 46

**RULES**

Fed. R. Civ. P. 12(b)(2)..........................................................................................3, 14

Fed. R. Civ. P. 12(b)(3)..........................................................................................3, 20

Fed. R. Civ. P. 12(b)(6)......................................................................................2, 5, 42

Fed. R. Civ. P. 32(a)(4)..............................................................................................48

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Fed. R. Civ. P. 45(b)(2)...........................................................................................48

Fed. R. Civ. P. 45(c)(1)...........................................................................................48

**OTHER AUTHORITIES**

17 Moore et al., *Moore's Federal Practice* § 111.13(1)(i) (3d ed. 1997) ....................................51

2 *Nimmer on Copyright*, § 8.19 (2016).........................................................................9

Stasha Loeza, Out of Tune: How Public Performance Rights Are Failing to Hit
   the Right Notes, 31 Berkeley Tech. L.J. 725 (2016) ...............................................8

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

This case concerns licensing the rights to perform musical compositions publicly.  For almost a century, that industry was dominated by just three companies: the American Society of Composers, Authors, and Publishers ("ASCAP"), Broadcast Music, Inc. ("BMI"), and the Society of European Stage Authors and Composers ("SESAC").  Known as performing-rights organizations, or "PROs," these industry giants represent more than *1.3 million* songwriters, composers, and music publishers, and control rights to more than *22 million* musical works.  Together, they manage more than 99% of the compositions available for public performance.  To get their writers' songs played on U.S. terrestrial radio, all three PROs must negotiate with a single entity: the Radio Music License Committee ("RMLC"), a Tennessee-based company that represents the overwhelming majority of terrestrial radio station owners in the United States and *90%* of U.S. terrestrial radio revenue.

Global Music Rights ("GMR") saw an opportunity to compete in this decades-old, highly concentrated marketplace.  GMR was formed in 2013 as a Delaware limited liability company.  It has a single office in Los Angeles, seventeen employees, and no connection to the State of Pennsylvania.  Its business plan was to provide concierge service to a select group of key songwriters and publishers, offer them more attractive financial and personalized service packages than the gargantuan PROs could provide, and then negotiate with radio stations for license rates commensurate with the quality of GMR's writers' works.  GMR was, is, and, by design, will remain small—infinitesimally small when compared to ASCAP, BMI, and SESAC.  GMR has just over seventy writers as clients and a repertory of approximately 20,000 compositions.  This is but a sliver of the performance-rights business—about one-tenth of one percent of the available compositions and a single-digit share of all songs played on the radio.

Radio stations—represented by RMLC—do not want real competition concerning the music they play, nor do they want to pay for the value GMR and its writers bring to the table. Instead, they sought to bully GMR into accepting contractual terms and licensing procedures similar to those of ASCAP, BMI, and SESAC.  GMR resisted RMLC's blatantly anticompetitive maneuver.  But rather than negotiate, RMLC sued.  Without a hint of irony, the industry giant that represents 90% of the country's terrestrial radio station revenue called the tiny startup company with just seventy-three writers a "monopolist."  But RMLC's factual allegations about GMR actually describe an *increase* in competition—competition among PROs and competition between radio stations—not competitive harm.  RMLC's real complaint is that radio stations might have to compete for GMR's business in the previously staid PRO market.

Under the guise of this "antitrust" lawsuit, RMLC asks this Court to take the radical step of imposing on GMR a compulsory license scheme with a "rate court" to decide license prices. That regime would stifle competition, neutralize GMR as a competitor in the music licensing market, rewrite the Copyright Act, and usurp the legislative prerogative of Congress, since the Copyright Act expressly does *not* require a compulsory license or rate for public performance licenses of compositions.

This motion presents three independent bases for dismissing RMLC's Complaint:  *first*, this Court lacks personal jurisdiction over GMR; *second*, the Eastern District of Pennsylvania is an improper forum in which to adjudicate this dispute; and *third*, RMLC's Complaint fails to state a claim upon which relief can be granted.  If the Court concludes that it lacks personal jurisdiction over GMR, it need not—and, indeed, cannot—address GMR's remaining arguments. If the Court exercises jurisdiction over GMR but finds that the venue here is improper, it need not address GMR's substantive argument.  The Court need only address GMR's Rule 12(b)(6)

arguments if it concludes this forum is proper **and** the Court possesses personal jurisdiction over GMR.  With that framework in mind, GMR argues as follows:

1. ***No Personal Jurisdiction (Rule 12(b)(2)).***  GMR has no meaningful or legally cognizable connection to the State of Pennsylvania.  RMLC, a Tennessee company based in Nashville, filed in the Eastern District of Pennsylvania for no apparent reason except tactical advantage.  This forum is located across the country from GMR's sole office and headquarters in Los Angeles, 800 miles from RMLC's own center of operations in Nashville, and has no nexus whatsoever to GMR or the present dispute.  GMR does not have the substantial, systematic, and continuous contacts with Pennsylvania that are necessary to create general personal jurisdiction here.  Nor has GMR "purposely availed" itself of Pennsylvania law by doing business here, such that the Court may exercise specific personal jurisdiction over it.  For example:

- Neither plaintiff nor defendant is a resident of Pennsylvania or has any offices in this State.
- Neither has any employee who resides in Pennsylvania.
- GMR does not own any property in Pennsylvania and does not conduct any business in this State.
- No meetings between GMR and RMLC occurred in Pennsylvania.
- None of GMR's songwriters or publishers have a primary residence in Pennsylvania.
- No key fact witnesses reside in Pennsylvania.
- No material documentary or other evidence is located in Pennsylvania.
- Before the filing of the Complaint, GMR had not entered into an agreement with any Pennsylvania company.

Because there is no legally meaningful connection between GMR and Pennsylvania, the Court must dismiss this case for lack of personal jurisdiction.

2. ***Improper Venue (Rule 12(b)(3)).***  No facts giving rise to RMLC's claims occurred in Pennsylvania.  This means that the Court should dismiss this case for improper venue.  Undoubtedly realizing this, RMLC argues for venue in this State under Section 12 of the

Clayton Act, codified at 15 U.S.C. § 22.  But that statute has no application to this case or to

GMR.  For one, the statute only applies to corporations, and GMR is not a corporation.  GMR is

a limited liability company organized under the laws of Delaware.  Courts, including in this

District, distinguish between corporations and limited liability companies for this purpose and

reject plaintiffs' efforts to manufacture jurisdiction and venue against LLCs under 15 U.S.C. §

22.  *E.g.*, *Farina v. Nokia*, 578 F. Supp. 2d 740, 751 (E.D. Pa. 2008), *aff'd*, 625 F.3d 97 (3d Cir.

2010); *Nova Design Techs., Ltd. v. Walters*, No. 10-7618, 2011 WL 5084566, at *6 (E.D. Pa.

Oct. 25, 2011); *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1356 (Fed. Cir.

1998).  Additionally, the statute's nationwide venue and service provisions apply only to ***foreign***

***corporations*** operating in the United States.  *Howard Hess Dental Labs. Inc. v. Dentsply Int'l,*

*Inc.*, 516 F. Supp. 2d 324, 337-38 (D. Del. 2007), *aff'd*, 602 F.3d 237 (3d Cir. 2010).  GMR is a

domestic LLC.

     An alternative venue, the Central District of California, is a much more convenient forum

to adjudicate this case:

- GMR is headquartered in Los Angeles, California; California clearly has personal jurisdiction over GMR.
- GMR conducted virtually every phone conference with RMLC from California.
- The only substantive in-person meeting between GMR and RMLC, where proposals were exchanged, occurred at GMR's headquarters in Los Angeles, California.
- GMR's employees are located in California.
- GMR's documents and other evidence are located in California.
- Key fact witnesses, including GMR songwriters, publishers, and industry experts, reside in California.
- RMLC has twice the number of member radio stations in California than it does in Pennsylvania.
- Litigation in California requires travel by only one of the parties, and therefore would be less expensive.

Because GMR is located in California and many of the facts giving rise to this action occurred in California, all of the public and private factors relevant to the determination of venue favor transfer.

Plaintiff's choice of forum is entitled to no weight here because RMLC is not a Pennsylvania resident.  As this Court emphatically has stated, "deference is not given to Plaintiff's choice of forum" where "the Eastern District of Pennsylvania is neither Plaintiff's home district nor the district in which the operative facts of the action occurred."  *Ramsey v. Devereux Found.*, Civ. A. No. 16-299, 2016 WL 3959075, at *5 (E.D. Pa. July 22, 2016) (Jones II, J.).  Pennsylvania has no "local interest" in adjudicating this dispute.

3.     ***RMLC's Complaint Fails to State a Claim (Rule 12(b)(6)).***  RMLC's conclusory allegations are just that: legal conclusions, divorced from industry reality and unsupported by antitrust law.  More importantly, the *facts* RMLC alleges demonstrate an increase in competition, not any cognizable competitive harm.

An innovator such as GMR entering a legacy market makes that market more competitive, not less.  This is especially true for a small newcomer like GMR.  A PRO that represents fewer than 100 songwriters can hardly be said to monopolize an industry dominated for nearly a century by three other PROs with 1,000,000-plus songwriters among them.  And no matter what fee GMR chooses to seek for its writers, it certainly cannot (and has not) "forced" a sophisticated broker like RMLC, which represents nearly all of the thousands of U.S. terrestrial radio stations, to accept contractual terms.  Because RMLC's allegations describe GMR as behaving pro-competitively at all times, the Complaint does not plausibly allege a violation of the antitrust laws.

RMLC's antitrust claims also fail because they rely on a fanciful and implausible market definition.  GMR has agreements with seventy-three writers.  Not 73,000 or even 7,300.  Seventy-three.  Those writers have copyrighted approximately 20,000 compositions—or roughly 0.125% of the 22 million-plus copyrighted compositions in existence today.  That does not describe a monopolist.  By RMLC's logic, every PRO, every music publisher, and indeed, ***each and every songwriter*** who has ever produced a "unique" composition is a "monopolist" in his or her own right.  However popular GMR's songs may be, radio stations obviously can exist without GMR's catalog because they can access 22 million other compositions.  The premise that one who controls copyrights over a sliver of popular compositions is necessarily a monopolist is contrary to law, logic, and sound economics.

The relief sought by RMLC is extraordinary, contrary to law, and underscores the vacuous nature of the Complaint itself.  RMLC asks the Court to impose industry-wide regulation where Congress has prescribed none.  Specifically, RMLC asks this Court to subject GMR to judicial rate regulation because GMR is a "monopolist," and because ASCAP and BMI, who are much larger than GMR, agreed to similar conditions in consent decrees dating back to the 1940s.  RMLC glosses over both ASCAP's and BMI's size and their anticompetitive conduct that bears no semblance to anything GMR even is alleged to have done.  In the 1940s, ASCAP and BMI controlled nearly 100% of the copyrighted compositions in existence.  That enormous market power, coupled with ASCAP's and BMI's marketplace conduct, established an antitrust violation.

GMR plainly does not fit that paradigm.  GMR controls less than 1% of musical compositions available for public performance in the United States, and has no history of

anticompetitive conduct whatsoever.  There is nothing in RMLC's Complaint from which the Court could conceivably infer an antitrust violation.

RMLC essentially says, "GMR may be new and small, but they are powerful," and they demand a "premium" for their works.  This is true—but it proves GMR's point, not RMLC's. GMR's writers are talented.  Their talent, ingenuity, creativity, and popularity are precisely why these composers and GMR can fairly seek a premium from stations performing their works.  This only increases competition and innovation.  Writers who know they can get a higher advance and increased rates from GMR (as opposed to other PROs) are incentivized to write and market better songs.  Subjecting GMR to RMLC's proposed regulatory scheme, by contrast, would restrict copyright owners' ability to license their works in a free market and in the manner they choose, thereby limiting competition and reducing economic incentives for artistic innovation.

Of course some radio stations may not want to pay for GMR's premium content.  That is their choice and nobody is forcing them to do so.  They can simply opt not to license GMR's works and perform, instead, any of the 22 million other works administered by other PROs. Radio stations who do choose to license GMR's works may be able to attract different listeners and advertisers.  These are the kinds of choices that are made every day in free markets.

In the end, RMLC asks this Court to rewrite the Copyright Act, where Congress refused to do so.  Certain provisions of that law—such as the mechanical license provision—require that a copyright owner license his or her work for mechanical reproduction (*i.e.*, creating records) at a set statutory rate once the author has enjoyed the first opportunity to reproduce and distribute the work.  After the first right to reproduce a song, the owner may not deny a license and may not charge a higher price for it.  But Congress expressly declined to impose a compulsory license and statutory rate for public performances of compositions.  Congress chose to do just the

opposite:  the Copyright Act grants owners of compositions the right to license performances for

whatever fee the market bears.  This is precisely what GMR's writers have done.  To call that an

antitrust monopoly is an assault on free market principles and a transparent request that this

Court effectively amend the Copyright Act.  RMLC may not use the Sherman Act to force GMR

to license its works through a judicially imposed rate-regulation scheme whenever RMLC

considers its price negotiations unsuccessful.

This Court should dismiss the Complaint in its entirety.  In the alternative, the Court

should transfer this litigation to a more appropriate and convenient venue:  the Central District of

California, where GMR and its witnesses reside.

## II.      FACTUAL BACKGROUND

### A.      Three PROs Reign Over the Music Rights Industry

For more than seventy-five years, only three PROs operated in the United States:

ASCAP, BMI, and SESAC.  ASCAP and BMI, by far the largest, are responsible for licensing an

overwhelming majority of musical works played on the radio.  (*See* Compl. ¶¶ 2, 29.)  ASCAP

represents approximately 600,000 affiliates and lists over 10 million songs in its repertory.  (*Id*. ¶

29.)  BMI represents approximately 750,000 affiliates and boasts a repertory of 12 million songs.

(*Id.*)  A third PRO, SESAC, represents 30,000 affiliates with a repertory of roughly 400,000

songs.  *See Radio Music License Comm., Inc. v. SESAC, Inc.*, Civ. A. No. 12-cv-5807, 2013 WL

12114098, at *3 (E.D. Pa. Dec. 23, 2013).

Decades ago, when ASCAP and BMI first entered the marketplace, they collectively

controlled virtually every copyrighted composition in the United States, making them the *de*

*facto* gatekeepers for all copyrighted music.  *See Broadcast Music, Inc. v. CBS, Inc*., 441 U.S. 1,

5-6 (1979).  The Department of Justice ("DOJ") alleged that ASCAP and BMI violated the

Sherman Act, pointing to their extraordinary market shares and a history of extreme price

increases—in the case of ASCAP, a 446% increase between 1931 and 1939.  (Compl. ¶ 32); *see*

Stasha Loeza, Out of Tune: How Public Performance Rights Are Failing to Hit the Right Notes,

31 Berkeley Tech. L.J. 725, 733 (2016).  The resulting consent decrees—which ASCAP and BMI voluntarily entered into—imposed restrictions that were designed to neutralize the effects that such gigantic PROs could have on competition.  Among other things, the decrees require ASCAP and BMI to offer non-blanket licenses, refrain from exclusively contracting with writers, and submit to a "rate court" procedure for settling rate disputes with broadcasters.  (Compl. ¶ 50); *CBS*, 441 U.S. at 11-12.  The decrees do not mandate any particular rates, nor do they speak to whether any particular rates are competitive.  At no point has the DOJ sought to extend the consent decrees' terms to any PRO other than ASCAP and BMI.[1]  (*See* Compl. ¶ 33.)  RMLC does not (and could not) allege that the DOJ has ever pursued an action against SESAC.

SESAC has since agreed to certain restrictions in its negotiations with terrestrial radio via a private settlement with RMLC.  (Compl. ¶ 50.)  Of course, this settlement does not govern the conduct of any PRO besides SESAC.

### B.    Global Music Rights Shakes Up the PRO Industry

The first new entrant to the PRO industry in more than seven decades, GMR is a limited liability company organized under the laws of Delaware with its sole office in Los Angeles, California.  (January 20, 2017 Declaration of Randy Grimmett ("Grimmett Decl.") ¶ 3.)[2]  GMR represents a small number of music rights holders in the licensing of their public performance rights under copyright laws.  (*Id.* ¶ 5.)  GMR was founded in 2013, and today has seventeen employees, fifteen of whom work out of GMR's Los Angeles headquarters.  (*Id.* ¶ 3)  GMR is owned by (i) Azoff MSG Entertainment LLC, a Delaware limited liability company with its sole

---

[1] Indeed, decades ago, the Supreme Court recognized that PROs—including the blanket licenses they offer—have pro-competitive benefits.  *See CBS*, 441 U.S. at 22-23.  The Copyright Act itself "provides explicit recognition to these organizations by including the following definition" of PROs: "A 'performing rights society' is an association, corporation, or other entity that licenses the public performance of nondramatic musical works on behalf of copyright owners of such works, such as the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), and SESAC, Inc.," 2 *Nimmer on Copyright*, § 8.19 (2016) (citing 17 U.S.C. § 101).

[2] The scope of the Court's review on a motion to dismiss for lack of personal jurisdiction is not limited to the face of the complaint, but may include affidavits or other competent evidence submitted by the parties.  *Patterson v. FBI*, 893 F.2d 595, 603-04 (3d Cir. 1990).

place of business in Los Angeles; (ii) Randy Grimmett, a resident of Los Angeles; and (iii) a few of GMR's founding songwriters, none of whom has a primary residence in Pennsylvania.  (*Id.* ¶ 4.)

GMR is unlike any other PRO.  It maintains a repertory of less than 100 writers and roughly 20,000 songs.  (Compl. ¶ 45.)  Standing in the shadow of the more than 22 million songs in the collective repertories of the other three PROs, GMR represents a small fraction of the performing rights in musical works.  GMR licenses rights to songs reflecting no more than 5% to 7.5% of radio airplay, as RMLC admits.  (*Id.* ¶ 53.)  Still, GMR's repertory includes premium content that consumers, and hence radio stations, find highly desirable.  GMR has attracted many talented songwriters formerly affiliated with ASCAP or BMI by offering them very attractive economic and non-economic terms not previously available.  (*Id.* ¶¶ 4, 52.)  Nonetheless, the vast majority of writers have remained with their longstanding PRO partners, and three years after its inception, GMR is still tiny compared to its counterparts.  (*See id.* ¶ 45.)

### C.     RMLC Abandons Negotiations with GMR

RMLC describes itself as a trade association that "represents the interests of the commercial radio industry."   (*Id.* ¶ 50.)  That is an understatement.  RMLC is the designated negotiating arm for virtually all of terrestrial radio, acting for and on behalf of over 10,000 commercial radio stations.  (*Id.*)  RMLC's objective is to use aggregated market power to achieve artificially lower rates.  Its "overwhelming objective is to keep license fees for the commercial radio industry as low as [it] can possibly keep them."  *Radio Music License Comm., Inc. v. SESAC, Inc.*, Case No. 2:12-cv-05807-CDJ(LASx) (E.D. Pa.) Dkt. 53 (Dec. 9, 2013 Tr. of Hearing on RMLC's Motion for Preliminary Injunction), at 24:9-11.[3]  RMLC does not just

---

[3]  The transcript of this Court's prior evidentiary hearing regarding RMLC's motion for a preliminary injunction in *RMLC v. SESAC*, Case No. 2:12-cv-05807-CDJ(LASx) (E.D. Pa.) is a proper subject of judicial notice.  Courts in this circuit routinely take judicial notice of transcripts of judicial hearings.  *See, e.g.*, *Jacobs v. Bayha*, Civ. A. No. 07-237, 2011 WL 1044638, at *6 (W.D. Pa. Mar. 18, 2011) (taking judicial notice of transcripts of plaintiff's prior trial and noting, "[e]ven when adjudicating a motion to dismiss for failure to state a claim, courts are permitted to take judicial notice of matters of public record, prior judicial opinions, and official court records.") (citing *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009)); *In re Stoney*

negotiate on behalf of its members. It files lawsuits as a means to compel PROs to accept license fees at RMLC-approved rates. For example, RMLC has periodically coordinated "rate court" litigation against ASCAP and BMI under the consent decrees. *See, e.g.*, *In re Application of the Cromwell Group, Inc.*, Case No. 1:10-cv-5210-DLC (MHDx) (S.D.N.Y.). Likewise, when radio stations were dissatisfied with the progress of their license fee negotiations with SESAC, RMLC organized and sued SESAC in this Court. *See Radio Music License Comm., Inc. v. SESAC, Inc.*, Case No. 2:12-cv-5807-CDJ-LAS (E.D. Pa.).

Soon after its founding, GMR reached out to RMLC as the negotiating arm for the terrestrial radio industry. (Grimmett Decl. ¶ 10.) GMR began negotiations with RMLC towards a license agreement that could apply to RMLC's thousands of radio station members. (Compl. ¶ 51.) This gave RMLC significant bargaining power over GMR, a newcomer PRO that offered licenses to only a single-digit percentage of radio airplay. (*Id.* ¶ 53.) GMR never met with representatives of RMLC in Pennsylvania. (Grimmett Decl. ¶¶ 10-11.) The lone substantive meeting where license proposals were exchanged occurred in Los Angeles at GMR's headquarters. (*Id.* ¶ 11.)

RMLC insisted that any license include terms such as a compulsory license and rate-setting arbitration. (*Id.* ¶ 13.) This is not acceptable to GMR. GMR then had no choice but to negotiate directly with individual RMLC members. (*Id.*) Very few members would even have a conversation with GMR, saying instead that they would follow what RMLC prescribed. Indeed, before RMLC brought this lawsuit, GMR successfully concluded a license agreement with only one RMLC member, iHeartMedia, Inc. ("iHeartMedia"), which is not a Pennsylvania company and does not have a principal place of business in Pennsylvania. (*Id.*)[4]

---

*Creek Technologies, LLC*, 364 B.R. 882, 883 n.2 (Bankr. E.D. Pa. 2007) (taking judicial notice of the record of a hearing in a prior matter in which parties "actively participated" "for purposes of understanding the background of the matter before [the court]").

[4] Shortly after this lawsuit was filed, GMR concluded an agreement with another RMLC member company, TownSquare; TownSquare is not a Pennsylvania company.

GMR tried again to negotiate with RMLC, all while its members continued to use GMR's repertory to compete with one another. But, when GMR refused to capitulate to RMLC's terms, RMLC abandoned negotiations with GMR and filed this action, along with a 200-page Motion for Preliminary Injunction, just before Thanksgiving 2016. RMLC did not perfect service until twelve days later, when RMLC personally served GMR's agents in California and Delaware with papers on November 30, 2016.[5]  (*Id.* ¶ 15.)

## III.    PENNSYLVANIA LACKS PERSONAL JURISDICTION OVER GMR

### A.    No General Personal Jurisdiction: GMR Does Not Have the Required Minimum Contacts with Pennsylvania

General personal jurisdiction requires " 'continuous and systematic' contacts with the forum." *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001). General jurisdiction over a corporation is appropriate only where it is incorporated or where its principal place of business is located, *i.e.*, where "the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).

RMLC alleges no facts that would constitute such "continuous and systematic contact." Nor could it. GMR is a Delaware LLC, whose principal place of business is in California. (Grimmett Decl. ¶ 3.) GMR has no employees who reside or work in Pennsylvania, and it does not conduct business in Pennsylvania. (*Id.*) Thus, GMR cannot be "fairly regarded as at home" in Pennsylvania, and Pennsylvania does not have general jurisdiction over GMR.

---

[5] RMLC has since withdrawn its Motion for a Preliminary Injunction. Dkt. 38. Shortly after RMLC initiated this lawsuit, GMR offered to license its repertory to RMLC's members on an interim basis. (Grimmett Decl. ¶ 16.) While RMLC initially rejected this offer, shortly before the holidays, at the request of Magistrate Judge Sitarski, RMLC reengaged in negotiations with GMR regarding an interim license. RMLC ultimately co-drafted and approved an interim license agreement GMR has since offered to RMLC members, with terms substantially similar to GMR's initial interim offer and, in exchange, RMLC would withdraw its Motion for a Preliminary Injunction. (*Id.* ¶¶ 16-18.)

**B.     No Specific Personal Jurisdiction: GMR Does Not Have the Required Minimum Contacts with Pennsylvania**

Specific personal jurisdiction is appropriate only if the plaintiff's "cause of action arises from the defendant's forum related activities, such that the defendant should reasonably anticipate being haled into court there." *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 151 (3d Cir. 1996) (citations omitted).  Specific jurisdiction is established where:  (1) the defendant has purposely directed his activities at the forum state; (2) the plaintiff's claim arises out of and relates to at least one of those specific activities; ***and*** (3) the exercise of jurisdiction comports with fair play and substantial justice.  *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007).  None of the three necessary elements is met in this case.

**1.     GMR Has Not "Purposefully Directed" Its Activities to Pennsylvania**

RMLC's claim is based on GMR's negotiation with RMLC, a Tennessee corporation with its principal place of business in Tennessee.  (*See* Compl. ¶ 20.)  Neither these negotiations, nor any other specific conduct RMLC alleges, occurred in Pennsylvania.  (Grimmett Decl. ¶¶ 11-13.)  RMLC's only jurisdictional allegation is that GMR interacts with third parties who ***themselves*** conduct business in Pennsylvania.  Such indirect and attenuated "contacts" are inadequate to support personal jurisdiction.

As an initial matter, RMLC's allegation that GMR "enter[ed] into licensing agreements with radio stations located in this district" is factually inaccurate.  Before this litigation, GMR had entered into only one license agreement with a member of RMLC, iHeartMedia.[6]  But iHeartMedia is not a Pennsylvania company.  (*Id*. ¶ 7.)  The most RMLC can assert is that GMR entered into a license with a foreign (non-Pennsylvania) company that, itself, operates a single radio station in Pennsylvania.

---

[6] Pursuant to the interim license agreement the parties negotiated at the request of Magistrate Judge Sitarski, GMR has now entered into temporary interim license agreements with a handful of additional RMLC member stations.

The Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (*or third parties*) and the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014).  The "unilateral activity of another party or a third person"—such as the activities of RMLC or iHeartMedia in Pennsylvania—"is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984).  This is because "due process requires that a defendant be haled into court in a forum State based on *his own affiliation with the State*, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State."  *Walden*, 134 S. Ct. at 1123 (emphasis added) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

Applying this principle, courts uniformly hold that the act of licensing intellectual property rights to a company that conducts business in a forum state is insufficient to establish personal jurisdiction over the licensor.  *See Red Wing Shoe*, 148 F.3d, at 1362; *see, e.g., Black v. JP Morgan Chase & Co*., Civ. A. No. 10-848, 2011 WL 4102802, at *49 & n.55 (W.D. Pa. Aug. 10, 2011) (no personal jurisdiction where defendant's "only 'product' was its intellectual property," which it licensed to other companies that operated in a forum state).  That rule is especially appropriate where, as here, the company to which the defendant licensed the right is not a resident of the forum state.  *Red Wing Shoe Co.*, 148 F.3d at 1361.  For example, in *Farina v. Nokia*, 578 F. Supp. 2d 740 (E.D. Pa. 2008), *aff'd*, 625 F.3d 97 (3d Cir. 2010), this Court granted Cellular One Group's ("COG") motion dismiss for lack of jurisdiction.  *Id.* at 751-52.  COG was a Delaware general partnership in the business of licensing "Cellular One" and related trademarks to others.  Plaintiffs in *Farina* filed a class action lawsuit alleging various cellphone manufacturers, wireless service providers, and COG conspired to market cell phones while suppressing knowledge of adverse biological effects resulting from their use.  *Id.* at 745.  Trying to manufacture personal jurisdiction in Pennsylvania against COG, Plaintiffs argued that twenty-nine "Cellular One" retail locations were using COG's trademark in Pennsylvania.  The Court

14

rejected this argument and dismissed the case against COG, explaining that "[a] licensor of a mark cannot be subject to personal jurisdiction in a state solely because its licensee is located in that state." *Id.* at 751. Similarly, in *Nova Design Techs., Ltd. v. Walters*, this Court granted codefendant RIC's motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), because RIC's decision to license its trademark to another company that operated in Pennsylvania "c[ould] not of itself give rise to a finding of minimum contacts." 2011 WL 5084566, at *7.[7]

RMLC also relies on conclusory and unsupported allegations that GMR "directed communications into this district" to "offer[] its licenses for sale to radio stations within this district" and to "inform[] stations of the risk of infringing works in its repertory." (*See* Compl. ¶¶ 16-17.) This does not support jurisdiction for at least two reasons. First, as the Third Circuit has held, an intellectual property holder does not "conduct business" in a given forum or avail itself of that forum's laws simply by notifying a business in that forum that the business is infringing on the holder's intellectual property rights. *See, e.g., IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 260 n.3 (3d Cir. 1998) (holding that letters were insufficient to create personal jurisdiction even where defendant knew letters would enter into the forum); *Gehling v. St. George's Sch. of Med., Ltd.*, 773 F.2d 539, 544 (3d Cir. 1985) (same).

Second, before the filing of this lawsuit, GMR did not direct communications to companies in Pennsylvania that offered licenses or threatened infringement litigation. (Grimmett

---

[7] Courts outside the Third Circuit have also found that licensing intellectual property to a licensee in the forum state does not create personal jurisdiction over the licensor. *See, e.g.*, *Paramount Pictures Corp. v. Nissim Corp.*, Nos. 2:14-cv-04624-ODW(ASx), 2014 WL 5528455, at *6-7 (C.D. Cal. Nov. 3, 2014) (defendant's non-exclusive patent licenses to companies in the forum state were inadequate to establish personal jurisdiction); *Gurglepot, Inc. v. New Schreve, Crump & Low LLC*, No. C13-6029-RBL, 2014 WL 2744283, at *5 (W.D. Wash. June 17, 2014) (no personal jurisdiction because defendant's trademark license to an in-state licensee was non-exclusive); *Lake Assocs., LLC v. DNZ Prods. LLC*, 886 F. Supp. 2d 1203, 1209 (D. Or. 2012) ("contracts between an out-of-state defendant and third-parties located or doing business in the forum state do not confer personal jurisdiction"); *Head USA, Inc. v. Sorensen*, No. 3:06-cv-983 (MRK), 2006 WL 3703646, at *4-5 (D. Conn. Dec. 13, 2006) (no personal jurisdiction, because defendant's non-exclusive patent license to a licensee in the forum state granted defendant no control over the licensee's sale or marketing activities, and contemplated no ongoing relationship beyond royalty payments); *Meyers & Sons Corp. v. Clipps, Inc.*, No. 00 CIV. 7191(HB), 2001 WL 125586, at *2 (S.D.N.Y. Feb. 13, 2001) (same).

Decl. ¶ 20.)  GMR's licensing negotiations and communications were primarily with RMLC and its executive committee.  They were not with any individual owners in Pennsylvania.  (*Id.* ¶¶ 10-13, 19-20.)  Before the filing of RMLC's suit, GMR had not directed communications offering licenses to any Pennsylvania radio stations.  (*Id.* ¶¶ 14, 20.)[8]

> 2.   **RMLC's Claims Neither Arise Out of Nor Relate to Any GMR Contact with Pennsylvania**

None of the licensing negotiations and business activities RMLC complains of were conducted in Pennsylvania.  GMR negotiated with Tennessee-based RMLC outside of Pennsylvania.  Before this litigation was filed, GMR had concluded only one direct license deal with a member of RMLC, and that member is not based in Pennsylvania.  RMLC is not asserting any claim that arises out of a GMR contact with Pennsylvania.

Unable to establish a meaningful connection between GMR and this State, RMLC attempts to invent an expansive new standard for personal jurisdiction based on GMR's allegedly "engag[ing] in a campaign of monopolization that has affected or will affect a nationwide market for the sale of copyrighted musical works in GMR's repertory, which market includes this district."  (*See* Compl. ¶ 14.)  That is not the law.  The Third Circuit has "never" permitted personal jurisdiction based on anticompetitive conduct directed at the nation as a whole.  *See Howard Hess*, 516 F. Supp. 2d at 337-38.[9]

---

[8] Since then, GMR sent email communications to a large group of radio stations to inform them of the interim license agreement the parties had negotiated.  (Grimmett Decl. ¶ 19.)  RMLC has agreed these settlement-type letters cannot serve as the basis for asserting jurisdiction.

[9] *See also Goldlawr, Inc. v. Heiman*, 369 U.S. 463 (1962) (noting that, in an antitrust action under the Sherman Act and the Clayton Act, the Eastern District of Pennsylvania lacked personal jurisdiction—i.e., personal jurisdiction was not available on a nationwide basis); *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 846 F. Supp. 374 (E.D. Pa. 1994) (dismissing an antitrust case involving national accreditation of law schools for lack of personal jurisdiction).

3.      **Exercising Jurisdiction Would Be Unfair and Result in Substantial Injustice**

GMR could not have "reasonably anticipate[d] being haled into" a court in Pennsylvania when it negotiated a licensing agreement *outside* Pennsylvania with a *Tennessee* corporation. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  And any argument that GMR should have reasonably foreseen that an agreement negotiated with RMLC would impact Pennsylvania radio stations is irrelevant.  " '[F]oreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *Id.* at 295.  In any event, because any foreseeable effect on Pennsylvania stems from RMLC's—not GMR's—contact with Pennsylvania, exercise of jurisdiction on this basis would violate due process and result in substantial injustice to GMR. *Walden*, 134 S. Ct at 1122.

C.      **The Clayton Act Does Not Confer Personal Jurisdiction over a Domestic Non-Corporate Entity**

The Third Circuit has held that 15 U.S.C. § 22 does confer nationwide personal jurisdiction over one class of entity—foreign (non-U.S.) "corporations"—based on their contacts with the United States as a whole.  *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 296 (3d Cir. 2004).  But that rationale—and, in turn, 15 U.S.C. § 22—does not apply here: GMR is neither a corporation nor a foreign company.

RMLC mistakenly alleges that "GMR is a for-profit corporation."  (Compl. ¶ 21.)  It is not.  GMR is a limited liability company.  (*See* January 20, 2017 Declaration of David Marroso ("Marroso Decl."), Ex. A.)  As court after court has held, 15 U.S.C. § 22 does not apply to actions against non-corporations like GMR.  *See Orange Theatre Corp. v. Rayherstz Amusement Corp.*, 139 F.2d 871, 875 (3d Cir. 1944) (15 U.S.C. § 22, "which also authorizes [nationwide] service applies only to suits against corporations"); *Mass. Sch. of Law*, 846 F. Supp. at 380 n.8 (15 U.S.C. § 22 "applies only to corporate, not individual, antitrust defendants"); *World Skating*

*Fed. v. Int'l Skating Union*, 357 F. Supp. 2d 661, 664 (S.D.N.Y. 2005) ("it is clear that [15 U.S.C. § 22] is directed only to corporations and that it does not apply to other entities that simply share common attributes with corporations").

Other sections of the Clayton Act make clear that Congress specifically intended the service and venue provisions to apply only to "corporations." For example, the Clayton Act defines "persons" to include "corporations *and* associations." 15 U.S.C. § 12 (emphasis added). Because LLCs are considered "associations," *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 350 (3d Cir. 2013), Congress could have easily extended the reach of 15 U.S.C. § 22 to encompass other forms of business associations, such as LLCs, by using the broader term "persons" instead of "corporations." Yet section 22 specifically refers to "corporations." 15 U.S.C. § 22. This difference indicates that Congress intentionally limited the venue and service provisions of the Clayton Act to corporations. *See McManus v. Tato*, 184 F. Supp. 958, 959 (S.D.N.Y. 1959) (noting that 15 U.S.C. § 22's specific language "necessarily excludes individuals and voluntary associations from those amenable to extraterritorial service").

Not only is 15 U.S.C. § 22's reach limited to corporations, but it creates nationwide jurisdiction only for *foreign* corporations, not domestic ones. *See Howard Hess*, 516 F. Supp. 2d at 337-38. Neither *Automotive Refinishing* nor any of the authorities on which the Third Circuit relied in that case held that personal jurisdiction under 15 U.S.C. § 22 could attach to domestic defendants. *See id.* (citing *Auto. Refinishing*, 358 F.3d at 298-99). Indeed, finding personal jurisdiction over a U.S. defendant based on nationwide contact with the United States as a whole would nullify the traditional minimum contacts requirement under due process, and would run counter to the holding of *Automotive Refinishing* itself. *See Auto. Refinishing*, 358 F.3d at 299 ("[P]ersonal jurisdiction under Section 12 of the Clayton Act is as broad as the limits of due

process under the Fifth Amendment.") (citations omitted); *Howard Hess*, 516 F. Supp. 2d at 337-38 ("Insofar as the Third Circuit has never applied a 'national contacts' test for establishing personal jurisdiction over a domestic antitrust defendant, the court declines to extend the holding of *Automotive Refinishing* in a manner that would counterindicate traditional long-arm jurisprudence with respect to such defendants.").

The Complaint fails to allege facts sufficient to support the requisite minimum contacts between GMR and Pennsylvania. The Clayton Act does not create nationwide personal jurisdiction over domestic non-corporations like GMR. Thus, this action should be dismissed for lack of personal jurisdiction.

## IV.     VENUE IS NOT PROPER IN THIS DISTRICT

### A.     Venue Is Improper Because No Event Giving Rise to RMLC's Claims Occurred in This District and GMR Is Not Subject to This Court's Personal Jurisdiction

A civil action may be brought in "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ; or (3) . . . any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391(b). For purposes of venue, an "entity . . . shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction . . . ." *Id.* § 1391(c)(2).

GMR is not subject to personal jurisdiction in Pennsylvania because it does not "reside" in this District. Thus, 28 U.S.C. § 1391(b)(1) does not apply in this case. For the same reason, 28 U.S.C. § 1391(b)(3) is also inapplicable. No events—let alone a "substantial part of the events"—giving rise to RMLC's claims occurred in this District. RMLC also does not allege that anything material happened in Pennsylvania, such as business meetings or signing of

documents.  (*See* Compl. ¶ 19.)  Thus, 28 U.S.C § 1391(b)(2) also does not apply, and venue is improper in this District under 28 U.S.C. § 1391(b).

> **B.      Venue Is Improper Because GMR Is Neither a "Corporation" Nor a Foreign Entity**

Title 15, U.S.C. § 22 states, in relevant part:  "Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business . . . ."  As discussed above, 15 U.S.C. § 22 is not applicable to non-corporations.  And even if it did apply to limited liability companies, the statute does not create a nationwide venue for domestic companies.  *See Howard Hess*, 516 F. Supp. 2d at 337-38.  Rather, 15 U.S.C. § 22 creates venue in any judicial district in which a corporation is an inhabitant or any district in which "it may be found or transacts business."  GMR—a Delaware LLC with an office in California and no employees in Pennsylvania—is not "found" and does not "transact business" in Pennsylvania.

Because venue is not proper in this District, the Court should dismiss RMLC's Complaint pursuant to Rule 12(b)(3).  *See Taylor & Francis Grp., PLC v. McCue*, 145 F. Supp. 2d 627, 629-31 (E.D. Pa. 2001) (dismissing complaint for improper venue).

## V.      THE COMPLAINT FAILS TO STATE A CLAIM BECAUSE RMLC HAS NOT PLAUSIBLY ALLEGED HARM TO COMPETITION[10]

Harm to competition is the centerpiece of an antitrust claim.  An antitrust complaint cannot escape dismissal without plausible allegations of competitive harm.  Even where a private plaintiff plausibly alleges harm to competition, there is no claim unless the plaintiff's injury stems from the competitive harm.  *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328,

---

[10] RMLC cites this Court's denial of SESAC's motion to dismiss monopolization claims that RMLC brought against SESAC.  (*See* Compl. ¶ 38.)  Setting aside the numerous differences between GMR and SESAC, SESAC's motion did not address antitrust injury and advanced only limited arguments regarding harm to competition.

334, 344 (1990).  These two requirements—harm to competition and injury to the plaintiff deriving therefrom—are collectively referred to as "antitrust injury," which is a "necessary precursor" to standing in antitrust cases and a threshold issue to be established at the outset of litigation.  *See McCullough v. Zimmer, Inc.*, 382 F. App'x 225, 230 (3d Cir. 2010).  Put simply, "[i]f antitrust injury is not found, further inquiry is unnecessary."  *Id.*  This requirement is designed to screen out antitrust claims that seek to protect particular ***market participants***, rather than competition—and to do so at the earliest stage of a litigation.  *See Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996).  RMLC makes precisely such a claim:  it complains that radio stations cannot get the exact terms they want in licensing negotiations with GMR.

This does not satisfy the antitrust injury element every antitrust plaintiff must plausibly allege.  As discussed below, (a) GMR's unwillingness to abide by consent decrees that bind ***other, very different*** market participants does not harm competition; (b) higher prices (even if RMLC had plausibly alleged them) do not, in and of themselves, harm competition; (c) competing aggressively for premium inputs—which is what GMR has done, and what radio stations should do in a free market—does not harm competition; (d) GMR's alleged conduct has not foreclosed potential competitors; (e) GMR's alleged conduct has caused no harm to consumers; and (f) GMR's alleged conduct is procompetitive.

### A.   The ASCAP and BMI Consent Decrees Are Not a Competitive Baseline from Which to Measure Harm to Competition

A fundamental flaw in the Complaint is RMLC's attempt to lump GMR together with industry giants ASCAP and BMI.  RMLC claims the fact "that unregulated PROs, like GMR, violate the antitrust laws has been established for 75 years."  (Compl. ¶ 2.)  That legal conclusion is flat wrong, and the ***factual*** allegations in RMLC's Complaint prove it.  At base, RMLC alleges that GMR does things that legacy PROs have agreed not to do, and that for this reason alone,

GMR harms competition. (*See, e.g.*, Compl. ¶ 59 (alleging GMR "refuse[s] to negotiate terms that would comply with core protections in the antitrust consent decrees and antitrust settlement"); *id.* ¶ 87 ("GMR's cartel pricing weakens any existing benefits of the ASCAP/BMI/SESAC paradigm").) For example, RMLC seeks to enjoin GMR from employing certain competitive tools, such as exclusive writer contracts, that ASCAP and BMI promised the DOJ they would not employ. RMLC conveniently ignores the key facts underlying the ASCAP and BMI consent decrees, which govern PROs *exponentially* larger than GMR and with histories of marketplace behavior unlike anything GMR is alleged to have done. These unique circumstances—none of which RMLC has alleged (or could allege) are present with GMR—led to restrictions on legacy PROs' conduct. But the decrees do not somehow transform all PRO conduct into per se illegal or anticompetitive behavior. The consent decrees are not laws or regulations. They are not even industry guidelines. (*See id.* ¶¶ 32, 33.) In fact, SESAC, a PRO with 30,000 affiliates and 400,000 compositions, has operated for 80 years without being subject to any DOJ consent decree.

Instead, RMLC asks this Court to take the extraordinary step of *imposing* compulsory licensing and judicial rate regulation via a private antitrust suit. That RMLC *wants* this is unsurprising. Its members have benefitted handsomely by dealing with two PROs restricted by consent decrees. They do not want to compete to do business with the first new PRO in seventy-four years. But RMLC's desire to avoid competition does not justify forcing GMR to be bound by decades-old agreements that derive from marketplace conduct wholly unlike GMR's, by PROs with market shares nowhere near GMR's. Nor would subjecting GMR to these third-party agreements prevent or correct any harm to competition.

**B.      Higher License Fees Do Not Constitute Harm to Competition**

RMLC alleges that GMR has demanded "stations pay rate multiples higher than they would pay if ASCAP, BMI, or SESAC licensed the exact same number and quality of works." (Compl. ¶ 53.)  Even if those stations were to pay such prices, and RMLC could somehow establish that GMR's pricing was by some indeterminate measure excessive, "imposition of a high price is not, in and of itself, an anticompetitive act."  *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 252 (D.C. Cir. 1987); *see, e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895 (2007) (holding that antitrust law does not prohibit charging high prices).  Here, for example, quality differences can readily explain differences in pricing.  As any shopper knows, "[g]enerally you must pay more for higher quality," *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995), and "a firm's comparatively high price may simply reflect a superior product."  *Harrison Aire, Inc. v. Aerostart Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005).  RMLC admits as much, alleging that GMR has an "indispensable repertory of 'must-have' musical works"—"essential works stations must be able to play to stay competitive."  (Compl. ¶¶ 4, 81.)  These allegations themselves explain higher pricing and say nothing about the existence of anticompetitive conduct.[11]

The Complaint also suggests that because ASCAP and BMI license fees are approved in rate-court proceedings under the DOJ consent decrees, any higher prices are necessarily

---

[11] The Complaint alleges that the amount GMR demands is higher than stations would pay other PROs "for the same number and quality" of works.  (Compl. ¶ 53).  But the Complaint does not provide any support for this conclusory allegation.  While RMLC alleges GMR songs reflect a 5-7.5% "weighted percentage of total plays," it does not allege how this percentage accounts for quality differences in various PROs' works and licenses.  (*Id.*)  Using number of plays alone to measure the value a PRO's repertory generates for a radio station is not only illogical, it is contrary to RMLC's entire theory of recovery, which relies on a change in value proposition when multiple licenses are aggregated, such that a PRO with 5-7.5% of the market somehow supposedly has market power.

23

supracompetitive.  Not so.  It is precisely because of the consent decrees and the compulsory scheme that ASCAP's and BMI's prices cannot be used as benchmarks for free market pricing. Unlike ASCAP and BMI, GMR is not required to license any of its works to anyone.  In contrast, the decrees impose rate regulation because the DOJ believed that ASCAP and BMI had and would continue to abuse their market power.  The fees that result from a regulated process are not market rates, and GMR's allegedly higher prices cannot be deemed "supracompetitive."

### C.  GMR's Alleged Challenged Conduct Stimulates Competition, Increases Efficiency, and Supports Innovation

RMLC alleges that GMR has reduced competition by entering into "*de facto* exclusive licenses*" with songwriters and publishers.  (Compl. ¶ 7.)  That conclusion is doubly wrong.  As an initial matter, all PROs prohibit their writers from signing with another PRO.[12]  GMR is not unique or advantaged in this manner.  More importantly, GMR's allegedly "exclusive licenses," which also prevent the writers from directly licensing their works for performance, are not anticompetitive.  To the contrary, it is "well established that competition among businesses to serve as an exclusive supplier should actually be *encouraged*." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010); *Paddock Publ'ns, Inc. v. Chi. Trib. Co.*, 103 F.3d 42, 45 (7th Cir. 1996) ("Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common.").  As RMLC alleges, GMR paid creators of premium content consideration to enter into an exclusive contract.  Paying to secure premium inputs helps GMR compete with its PRO rivals, resulting in "the benefits of exclusivity and rivalry simultaneously." *Paddock Publ'ns*, 103 F.3d at 47.  Further, competing for premium inputs stimulates competition among the PROs and

---

[12] In their consent decrees, ASCAP and BMI agreed that any writer whose works they represent can directly license his or her works for performance.  But an ASCAP writer cannot sign with another PRO, like BMI, SESAC, or GMR. In other words, their agreements are PRO-exclusive.

promotes artistic innovation. *Id.* at 45.  Writers are encouraged to write more catchy songs if they can make more money from a PRO like GMR.

RMLC alleges absolutely no facts suggesting that GMR's contracts harm competition.  In order for exclusive contracts to be anti-competitive, they must preclude entry in the marketplace. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 335 (1961) (exclusive dealing arrangements do not violate antitrust law "unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected"); *Barr Laboratories, Inc. v. Abbott Laboratories*, 978 F.2d 98, 110-11 (3d Cir. 1992) (legality of exclusive dealing arrangements depends on "whether the competition foreclosed constitutes a substantial share of the relevant market"); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 996 n.1 (9th Cir. 2010) (exclusive dealing arrangements may violate the Sherman Act only when they actually foreclose competition). Moreover, exclusive contracts affecting 5-7.5% of the songs on the radio cannot materially prevent entry or expansion into the performance rights marketplace.  Nor does RMLC allege restrictions on any new entrant PRO's ability to compete with GMR for such exclusive arrangements after the current agreements expire.  *See Race Tires Am., Inc.*, 614 F.3d at 84 (rejecting challenge to the exclusive contracts for which other market participants "had the clear opportunity to compete").  Indeed, as a new entrant, GMR competed with legacy PROs for the business of its writers.  This is competition, not anticompetitive.

RMLC acknowledges that only a minuscule percentage of writers actually left BMI and ASCAP to affiliate with GMR, exclusively or otherwise.  The Complaint alleges that GMR "lured" away from ASCAP and BMI only "100 songwriters" (Compl. ¶¶ 4, 45), while 600,000 writers remain with ASCAP, and 750,000 writers remain with BMI (*Id.* ¶ 29).  Competition thus

has not been foreclosed; the legacy PROs "had the clear opportunity to compete and did compete, sometimes successfully," for writer contracts.  *Race Tires Am., Inc.*, 614 F.3d at 84. That legacy PROs chose, when they signed their consent decrees, not to seek ***exclusive*** contracts with writers does not negate their demonstrated ability to compete.  Indeed, the vast majority of writers continue to affiliate with ASCAP and BMI, not GMR, which speaks to the legacy PROs' continuing ability to compete for writer contracts.[13]  Exclusive contracts won under such circumstances are still the type encouraged by the antitrust laws, and they do not support antitrust injury.  *See id.*; *CAE Inc. v. Gulfstream Aerospace Corp.*, Civ. A. No. 15-924-LPS, 2016 WL 4497057, at *5 (D. Del. Aug. 26, 2016) (exclusive agreement did not support an antitrust injury because exclusive agreements are "generally permissible," especially "where the exclusive provider is chosen through a competitive process").

The Third Circuit reached a similar conclusion in *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139 (3d Cir. 1981), a case analogous to the facts RMLC alleges here.  Fleer, a bubblegum manufacturer, alleged that its competitor, Topps, had engaged in "an assiduous program of obtaining exclusive license agreements with every major and minor league baseball player" to use their images and information on baseball cards that accompanied chewing gum. *Id.* at 149.  These exclusive agreements lasted five years, with staggered termination dates.  *Id.* The court held that this "accumulation of exclusive licenses" did not foreclose competition, because Fleer and other potential competitors remained free to "compete with Topps for minor league players or even persuade the present major league players not to renew their Topps' contracts."  *Id.* at 150, 154.  In reaching this conclusion, the Third Circuit acknowledged that

---

[13] It is telling that RMLC, not ASCAP or BMI, is suing GMR.  If RMLC's theory of competitive harm were correct, ASCAP and BMI would be the market participants more directly injured by GMR's alleged conduct.

Fleer could not compete with Topps for baseball player contracts immediately or without restriction.  But the court attributed this to preexisting market conditions and structures:  "That such a program of head to head competition might take six or seven years to bear fruit does not make Topps' agreements anti-competitive; it is simply a function of modern-day baseball."  *Id.* at 150.  Topps exploited the existing market structure to gain a competitive advantage and "managed to obtain license agreements with all major league players," but that "[did] not make the aggregation of these contracts an unlawful combination in restraint of trade."  *Id.* at 149-50 (*citing Lawlor v. National Screen Service Corp.*, 270 F.2d 146 (3d Cir. 1959).[14]

So too here.  Both existing PROs and new entrant PROs are free to persuade writer affiliates not to renew their agreements with GMR, and also to compete for new writers, just as Topps' competitors could compete for contracts with ball players.  These PROs may not be able to do so immediately, or in any way they prefer, but this is a function of the "modern-day" market at issue, "not an indictment of" GMR's alleged exclusive licensing.  *See Fleer*, 658 F.2d at 150.  Even if GMR's exclusive contracts allegedly "exploit" this market structure (Compl. ¶¶ 4, 46, 47), that is insufficient under *Fleer* to establish competitive harm.

Although exclusive contracts may, under different circumstances, contribute to competitive harm, RMLC has not (and could not) allege the kind of coercion or other improper conduct needed to support such a theory.  *See Race Tires America*, 614 F.3d at 77 (noting that unlawful exclusive dealing cases typically involve evidence of coercion).  RMLC does not allege that the exclusive contracts at issue create or were the result of coercion, or that they otherwise involved fraud or deception.  Offering the highest licensing fees to writers "is no more an act of coercion, collusion, or improper interference . . . than it is . . . to offer the lowest."  *Id.* at 79.

---

[14] The court also rejected the argument that Topps' aggregation of exclusive licenses, when combined with other behavior, was anticompetitive.  *Id.* at 150-51.

GMR wooed writers from their longstanding PRO homes with a more attractive offering, not coercion.  (*See* Compl. ¶¶ 52, 45.)  RMLC alleges nothing to suggest that those writers were not "free to pick the [PRO] that [they] believe[d] will provide the best deal."  *Race Tires America*, 614 F.3d at 79.  Nor does RMLC allege collusion among the writers to enter into agreements with GMR.  *Cf. Paddock Publ'ns*, 103 F.3d at 44-45.  GMR obtained its exclusive contracts through "a competitive process that was open to" all potential competitors.  *Gulfstream Aerospace*, 2016 WL 4497057 at *6.[15]

> **D.    RMLC Does Not Plausibly Allege That GMR Has Foreclosed Potential Competitors**

RMLC offers the self-serving conclusion that GMR's conduct has "foreclosed potential competitors (including its own affiliates) from licensing copyrighted works."  (Compl. ¶ 101.)  RMLC fantasizes that, absent GMR's challenged conduct, GMR-affiliated writers would suddenly begin competing with one another by offering direct deals to RMLC or its member stations, thereby driving down license prices.  (*Id.* ¶ 84.)  Those allegations are implausible, since there is no allegation that, either before or after GMR came into existence, GMR-affiliated writers (or any other writers) have *ever* directly licensed their works to radio stations.  Nor does RMLC allege facts suggesting writers would be inclined do so for the first time, absent GMR's entry into the marketplace or any of its alleged conduct.  Indeed, the Complaint alleges the *opposite*:  that before GMR existed, these writers negotiated with radio through ASCAP or BMI.

---

[15] Nor is the "Hobson's choice" that RMLC alleges coercive.  RMLC claims its member stations are forced to either pay the licensing fees GMR offered in negotiations or risk being sued by GMR for copyright infringement, because they cannot avoid infringing on GMR artists' works. (Compl. ¶¶ 102, 108.)  There are no facts alleged to support a conclusion that an inadvertent performance of a single work has resulted in or will result in this supposed onslaught of copyright infringement litigation.

(*See id.* ¶ 45.)  The logical "but-for world," absent some factual allegation suggesting otherwise, is that current GMR writers would still be negotiating through one of the legacy PROs.

### E.  RMLC Does Not Plausibly Allege Consumer Harm

RMLC alleges that GMR's conduct harms or will harm competition by "restrict[ing] consumer choice" as to the variety of music that radio stations can license and the forms of licenses available to radio stations.  But RMLC does not (and cannot) allege that GMR has refused to license any works to RMLC stations.  (Compl. ¶¶ 101-02.)  Instead, it alleges that GMR has declined to license its works to RMLC stations **on the terms RMLC would prefer**. Likewise, RMLC does not (and cannot) allege that GMR is the only source of premium content on the radio, or even most of it.  If RMLC member stations choose not to contract with GMR, they still have their pick of more than 22 million songs from the ASCAP, BMI, and SESAC repertories.  Radio stations are not deprived of any choice—they just do not like their options. And to the extent radio stations choose not to license GMR writers' works, it is **radio stations**— not GMR—who are choosing to limit the content they broadcast.  While RMLC offers the conclusory allegation that listener access to GMR artists' works has been impeded, it alleges no **facts** to suggest that other broadcasters, such as satellite or digital radio, have been unable to license GMR artists' works and make them available to the public.

The Complaint offers nothing plausibly to suggest GMR's conduct harms the radio-listening public in any other way.  Paying higher prices for higher quality products does not alone constitute consumer harm.  *See supra*, Section V.B.  And any cost savings RMLC seeks for its members would not render radio more affordable for listeners, who already listen for free. Instead, listeners would be **worse** off, since the relief RMLC seeks would prevent GMR from compensating its writers commensurate with the value of their works and would lessen economic incentives for writers to innovate, resulting in a less robust pool of music.  *See*, *Data General*

*Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1186-87 (1st Cir. 1994) ("in passing the Copyright Act, Congress itself made an empirical assumption that allowing copyright holders to collect license fees and exclude others from using their works creates a system of incentives that promotes consumer welfare in the long term by encouraging investment in the creation of desirable artistic and functional works of expression").  The Seventh Circuit reached a similar conclusion in reviewing an antitrust challenge to exclusive agreements between newspapers and their respective content providers, holding that "a market in which the creators of intellectual property . . . [can] not decide how best to market it for maximum profit would be a market with less (or less interesting) intellectual property created in the first place."  *Paddock Publ'ns*, 103 F.3d at 454.

### F.    RMLC's Alleged "Injury" Stems from the Competition-Enhancing Aspects of GMR's Conduct

Finally, RMLC's Complaint turns the antitrust laws on their head, alleging it will suffer harm because an ***additional*** competitor has entered the marketplace.[16]  RMLC is complaining about an ***increase*** in competition.  To establish antitrust injury, however, a plaintiff must plausibly allege it has suffered injury as a result of a "competition-***reducing*** aspect or effect of the defendant's behavior."  *Atl. Richfield*, 495 U.S. at 344 (emphasis added).  If a plaintiff is harmed by ***increased competition*** flowing from the challenged conduct, there is no antitrust injury and no antitrust claim.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 484-85 (1977).  In *Brunswick*, for example, the plaintiffs alleged that the defendant's acquisition of several smaller bowling alleys saved those alleys from defaulting.  *Id.* at 479-80.  Under their

---

[16] Indeed, in its Motion for a Preliminary Injunction, Dkt. No. 3, RMLC claims GMR should not exist.  (*See* Mot. at 20 ("GMR, as a new PRO in a field that already includes three incumbents, has no pro-consumer justification for its existence.").)  And the relief it seeks neutralizes any competitive effect GMR might have on other PROs, the effective equivalent of GMR ceasing to exist.  (*See, e.g.*, Compl. at 46-47.)

theory of injury, the plaintiffs asserted that they would have been able to charge higher prices if the defendants had not saved the defaulting alleys, since there would have been fewer competitors and less price competition, but for the acquisition.  *Id.* at 481.  The Supreme Court concluded that this did not constitute antitrust injury because it "did not occur 'by reason of' that which made the acquisitions unlawful."  *Id.* at 488 (quoting 15 U.S.C. § 4).

So too with RMLC's claimed injury.  This is reflected in its prayer for relief, which asks this Court to prohibit GMR from competing vigorously with behemoth PROs like ASCAP and BMI for writers.  Such relief is "designed to provide [RMLC stations] with the profits they would have realized, had competition been ***reduced***," not enhanced.  *Brunswick*, 429 U.S. at 488 (emphasis added).  That is, RMLC seeks the profits and opportunities it believes it would have enjoyed, were GMR's competition-enhancing effects on other PROs neutralized.  Thus, "[at] base [RMLC] complain[s] that. . .[the challenged conduct] ***preserved*** competition, thereby depriving [the RMLC stations], of the benefits of increased ***concentration***."  *Id.* at 488 (emphasis added).  Such losses resulting from increased competition cannot constitute antitrust injury.

## VI.   THE COMPLAINT FAILS TO STATE A CLAIM BECAUSE RMLC DOES NOT ADEQUATELY ALLEGE MARKET POWER

RMLC's inability plausibly to plead antitrust injury is fatal to its claims, but they suffer from yet another major flaw as well:  the lack of any plausible allegation that GMR exercises market power, an essential element of any monopolization or attempted monopolization claim.  *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 433-38 (3d Cir. 2016);  *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512-13 (3d Cir. 1994).

Market power can be demonstrated either directly or indirectly.  *Mylan*, 838 F.3d at 434-38.  The direct method requires "direct evidence of supracompetitive prices and restricted output," and must include "an analysis of the defendant's costs, showing both that the defendant

had an 'abnormally high price-cost margin' and that the defendant 'restricted output.'"  *Id.* at 434

(quoting *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) and *Geneva*

*Pharm. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 500 (2d Cir. 2004)).  The indirect method

requires "structural evidence of a monopolized market."  *Id.* at 435 (quoting *Harrison Aire, Inc.*,

423 F.3d at 381).  Specifically, the plaintiff must plead and prove that defendants have a

cognizably high share of a properly defined relevant market, in which there are barriers to entry.

*Id.*; *Broadcom*, 501 F.3d at 307 & n.3.

### A.    RMLC Fails to Allege Direct Evidence of Market Power

RMLC purports to allege that supracompetitive pricing provides direct evidence of

GMR's market power, but fails to plead any ***actual prices***.  This defect is critical, since market

power is the ability to "control prices" without forfeiting market share.  *Harrison Aire*, 423 F.3d

at 380 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)); *see*

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107-08 (2d Cir. 2002) ("The more competition a

company faces, the less it can control prices because competitors will undercut its prices to

secure market share.").  Here, RMLC has not alleged that GMR controls market prices, much

less that it could profitably do so.

RMLC's supposed "direct evidence" of market power consists only of ***licensing offers***

that GMR allegedly made in the course of unsuccessful negotiations.  (*See* Compl. ¶ 81 ("GMR's

demands during negotiations with RMLC are direct evidence of its monopoly power.").)  RMLC

claims that GMR "demands rates many multiples higher than stations would pay if any of the

other PROs attempted to license the same quantity and quality of songs," and further that GMR

"demanded yearly rate increases" in the course of bargaining with RMLC.  (*Id.* ¶¶ 81–82.)

Market power cannot be inferred from price demands that were rejected.  Market power means

customers have no choice but to accede to the demand.  Even the lowliest of competitors can

"demand[] rates many multiples higher" than its rivals—but that does not make it a monopolist. (Compl. ¶ 81.)  As the Third Circuit has recognized, negotiating to "get the best deal possible" amounts to "no more than conduct[ing] [one's] business as every rational enterprise does." *Travelers Ins. Co. v. Blue Cross of W. Pa.*, 481 F.2d 80, 84 (3d Cir. 1973).  Mere "statement[s] of bargaining terms" and similar "bargaining ploys" cannot give rise to an antitrust violation. *Am. Mfrs. Mut. Ins. Co. v. Am. Broadcasting—Paramount Theatres, Inc.*, 446 F.2d 1131, 1137 (2d Cir. 1971); *see also Nat'l Cable Television Ass'n v. BMI*, 772 F. Supp. 614, 643 (D.D.C. 1991) ("[T]hat BMI *sought* certain fee levels does not make it an antitrust violator.  An asking price is a bargaining position.").

This points to a critical distinction between GMR's alleged conduct and RMLC's litigation against SESAC.  There, RMLC alleged that "SESAC ha[d] raised prices from 8% to 20% each year since 2009."  *Radio Music License Comm., Inc. v. SESAC, Inc.*, 29 F. Supp. 3d 487, 500 (E.D. Pa. 2014) (Jones II, J.).  In ruling on SESAC's motion to dismiss, this Court held that RMLC's claims about SESAC's *actual price increases* "directly allege[d] monopoly power," thus satisfying RMLC's pleading burden.  *Id.*  Here, RMLC has not alleged—and cannot allege—that GMR actually charged supracompetitive prices or price increases, or even that RMLC incurred any GMR license fees (supracompetitive or otherwise) before filing suit.  The direct evidence of market power on which this Court's analysis hinged in the *SESAC* case is totally lacking here.

Even if "demands" for higher prices *were* equivalent to charging higher prices, RMLC's allegations would still fall short.  RMLC merely alleges—in conclusory fashion, without any factual support—that GMR sought "rates many multiples higher" than what stations would pay other PROs for "the same quantity and quality of songs."  (Compl. ¶ 81.)  However, in light of

RMLC's dubious claim that GMR and other PROs do not even compete in the same market, there is no reason to believe that GMR's prices **should be** correlated with those of rival PROs. (*Id.* ¶¶ 72-74.)  Even more problematically, RMLC does not—and could not— allege any facts whatsoever concerning GMR's costs or price-cost margin, or the restriction of output, that might directly establish market power under Third Circuit law.  *Mylan*, 838 F.3d at 434.

At bottom, RMLC alleges only that GMR asked for license fees in excess of what RMLC **wanted to pay**, and asking is not direct evidence of market power.

### B.      RMLC Does Not Allege Indirect Evidence of Market Power

Indirect evidence of market power starts with a "definition of the relevant market."  *Id.* at 435 (quoting *Broadcom*, 501 F.3d at 307).  "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).

RMLC here fails to define a relevant market in terms of reasonable interchangeability or cross-elasticity of demand and, as indicated, RMLC fails to allege facts demonstrating high entry barriers.

### 1.      RMLC's Market Is Implausibly Narrow

#### a.      *Licenses to "Unique" Copyrighted Works May Be Reasonably Interchangeable*

RMLC alleges an implausibly narrow relevant market, consisting solely of "licenses to copyrighted musical compositions and performances in GMR's repertory."  (Compl. ¶ 72.) "Courts routinely reject Sherman Act claims at the motion to dismiss stage where such claims

involve single-brand or single-manufacturer product markets." *Satnam Distribs., LLC v. Commonwealth-Altadis, Inc.*, 140 F. Supp. 3d 405, 419 (E.D. Pa. 2015). RMLC pleads no facts and furnishes no reason why its market definition should not likewise be rejected.

RMLC's market definition hinges on the allegation that "licenses sold by ASCAP, BMI, and SESAC are not reasonably interchangeable with those that GMR sells"—and therefore do not compete in the same market with GMR—because GMR's repertory comprises a "unique set of copyrighted musical works." (Compl. ¶¶ 72-73.) But every copyrighted song is by definition "unique" or it would not be eligible for a copyright. *See CBS, Inc. v. ASCAP*, 400 F. Supp. 737, 771 (S.D.N.Y. 1975), *rev'd on other grounds by* 562 F.2d 130 (2d. Cir. 1977) ("[E]very copyrighted composition is philosophically or aesthetically 'unique' and its uniqueness is dignified by copyright"). It is meaningless to allege, as RMLC does, that because "GMR controls 100% of the performance rights" for a "critical number" of works, a radio station with "licenses from ASCAP, BMI, **and** SESAC . . . still would not have the right to play the GMR exclusive works." (Compl. ¶ 73.) The same could be said if GMR had just one copyrighted song in its repertory, so long as RMLC stations subjectively considered that song to be "critical." RMLC's approach would make a PRO with a single "unique" song a market unto itself, because no two "unique" songs would ever be deemed reasonably interchangeable.

"Merely asserting that a commodity is in some way unique is insufficient to plead a relevant market." *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 171 (S.D.N.Y. 1995). The Supreme Court has ruled out anything approaching literal equivalence as a standard for identifying product markets. *See E.I. du Pont de Nemours*, 351 U.S. at 394 ("[I]llegal monopoly does not exist merely because the product said to be monopolized differs from others. If it were not so, only physically identical products would be a part of the

market.").  Coke and Pepsi are not each monopolists because their colas have unique flavors and

most cola consumers have a preference for one beverage or the other.  *See id.* at 393 ("[T]his

power that, let us say, automobile or soft-drink manufactures have over their trademarked

products is not the power that makes an illegal monopoly.").  The correct standard is ***reasonable***

interchangeability, which requires only that "one product [be] roughly equivalent to another for

the use to which it is put."  *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 206 (3d Cir. 1994).

Because of this, the "natural monopoly [a company] owns over its own product" cannot,

by itself, constitute a relevant market for purposes of antitrust liability.  *TV Commc'ns Network,*

*Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992).  In the *TV*

*Communications* case, the Tenth Circuit held that the relevant market could not be limited to the

TNT cable channel, *id.*—even though TNT presumably offered a  "unique" package of

copyrighted programs, such that consumers with access to ESPN, HBO, and the History Channel

"still would not have the right to [view TNT's] exclusive works."  (Compl. ¶ 73.)

Courts consistently have rejected the argument that particular copyrighted works—or

bundles of copyrighted works—can be so "unique" as to constitute their own relevant market.[17]

---

[17] *See, e.g.*, *Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227, 1234 n.6
(C.D. Cal. 2013) ("Even though there might not be an identical game on the market, the Court is
not convinced that there are no market substitutes for [World of Warcraft]."); *Whitehurst v.*
*Showtime Networks, Inc.*, Civ. A. No. 1:08-CV-47, 2009 WL 3052663, at *11 (E.D. Tex. Sept.
22, 2009) ("The Plaintiff has cited no authority supporting his proposition that the single film at
issue creates a relevant market sufficient to state a claim for monopolization."); *Flash Elecs., Inc.*
*v. Universal Music & Video Distrib. Corp.*, 312 F. Supp. 2d 379, 391-92 (E.D.N.Y. 2004) (where
plaintiff argued that a "single movie" or "single supplier's movies" could constitute a market, on
the ground that "each movie is a unique product [and] has no adequate substitute," court held
that "[t]his is exactly the sort of argument courts have routinely rejected in the past") (collecting
cases); *Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 264-65 (S.D.N.Y. 2000) (market could
not be limited to "licensing the Makeup Designs and other *Cats*-related intellectual property");
*Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705
(S.D.N.Y. 1997) (Sotomayor, J.) (NBC could not constitute a market unto itself just because
consumers might prefer "Friends," "Seinfeld," and "E.R." to the shows on other networks);

The Supreme Court, Third Circuit, and other authorities similarly hold that market power may

not be presumed from the presence of intellectual property.[18]  These principles led the court in

*Mediacom Communications Corp. v. Sinclair Broadcast Group, Inc.*, 460 F. Supp. 2d 1012 (S.D.

Iowa 2006), to reject allegations that were virtually identical to those made by RMLC.

Mediacom, a cable television system owner, sued Sinclair, a television broadcaster, after

negotiations for rights to retransmit to Sinclair's television stations fell through.  *Id.* at 1015-17.

Mediacom alleged that Sinclair derived market power from its "exclusive hold" on thirteen

stations that carried "popular network programming [that was] considered essential by

Mediacom subscribers."  *Id.* at 1026.  Mediacom further asserted that the retransmission rights

for each of the thirteen stations constituted a separate market, on the ground that "much of the

network programming" on each station was "so unique and 'must see' that there [was] no

substitute product."  *Id.* at 1027.  The court rejected this market definition as implausible,

holding that market power could not be premised on the "uniqueness" of the copyrighted

material that appeared on each of the thirteen stations.  *Id.* at 1027-28.

 The same goes for RMLC, which, like Mediacom, alleges that GMR possesses

"exclusive rights" to a "unique set of copyrighted musical works" that consumers consider "must

have."  (Compl. ¶¶ 71-74); *see Mediacom*, 460 F. Supp. 2d at 1026-27.  The works in GMR's

repertory are by definition "unique," and they may very well be "must have," but that does ***not***

---

*Theatre Party Assocs., Inc. v. Shubert Org., Inc.*, 695 F. Supp. 150, 154-55 (S.D.N.Y. 1988)
(rejecting market definition that was limited to tickets to the early run of a particular Broadway
show, nothing that "other forms of entertainment, namely other Broadway shows, the opera,
ballet or even sporting events" could be "adequate  substitute products").

[18] *See Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 44-46 (2006) (rejecting "the
'patent equals market power' presumption"); *Lexmark Int'l, Inc. v. Impression Prods., Inc.*, 816
F.3d 721, 753 (Fed. Cir. 2016) (*Illinois Tool Works* overturned "antitrust presumption that patent
(and copyright) owners have market power"); *Town Sound & Custom Tops, Inc. v. Chrysler
Motors Corp.*, 959 F.2d 468, 480 n.15 (3d Cir. 1992) ("modern courts and commentators reject
[the] position" that trademarks "creat[e] presumptions of market power").

mean the repertory is a market unto itself.  *Mediacom*, 460 F. Supp. 2d at 1027-28.

By RMLC's logic, *every* songwriter would be a monopolist under the Sherman Act—an absurd proposition.[19]  For example, Smokey Robinson could be said to have a "unique set of copyrighted musical works," for which he controls "100% of the public performance rights." (Compl. ¶¶ 72-73.)  Many radio stations consider Mr. Robinson's "prominent" works to be "must have" and "indispensable."  (*Id.* ¶¶ 4, 66, 71, 76.)  Since "many stations [allegedly] do not have total control over the songs they play," then without a license to Mr. Robinson's works, they "may risk infringement from the inadvertent broadcast of music in [his] repertory."  (*Id.* ¶ 81.)  Assuming Mr. Robinson did not affiliate with a PRO, then "[e]ven if a radio station were to obtain licenses from ASCAP, BMI, **and** SESAC"—and from GMR, for that matter—"it still would not have the right to play [Mr. Robinson's] exclusive works."  (*Id.* ¶ 73.)  While another writer might write fantastic songs of her own, a license to that writer's songs "would not be a substitute for a [Robinson] license, in any event, because [that writer] would by definition have a different repertory of works."  (*Id.* ¶ 76.)  The Court should reject this market definition.

To the extent RMLC's market definition relies on the aggregation of intellectual property rights, its position produces the same perverse results.  Every copyrighted song is unique, and any writer who has written more than one song could be characterized as a copyright "aggregator."  Moreover, any PRO that obtained rights to more than one "must have" composition—say, for example, all of Drake's and Taylor Swift's works—would present the exact same situation that RMLC complains of.  Although a radio station with licenses from

---

[19] *Cf. Smith v. Network Solutions, Inc.*, 135 F. Supp. 2d 1159, 1169 (N.D. Ala. 2001) (granting summary judgment for defendants where "[p]laintiff's argument implie[d] that each individual domain name is a relevant market unto itself for antitrust purposes, subjecting the entity 'controlling' the name at a particular time, be it a registrar or even a legitimate registrant, to a charge of monopolization.").

SESAC, ASCAP, BMI, and GMR could choose from **over 22 million** compositions, it still would not be able to play any songs written by Drake or Ms. Swift.  Under RMLC's logic, this lack of perfect substitution would render the repertory of this new two-songwriter PRO a discrete, but minuscule, relevant market.  (*See* Compl. ¶¶ 73-74.)  And minuscule markets are "too unreliable a basis for a finding of monopoly power."  *Lockheed Martin Corp. v. Boeing Co.*, 390 F. Supp. 2d 1073, 1080 (M.D. Fla. 2005) (citing *United States v. Baker Hughes Inc.*, 908 F.2d 981, 986 (D.C. Cir. 1990)).

RMLC itself seems to recognize the incoherence of its proposed market definition, implicitly conceding that GMR's "unique" works are interchangeable with songs under the control of other PROs.  RMLC alleges that "even if a hypothetical new PRO entrant could induce some GMR affiliates to defect at the end of their contracts," GMR could maintain its supposed market power by simply "replac[ing] lost affiliates with new members that it lures away from other PROs."  (Compl. ¶ 76.)  In other words, RMLC would apparently have this Court believe that GMR's songs are so "unique" that the 22 million songs in ASCAP's and BMI's repertories cannot substitute for them, but not sufficiently "unique" to preclude GMR from swapping in new, unnamed songwriters to make up for departed affiliates.  Such internal contradiction and incoherence warrant dismissal.  *See Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, No. 13 C 1129, 2013 WL 4599903, at *4 (N.D. Ill. Aug. 29, 2013) (dismissing antitrust claims where allegations in plaintiff's complaint "contradict[ed] its narrow market definition").

> b.   *Licenses to "Essential" Copyrighted Works May Be Reasonably Interchangeable*

RMLC further alleges that licenses to the larger PROs' repertories are no substitute for a GMR license because GMR's repertory includes many "essential" works.  (Compl. ¶¶ 72, 74.)  These conclusory allegations appear to be based on two premises, both of which are flawed.

*First*, RMLC claims that GMR's works are essential because consumers demand them. For example, RMLC alleges that "stations must be able to play [GMR's 'must-have' works] to stay competitive." (*Id.* ¶¶ 4, 81.) But the fact that "there might be some degree of preference" for certain songs in GMR's repertory does not render them a separate market. *Allen-Myland*, 33 F.3d at 206. To the extent GMR has "spent time and energy differentiating [its] creation from the panoply of products in the market," that does not alter the fact that GMR competes with all other PROs. *Global Discount*, 960 F. Supp. at 705.

*Second*, RMLC claims that GMR's works are essential because stations cannot avoid playing them. Specifically, RMLC states that GMR "does not provide radio stations with any reliable, transparent . . . way to determine" the works in its repertory—a plainly inaccurate allegation, as RMLC as publicly admitted[20]—and "does not identify which of its works it controls 100%, and which it licenses only fractionally." (Compl. ¶ 46.) According to RMLC, this makes it "effectively impossible for radio stations to avoid the risk of copyright infringement claims absent taking a license from GMR." (*Id.*)

Even if the Court accepts that radio stations have no choice but to purchase a license from GMR, that still would not justify RMLC's proposed single-brand market. In *Satnam*

---

[20] On November 21, 2016, RMLC posted to its website a communication to radio stations (dated November 23, 2016), stating that GMR had provided a "spreadsheet including information about GMR's repertory" to RMLC "earlier this year." (Marroso Decl., Ex. B.) On November 22, 2016, RMLC posted a new version of the communication that omitted the reference to GMR having provided any spreadsheet earlier in the year. (Marroso Decl., Ex. C.) The Court may consider these documents in ruling on GMR's motion to dismiss because they show that the allegations in RMLC's complaint are "demonstrably false." *See, e.g.*, *Vavro v. Albers*, Case No. 2:05-cv-0321, 2006 WL 2547350, at *3 n.8 (W.D. Pa. Aug. 31, 2006) (considering documents submitted by defendants in support of motion to dismiss and noting "the Court is not required to accept as true a factual allegation that is clearly not true"); *White v. B.A.C. Home Loans Servicing, L.P.*, Case No. 4:10-cv-2137-CAS, 2011 WL 1483919, at *6 (E.D. Mo. Apr. 19, 2011) (considering evidence submitted by defendants which demonstrated that plaintiff's allegations were "simply inaccurate").

*Distributors v. Commonwealth-Altadis*, the court rejected this same argument.  The plaintiff there alleged that the relevant market was limited to "the distribution of CA's mass-market cigars."  *Satnam*, 140 F. Supp. 3d at 416 n.10.  "Plaintiff support[ed] this market definition by alleging that there are no substitutable products for any manufacturer's brands, including CA's, because convenience stores and wholesalers who purchase from distributors must carry ***all*** major brands of mass market cigars to satisfy end-user demand."  *Id.* at 419.  In dismissing the complaint, the court held that even if retailers had no choice but to "buy the ***full line*** of all manufacturers' mass market cigar brands," the market would "consist[] of every brand produced by every major manufacturer, rather than any subset thereof."  *Id.* at 420.  In other words, "where it is recognized as necessary in an industry to carry a full line of products," the relevant market consists of the "full line" of those products.  *Id.*; *see also*, *JBL Enters., Inc. v. Jhirmack Enters., Inc.*, 698 F.2d 1011, 1017 (9th Cir. 1983) (where "[t]he industry generally considers it necessary to carry a full line" of products, the relevant market consists of the full line; holding that relevant market was "full line of beauty products," rather than merely shampoos and conditioners).

   The same outcome follows here.  RMLC alleges that the relevant consumers (radio stations) cannot pick and choose between multiple suppliers (PROs), but rather must purchase from ***all*** of them.  (*See* Compl. ¶ 73.)  Likewise, RMLC alleges that the necessity of purchasing from each supplier means that no PRO license can substitute for any other.  (*See id.*)  RMLC's Sherman Act claim fails for the reason stated in *Satnam*:  namely, the relevant market necessarily includes every license from every PRO, "rather than any subset thereof."  140 F. Supp. 3d at 420.

   c.   *Licenses to Different PROs' Repertories Are Reasonably
         Interchangeable by Radio Stations for the Same Purpose*

   RMLC repeatedly characterizes GMR's works as "unique" and "essential," but apart from these superlatives, pleads no ***facts*** showing that licenses to other PROs' repertories could

41

not reasonably substitute for a license to GMR's repertory. The operative question is whether the various PROs' licenses are "reasonably interchangeable by consumers *for the same purpose*." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513 (3d Cir. 1998) (emphasis added). The indisputable answer is *yes*.

RMLC alleges that radio stations "use a vast array of musical works," and that to gain access to them, they typically obtain performance licenses from PROs rather than directly from songwriters. (Compl. ¶¶ 23-24.) As RMLC concedes, all of the PROs offer licenses, and radio stations use those licenses for the *exact same purpose*—to publicly perform the "vast array of musical works" in the PROs' repertories. (*Id.* ¶¶ 23-25.) By RMLC's own allegations, the PROs' licenses are reasonably interchangeable by radio stations for the same purpose.

The fact that the PROs do not offer licenses to *identical* compositions does not mean that their licenses do not serve the "same purpose" or are not "reasonably interchangeable." In *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81 (S.D.N.Y. 2015), the court held that an alleged market for "commercial licensing of NFL-related stock photographs" was implausible, since it excluded such alternatives as licenses to other "sports-related photographs." *Id.* at 111-13. Just as consumers obtain licenses to professional football photos for the "same purpose" as they do professional hockey or basketball photos—despite the fact that the respective sets of photos are not only "unique," but depict entirely different sports—radio stations obtain licenses to GMR's repertory for the "same purpose" as they do ASCAP's, BMI's, or SESAC's repertories. If licenses to NHL- and NBA-related photographs are so obviously interchangeable with licenses to NFL-related photographs as to justify dismissing a complaint under Rule 12(b)(6), *see id.*, then RMLC's attempt to limit its relevant market to a single PRO's licenses cannot withstand scrutiny.

42

Because RMLC has not plausibly alleged that GMR, ASCAP, BMI, and SESAC licenses are not reasonably interchangeable, its proposed market definition necessarily fails.

## 2.     RMLC Does Not Allege Cognizable Barriers to Entry

Defining a relevant market is a necessary but insufficient requirement for proving market power.  RMLC must also plead facts demonstrating the existence of entry barriers.  *Parker v. Viacom Int'l, Inc.*, 605 F. Supp. 2d 659, 668 (E.D. Pa. 2009).  RMLC alleges two: "GMR's exclusive contracts and GMR's ability to share part of its monopoly profits with its cartel affiliates."  (Compl. ¶ 80.)  Neither of these supposed "barriers" passes muster.

First, GMR's alleged "*de facto* exclusive contracts with its members" are not a cognizable entry barrier.  (Compl. ¶ 67.)  RMLC claims that because GMR "does not offer anything other than blanket licenses to radio stations, and does not offer either per-program or carve-out licenses," "radio stations have no incentive to enter into direct licensing agreements" with GMR's members.  (*Id.*)  This misses the point.  GMR entered the market and convinced writers to join GMR after their PRO-exclusive agreements with ASCAP, BMI, and SESAC expired.  Competitors can do the same by offering a better product or service.  The only barrier to entry is the quality of the product being offered by the entrant.  Nothing GMR does or is doing stands in the way.  As this Court put it, any upstart competitor could "compete against [GMR] for subsequent contracts . . . or even persuade the present [GMR affiliates] not to renew their [GMR] contracts."  *Fleer*, 658 F.2d at 150.

Nor does GMR's alleged "ability to share part of its monopoly profits" with songwriters constitute a plausible entry barrier.  RMLC claims that because GMR pays its songwriters more—by allegedly "shar[ing] part of its monopoly profits" with them—"no other PRO can successfully lure significant numbers of GMR members away from GMR."  (Compl. ¶ 76.)  This allegation is belied by GMR's own recent entry into the PRO market and the fact that GMR

"lured" away several dozen songwriters, even before it had allegedly begun reaping monopoly profits. *See Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792-93 (2d Cir. 1987) (concluding as a matter of law that, where a new competitor had entered the market and existing competitors had expanded their operations, entry barriers were low). RMLC does not allege any facts to support the notion that other upstart PROs cannot offer terms—financial or otherwise— that rival GMR's. That those PROs might have to spend money to get there is of no instance, since even multimillion-dollar capital expenditures are not a cognizable barrier to entry. *See Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1200-01 (3d Cir. 1995) ("couple of million dollars" capital requirement did not pose barrier to entry); *see also Int'l Distrib. Ctrs.*, 812 F.2d at 792-93 ("relatively large" capital outlays not a high entry barrier). The Third Circuit has held that "the pharmaceutical drug market" does not have high entry barriers, notwithstanding the notoriously lengthy and expensive FDA approval process. *See Barr Labs., Inc.*, 978 F.2d at 113. It strains credulity to think that the alleged market here is characterized by entry barriers higher than those to the pharmaceutical industry.[21]

## VII.   AT A MINIMUM, THIS CASE SHOULD BE TRANSFERRED TO A MORE CONVENIENT FORUM

In view of RMLC's jurisdictional and pleading deficiencies, the Complaint should be dismissed outright. Should the Court decline to grant GMR's motion to dismiss, however, the action should at least be transferred to the Central District of California, where GMR is located

---

[21] RMLC also alleges that "even if a hypothetical new PRO entrant could induce some GMR affiliates to defect at the end of their contracts, the GMR cartel would remain in full effect," since GMR could simply "replace lost affiliates with new members that it lures away from other PROs." (Compl. ¶ 76.) But what RMLC is describing is the essence of competition—rivals "luring" away customers from one another, jockeying to maintain and expand their market shares. The allegation only further underscores the incoherence of RMLC's market definition. *See Satnam*, 140 F. Supp. 3d at 418 (dismissal is appropriate where plaintiffs' allegations "'make[] no economic sense'") (quoting *Theatre Party*, 695 F. Supp. at 154).

and conducts its business.

Under 28 U.S.C. § 1404(a), the Court can "transfer the venue of any civil action for the convenience of parties and witnesses or in the interests of justice, to any other district where it might have been brought." *Weber v. Basic Comfort*, 155 F. Supp. 2d 283, 284 (E.D. Pa. 2001). In evaluating motions to transfer venue, courts must first "determine whether venue would be proper in the transferee district." *Id*. If the first prong is satisfied, the court next evaluates "whether a transfer would be in the interests of justice." *Id.* (citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995)). To decide this second prong, courts weigh the following factors: (1) the convenience and preference of the parties; (2) the convenience of witnesses; (3) access to sources of proof; (4) practical considerations that make litigation easy, expeditious, or inexpensive; (5) the relative calendar congestion of the two competing districts; (6) where the events at issue took place and the interest of the respective courts in deciding local controversies; (7) the enforceability of any judgment; and (8) the familiarity of the trial judge with the applicable law. *Weber*, 155 F. Supp. 2d at 285 (citing *Jumara*, 55 F.3d at 879-80).[22]

Here, the Central District of California easily qualifies as a proper venue, and the factors for weighing a transfer strongly support litigating the case in GMR's home state.

**A.      Venue Would Be Proper in the Central District of California**

Venue is proper in any "judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). Where the defendant is an entity, it is "deemed to reside . . . in any judicial district in which such defendant

---

[22] The convenience and preferences of the parties, the convenience of the witnesses, where the claims arose, and access to sources of proof, are collectively referred to as the "private factors." *LogoPaint A/S v. 3D Sport Signs SI*, 163 F. Supp. 3d 260, 265 (E.D. Pa. 2016). Relative court congestion, practical considerations bearing on litigation, the interests of the respective courts in deciding local disputes, enforceability of judgments, and each court's familiarity with applicable law are referred to as the "public" factors. *Id.*; *see also Jumara*, 55 F.3d at 879-80.

is subject to the court's personal jurisdiction." *Id.* § 1391(c)(2).  Since GMR's principal place of business is in Los Angeles, it is subject to personal jurisdiction in the Central District of California.  (Compl. ¶ 21; Grimmett Decl. ¶ 3.)  GMR therefore "resides" in the Central District of California, and venue is proper there.  *See* 28 U.S.C. §§ 1391(b)(1), (c)(2).

### B.   Transfer to the Central District of California Would Be More Convenient and Would Best Serve the Interest of Justice

Every one of the public and private factors that courts consider under Section 1404(a) either favors transfer to the Central District of California or is neutral.

*Preferences of the Parties*.  RMLC does not allege that it has an office or any other physical presence in this District.[23]  A plaintiff's preference of forum is entitled to less deference where the plaintiff does not reside in, or has only minimal connections to, the district in which it sues.  *See e.g.*, *Ostella v. IRBSearch, LLC*, Civ. A. No. 12-7002, 2014 WL 3843880, at *4 (E.D. Pa. Aug. 5, 2014); *Weber*, 155 F. Supp. 2d at 285.  By contrast, GMR resides in and has a substantial connection to its preferred forum.  The Court should give weight to GMR's preference to litigate in its home district.

*Convenience of the Parties.*  Since *neither* party is based anywhere near Pennsylvania, litigating in this District would entail considerable inconvenience and expense.  *See Vt. Juvenile Furniture Mfg., Inc. v. Factory Direct Wholesale, Inc.*, 317 F.R.D. 16, 21 (E.D. Pa. 2016) (granting transfer where "[n]either party is located in, or even particularly near, the Eastern District of Pennsylvania").  By contrast, GMR's sole office is in the Central District of California.  *See Smith v. HireRight Solutions, Inc.*, Civ. A. No. 09-6007, 2010 WL 2270541, at *5 (E.D. Pa. June 7, 2010) (transferring to district in which defendant "maintain[ed] its principal

---

[23] RMLC's seven Executive Committee members and eighteen Committee members are located across the country, from Oregon to New York; only one of them resides in this District. (Marroso Decl., Ex. D.)

place of business," where "[d]efendant ha[d] no offices or employees in Pennsylvania").

RMLC's Executive Director resides in Tennessee, and RMLC's Committee and Executive Committee members are scattered across the country.[24]  RMLC's officers and likely witnesses would thus have to "travel by plane to either district."  *EVCO Tech. & Dev. Co. v. Precision Shooting Equip., Inc.*, 379 F. Supp. 2d 728, 731 (E.D. Pa. 2005) (transferring to defendant's home district).  Transfer to California would improve overall convenience and reduce overall costs by ensuring that only one party—rather than both—has to travel.  *See Schoonmaker v. Highmark Blue Cross Blue Shield*, Civ. A. No. 09-cv-703, 2009 WL 3540785, at *3 (E.D. Pa. Oct. 30, 2009) (transferring case where plaintiffs "would incur the costs of travel" in either district, but "defendants w[ould] benefit from a transfer of venue"); *Ricoh Co. v. Honeywell, Inc.*, 817 F. Supp. 473, 485 (D.N.J. 1993) (transferring case where trial in defendants' home forum "would require only one, rather than both, parties to [the] litigation to be inconvenienced").

The parties' relative financial resources further underscore the disproportionate burden GMR would face by litigating in this District.  RMLC has tremendous financial resources at its disposal, since it can—and does—"assess" its members to raise "the amounts required to conduct effective . . . court litigations."[25]  Because "the financial resources of [RMLC] far surpass those of [GMR]," transfer to GMR's home district is appropriate.  *Lannett Co. v. Asherman*, Civ. A. No. 13-2006, 2014 WL 716699, at *8 (E.D. Pa. Feb. 24, 2014).

***Convenience of the Witnesses.***  The convenience of the witnesses is relevant "only to the extent that the witnesses may actually be unavailable for trial in one of the fora."  *Jumara*, 55 F.3d at 879.  This factor thus asks whether ***nonparty*** witnesses are within the subpoena power of

---

[24] (*See* Marroso Decl., Ex. D; Ex. E.)

[25] (Marroso Decl., Ex. F.)

47

this Court.  *Synthes, Inc. v. Knapp*, 978 F. Supp. 2d 450, 462 (E.D. Pa. 2013).  To the extent

witnesses' live testimony would be necessary,[26] there are no witnesses with any meaningful

relevant information who reside in Pennsylvania.  Though RMLC alludes in passing to "over one

hundred RMLC member stations [that] reside in this district" (Compl. ¶ 15), there is no

indication that these radio stations bear any relevance to, or have any particular knowledge of,

the allegations at issue.

 In any event, there are more than double the number of radio stations in California than

there are in Pennsylvania.  (Grimmett Decl. ¶ 8.)  And there are numerous important nonparty

witnesses who reside in California, including: (i) numerous writers who are clients of GMR; (ii)

key publishing companies; and (iii) witnesses who have knowledge of the music industry and

percipient information about RMLC's conduct.  (*Id.* ¶ 6.)

 ***Convenient Access to Sources of Proof.***  The Central District of California provides

more convenient "access to sources of proof."  As noted, nearly all of GMR's employees are

based in Los Angeles.  (*Id.* ¶ 3.)  So are nearly all GMR documents, both physical and digital.

(*Id.* ¶ 6.)  GMR offsite data is stored in San Francisco.  (*Id.*)  This access strongly weighs in

favor of transfer to California.  *See Vt. Juvenile Furniture*, 317 F.R.D. at 21 ("access to

evidence" factor weighed "heavily in favor of transfer" where "most of the evidence and

---

[26] While a witness cannot be compelled to travel more than 100 miles, Fed. R. Civ. P. 45(b)(2) now allows nationwide issue of subpoena.  *See* Fed. R. Civ. P. 45(b)(2) and (c)(1).  Thus, to the extent any nonparty witnesses reside within 100 mile of this Court but outside the 100-mile of the transferee court, those witnesses may still be deposed under the transferee court's subpoena power, and their testimony can be used at trial in lieu of live testimony.  Fed. R. Civ. P. 32(a)(4); *see Connors v. R & S Parts & Servs., Inc.*, 248 F. Supp. 2d 394, 396 (E.D. Pa. 2003) (convenience of witnesses factor did not weigh against transfer where some non-party witnesses would be outside the subpoena power of the transferee court because "the use of a . . . videotaped deposition at trial is well-accepted and widespread.").

witnesses the plaintiff seeks access to are most likely found in the [state defendant was located]").

There is no reason to believe that the Eastern District of Pennsylvania would afford comparable—much less superior—access to sources of proof.  As RMLC admits, approximately **99%** of its members are located outside of this District.  (*See* Compl. ¶¶ 15(b), 19.)

***Practical Considerations.***  Each of the factors already discussed—travel, financial burdens, and the locations of party and nonparty witnesses and evidence—constitutes a "practical consideration" that would make litigation significantly easier, more efficient, and less expensive in California than in Pennsylvania.  *See, e.g.*, *Plotnick v. Computer Scis. Corp. Deferred Comp. Plan for Key Execs.*, Civ. No. 14-cv-303 (KM), 2015 WL 4716116, at *3 (D.N.J. Aug. 7, 2015) (practical considerations "weigh[] heavily in favor of transfer, given that the Defendants' operations are concentrated in proximity to the Eastern District of Virginia.").

In addition, the Central District of California is already the venue for another litigation between GMR and RMLC.  On December 6, 2016, GMR filed a complaint against RMLC there for violation of Section 1 of the Sherman Act and California Cartwright Act.[27]  That lawsuit is separate but does involve the same parties, and GMR would not oppose consolidation of the two matters in California.[28]  Unlike this case (which raises only federal claims), the California litigation raises claims under California state law (the Cartwright Act and Unfair Competition

---

[27] *Global Music Rights, LLC v. Radio Music License Comm., Inc. et al.*, Case No. 2:16-cv-09051-BRO-AS (filed Dec. 6, 2016) (C.D. Cal.).

[28] RMLC may argue that the case in the Central District of California should have been filed as a compulsory counterclaim in this case.  Not so.  The California litigation involves RMLC and its member stations cartel behavior driving down license prices, which does not arise from the same transaction or occurrence giving rise to this case, namely GMR's behavior and lack of market power in the music licensing marketplace.  The resolution of RMLC's claims against GMR does not resolve GMR's claims against RMLC—i.e., determining whether GMR has engaged in monopolistic activity requires a separate and independent inquiry from determining whether RMLC has engaged in monopolistic activity.

Law), and thus should be resolved in California because that court will be more familiar with issues involving state-law claims.  And if the California litigation is to be resolved by the Central District of California, judicial economy dictates that this case also be resolved by the same court.

*Court Congestion.*  Although the two districts' relative calendar congestion is "not a factor worthy of great weight," *Penda Corp. v. STK, LLC*, Nos. Civ. A. 03-5578, 03-6240, 2004 WL 2004439, at *3 (E.D. Pa. Sept. 7, 2004), it remains relevant to the transfer analysis.  The appropriate metric for congestion is ***not*** the total number of cases pending in each district, but rather "the average time from filing to disposition of cases and the average time from filing to trial."  *United States ex rel. Hollander v. MTD Prods., Inc.*, Civ. A. No. 09-5507, 2011 WL 3501749, at *3 (E.D. Pa. Aug. 9, 2011).  The Central District of California and the Eastern District of Pennsylvania are nearly identical in this regard,[29] rendering this factor neutral.

*Local Interest.*  RMLC's lawsuit is in no sense a "local controversy."  RMLC can point to no concrete connection between its purported claims and this District, and alleges no concrete factual basis that supports its conclusory allegation that GMR "directed communications" or "transacted business" here.  (Compl. ¶¶ 16-17.)  The same was true in *Cameli v. WNEP-16 The News Station*, 134 F. Supp. 2d 403 (E.D. Pa. 2001), where neither party resided within the Eastern District of Pennsylvania, and all of the alleged conduct took place in another district. *See id.* at 405-07.  The court noted that "Philadelphia's connection to this matter [was] at best tenuous," since there was "no indication that any party, witness, or other implicated person ha[d] any connection whatsoever with Philadelphia, other than perhaps working for a corporation that generally 'conducts business' here."  *Id.* at 407.

RMLC's halfhearted attempt to create the appearance of a local interest in this case only

---

[29] (Marroso Decl., Ex. G.)

further demonstrates the propriety of transfer to California.  First, RMLC alleges that Philadelphia is "the ninth largest radio market in the United States" (Compl. ¶ 15(a)), but neglects to mention that Los Angeles is the **second** biggest.[30]  Second, RMLC claims that "over one hundred RMLC member stations reside in this district."  (Compl. ¶ 15(b).)  Even more RMLC members reside in California.  (Grimmett Decl. ¶ 8.)  Finally, RMLC alleges that "one of the largest radio companies in the United States, Entercom Communications Corp., is headquartered in Bala Cynwyd in this district."  (Compl. ¶ 15(c).)  But RMLC does not allege that Entercom—a nonparty to this litigation—has any special involvement or interest in this dispute.

*Enforceability of Judgment.*  Because there is "little significant difference in enforcing a judgment in one federal forum than in another," the enforceability factor is neutral.  *E'Cal Corp. v. Office Max, Inc.*, No. Civ. A. 01-3281, 2001 WL 1167534, at *4 (E.D. Pa. Sept. 7, 2001) (citing 17 Moore et al., *Moore's Federal Practice* § 111.13(1)(i) (3d ed. 1997)).

*Familiarity with Federal Antitrust Law.*  As the Third Circuit explains, the trial judge's familiarity with applicable law comes into play only when the court is called on to interpret "the applicable state law in diversity cases."  *Jumara*, 55 F.3d at 879-80.  In this case, RMLC asserts claims only under the federal antitrust laws.  (Compl. ¶¶ 112-26.)  "[A]ll District Courts are presumed 'familiar with the applicable' Federal antitrust laws."  *Liggett Grp., Inc. v. R.J. Reynolds Tobacco Co.*, 102 F. Supp. 2d 518, 537 (D.N.J. 2000).  Because "the federal judge in either forum will be qualified to adjudicate this case," *Weber*, 155 F. Supp. 2d at 286-87, this factor is neutral.

RMLC will likely point out that this Court is familiar with applicable law due to its

---

[30] (Marroso Decl., Ex. H.)

oversight of RMLC's prior suit against SESAC.[31]  (Compl. at ¶ 2, 35-39.)  But there is nothing about this case that requires specialized knowledge on the part of the adjudicating court.[32]  This case, like the earlier *SESAC* case, simply involves an application of well-settled federal antitrust laws to the specific facts of the Complaint.

## VIII.   CONCLUSION

For the foregoing reasons, this action should either be dismissed (i) for lack of personal jurisdiction over GMR and for improper venue, or (ii) for failure to state a claim on which relief can be granted.  Even if personal jurisdiction and venue exist in this District, the convenience of the parties and witnesses and the interest of justice would be best served by transferring this action to the Central District of California.

---

[31] *See Radio Music License Comm., Inc. v. SESAC, Inc., et al.*, No. 2:12-cv-05807-CDJ(LASx) (E.D. Pa.).  That case ended in ***settlement***, not a final judgment on the merits.

[32] The same cannot be said of the case between the parties in the Central District of California. That case, *Global Music Rights, LLC v. Radio Music License Committee, Inc. et al.*, Case No. 2:16-cv-09051-BRO-AS (C.D. Cal.), involves claims under California state laws as well as federal claims, and the Central District of California would be more familiar with applicable state laws.

Dated:  January 20, 2017                    O'MELVENY & MYERS LLP


                                            By:  */s/ David Marroso*
                                            _____
                                                David Marroso (*pro hac vice*)
                                                dmarroso@omm.com
                                                Daniel Petrocelli (*pro hac vice*)
                                                dpetrocelli@omm.com
                                                O'MELVENY & MYERS LLP
                                                1999 Avenue of the Stars
                                                Los Angeles, California  90067
                                                Telephone:  (310) 553-6700
                                                Facsimile:  (310) 246-6779

                                                Richard G. Parker (*pro hac vice*)
                                                rparker@omm.com
                                                Edward D. Hassi (*pro hac vice*)
                                                ehassi@omm.com
                                                O'MELVENY & MYERS LLP
                                                1625 Eye Street, NW
                                                Washington, DC 20006
                                                Telephone:  (202) 383-5300
                                                Facsimile:  (202) 383-5414

                                                Neill C. Kling
                                                nkling@harkinscunningham.com
                                                HARKINS CUNNINGHAM LLP
                                                4000 Two Commerce Square
                                                 2001 Market Street
                                                 Philadelphia, PA 19103
                                                Telephone: (215) 851-6700

                                                *Attorneys for Global Music Rights,  LLC*