**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RADIO MUSIC LICENSE COMMITTEE, INC., | Civil Action No. 16-6076 |
| Plaintiff, | |
| v. | |
| GLOBAL MUSIC RIGHTS, LLC, | |
| Defendant. | |

**DEFENDANT GLOBAL MUSIC RIGHTS, LLC'S**
**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................. 1

II.  FACTUAL BACKGROUND .............................................................................. 5

III.  RMLC FAILED TO PLEAD A PLAUSIBLE ANTITRUST CLAIM ............ 5

    A.  RMLC Does Not Plausibly Allege Harm to Competition ..................... 5

        1.  The ASCAP and BMI Consent Decrees Are Not a Competitive Baseline from Which to Measure Harm to Competition .......................... 6

        2.  Higher License Fees Do Not Constitute Harm to Competition ................ 8

        3.  GMR's Alleged Conduct Stimulates Competition, Increases Efficiency, and Supports Innovation........................................................ 10

        4.  RMLC Do Not Plausibly Allege GMR Foreclosed Potential Competitors........................................................................................... 15

        5.  RMLC Does Not Plausibly Allege Consumer Harm............................... 16

        6.  RMLC's Alleged "Injury" Stems from the Competition-Enhancing Aspects of GMR's Conduct ................................................................. 18

    B.  RMLC Does Not Adequately Allege Market Power ........................................... 19

        1.  No Direct Evidence of Market Power...................................................... 20

        2.  No Indirect Evidence of Market Power ................................................... 22

            a.  RMLC's Market Is Implausibly Narrow.................................... 23

                (1)  Licenses to "Unique" Copyrighted Works Are Reasonably Interchangeable ............................................. 23

                (2)  Licenses to "Essential" Copyrighted Works Are Reasonably Interchangeable ............................................. 28

                (3)  Licenses to Different PRO's Repertories Are Reasonably Interchangeable by Radio Stations for the Same Purpose ............................................................. 30

            b.  RMLC Has Not Plausibly Pled Any Cognizable Barriers to Entry........................................................................................... 31

IV.  THE INTERIM LICENSE ALLEGATIONS FAIL TO STATE A CLAIM. ................. 33

    A.  The Interim License Agreement and GMR Interim Licenses are Creatures of This Litigation and Are Not Reflective of General Market Conditions. ......... 33

    B.  Like the Pre-Complaint Conduct Allegations, the Interim License Allegations Fail to Plausibly Allege Harm to Competition or Market Power. ............................................................................................... 35

1.     RMLC Alleges No Facts to Support Its Hollow Characterization of the Interim License Agreement and GMR Interim License Fees As "Supracompetitive" .................................................................................. 35

2.     The Record in This Action Regarding the Interim License Agreement Undermines RMLC's Theory of Market Power ................... 36

C.     RMLC Cannot Complain of Terms RMLC Co-Drafted, Encouraged, and Assisted in Implementing. .................................................................................. 37

V.     CONCLUSION ............................................................................................................ 38

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Advo, Inc. v. Phila. Newspapers, Inc.*,
  51 F.3d 1191 (3d Cir. 1995) ................................................................... 33

*Allen-Myland, Inc. v. IBM Corp.*,
  33 F.3d 194 (3d Cir. 1994) ............................................................... 25, 29

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*,
  592 F.3d 991 (9th Cir. 2010) ................................................................. 12

*Am. Mfrs. Mut. Ins. Co. v. Am. Broadcasting—Paramount Theatres, Inc.*,
  446 F.2d 1131 (2d Cir. 1971) ................................................................ 22

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ......................................................................... 6, 19

*B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*,
  909 F. Supp. 162 (S.D.N.Y. 1995) ......................................................... 24

*Barr Labs., Inc. v. Abbott Labs.*,
  978 F.2d 98 (3d Cir. 1992) ............................................................... 12, 33

*Blizzard Entm't Inc. v. Ceiling Fan Software LLC*,
  941 F. Supp. 2d 1227 (C.D. Cal. 2013) .................................................. 25

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995) ................................................................. 10

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d Cir. 2007) ..................................................... 20, 21, 23

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
  140 F.3d 494 (3d Cir. 1998) ................................................................. 31

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ....................................................................... 19, 20

*CAE Inc. v. Gulfstream Aerospace Corp.*,
  Civ. A. No. 15-924-LPS, 2016 WL 4497057 (D. Del. Aug. 26, 2016) ........................... 14, 16

*Carell v. Shubert Org., Inc.*,
  104 F. Supp. 2d 236 (S.D.N.Y. 2000) ..................................................... 25

*CBS, Inc. v. Am. Soc'y of Composers & Publishers*,
  400 F. Supp. 737 (S.D.N.Y. 1975),
  *rev'd on other grounds by* 562 F.2d 130 (2d. Cir. 1977) ............................... 24

iii

*Cinema Village Cinemart, Inc. v. Regal Entertainment Grp.*,
  No. 15-cv-05488 (RJS), 2016 WL 5719790 (S.D.N.Y. 2016) ............................... 10

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
  36 F.3d 1147 (1st Cir. 1994) ...................................................................................... 18

*E&L Consulting, Ltd. v. Doman Indus. Ltd.*,
  472 F.3d 23 (2d Cir. 2006) .......................................................................................... 14

*Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*,
  312 F. Supp. 2d 379 (E.D.N.Y. 2004) ...................................................................... 25

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
  658 F.2d 139 (3d Cir. 1981) .......................................................................... 14, 15, 32

*Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*,
  386 F.3d 485 (2d Cir. 2004) .................................................................................. 20, 21

*Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*,
  960 F. Supp. 701 (S.D.N.Y. 1997) ........................................................................ 26, 29

*Goldlawr, Inc. v. Shubert*,
  268 F. Supp. 965 (E.D. Pa. 1967) .............................................................................. 38

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
  423 F.3d 374 (3d Cir. 2005) .............................................................................. 10, 21, 36

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l., Inc.*,
  424 F.3d 363 (3d Cir. 2005) ........................................................................................ 38

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
  547 U.S. 28 (2006) ........................................................................................................ 26

*In re Elec. Books Antitrust Litig.*,
  Nos. 11 MD 2293 (DLC), 12 Civ. 3304 (DLC), 2014 WL 1282298 (S.D.N.Y.
  Mar. 28, 2014) ............................................................................................................... 10

*In re McCormick & Co., Inc.*,
  Misc. No. 15-1825 (ESH), — F. Supp. 3d —, 2016 WL 6678340 (D.D.C.
  Nov. 11, 2016) .............................................................................................................. 36

*Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*,
  812 F.2d 786 (2d Cir. 1987) ........................................................................................ 33

*Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*,
  No. 13 C 1129, 2013 WL 4599903 (N.D. Ill. Aug. 29, 2013) ............................... 28

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) ............................................... 36

*JBL Enters., Inc. v. Jhirmack Enters., Inc.*,
  698 F.2d 1011 (9th Cir. 1983) ................................................ 30

*Lawlor v. Nat'l Screen Serv. Corp.*,
  270 F.2d 146 (3d Cir. 1959) ................................................... 15

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ........................................................ 9, 36

*Lexmark Int'l, Inc. v. Impression Prods., Inc.*,
  816 F.3d 721 (Fed. Cir. 2016) ................................................ 26

*Lockheed Martin Corp. v. Boeing Co.*,
  390 F. Supp. 2d 1073 (M.D. Fla. 2005) ....................................... 28

*Mathews v. Lancaster Gen. Hosp.*,
  87 F.3d 624 (3d Cir. 1996) .................................................... 7

*McCullough v. Zimmer, Inc.*,
  382 F. App'x 225 (3d Cir. 2010) .............................................. 6

*Mediacom Communications Corp. v. Sinclair Broadcast Group, Inc.*,
  460 F. Supp. 2d 1012 (S.D. Iowa 2006) .................................... 26, 27

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
  838 F.3d 421 (3d Cir. 2016) ............................................ 20, 21, 36

*Nat'l Cable Television Ass'n, Inc. v. Broadcast Music, Inc.*,
  772 F. Supp. 614 (D.D.C. 1991) .......................................... 10, 22

*Pac. Bell. Tel. Co. v. Linkline Commc'ns. Inc.*,
  555 U.S. 438 (2009) .......................................................... 13

*Paddock Publ'ns, Inc. v. Chi. Trib. Co.*,
  103 F.3d 42 (7th Cir. 1996) ......................................... 12, 16, 19

*Parker v. Viacom Int'l, Inc.*,
  605 F. Supp. 2d 659 (E.D. Pa. 2009) ......................................... 32

*Pastore v. Bell Tel. Co. of Pa.*,
  24 F.3d 508 (3d Cir. 1994) ................................................... 20

*PepsiCo, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) .................................................. 21

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
    392 U.S. 134 (1968) ................................................................................................... 38

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ..................................................................................... 23

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010) ........................................................................ 12, 13, 14, 16

*Radio Music License Comm., Inc. v. SESAC, Inc.*,
    29 F. Supp. 3d 487 (E.D. Pa. 2014) ................................................................... 22, 23

*Satnam Distribs., LLC v. Commonwealth-Altadis, Inc.*,
    140 F. Supp. 3d 405 (E.D. Pa. 2015) .................................................. 24, 30, 31, 34

*Smith v. Network Solutions, Inc.*,
    135 F. Supp. 2d 1159 (N.D. Ala. 2001) ................................................................. 27

*Spinelli v. Nat'l Football League*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) ................................................................. 31, 32

*Sullivan v. Nat'l Football League*,
    34 F.3d 1091 (1st Cir. 1994) ................................................................................... 38

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ................................................................................................... 12

*Theatre Party Assocs., Inc. v. Shubert Org., Inc.*,
    695 F. Supp. 150 (S.D.N.Y. 1988) .................................................................. 26, 34

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
    959 F.2d 468 (3d Cir. 1992) ..................................................................................... 26

*Travelers Ins. Co. v. Blue Cross of W. Pa.*,
    481 F.2d 80 (3d Cir. 1973) ....................................................................................... 22

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
    964 F.2d 1022 (10th Cir. 1992) .............................................................................. 25

*U.S. v. ASCAP*,
    156 F.R.D. 64 (S.D.N.Y. 1994) .............................................................................. 11

*United States v. Baker Hughes Inc.*,
    908 F.2d 981 (D.C. Cir. 1990) ................................................................................ 28

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ...................................................................................... 21, 24, 25

*Vavro v. Albers*,
   No. 2:05-cv-0321, 2006 WL 2547350 (W.D. Pa. Aug. 31, 2006).........................................29

*Wallach v. Eaton Corp.*,
   814 F. Supp. 2d 428 (D. Del. 2011)......................................................................................38

*White v. B.A.C. Home Loans Servicing, L.P.*,
   No. 4:10-cv-2137-CAS, 2011 WL 1483919 (E.D. Mo. Apr. 19, 2011).................................29

*Whitehurst v. Showtime Networks, Inc.*,
   Civ. A. No. 1:08-CV-47, 2009 WL 3052663 (E.D. Tex. Sept. 22, 2009).............................25

*Willey v. J.P. Morgan Chase, N.A.*,
   No. 09 Civ. 1397 (CM), 2009 WL 1938987 (S.D.N.Y. July 7, 2009)....................................9

*Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*,
   810 F.2d 243 (D.C. Cir. 1987)................................................................................................9

**STATUTES**

15 U.S.C. § 4....................................................................................................................................20

**OTHER AUTHORITIES**

Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles & Their Application,
¶ 307(d) (4th ed. 2016 Supplement)……………………………………………………………9

ASCAP Consent Decree - Second Amended Final Judgment, *U.S. v. Am. Soc. of
   Composers, Authors, & Publishers*, Civ. Action No. 41-1395 (S.D.N.Y.
   2001),
   *available at*
   https://www.justice.gov/atr/case-document/file/485966/download ......................................11

Todd Brabec, Letter in Response to Second Request for Public Comments on U.S.
   Dept. of Justice Consent Decree Review, Nov. 3, 2015
   *available at*
   (https://www.justice.gov/atr/public/ascap/bmi2015/ascapbmi133.pdf) .................................10

# I.      INTRODUCTION

For almost a century, three companies dominated licensing the rights to perform musical compositions publicly: the American Society of Composers, Authors, and Publishers ("ASCAP"), Broadcast Music, Inc. ("BMI"), and the Society of European Stage Authors and Composers ("SESAC").  Known as performing-rights organizations, or "PROs," these industry giants today represent more than *1.3 million* songwriters, composers, and music publishers, and control rights to more than *22 million* musical works.  Together, they manage ***more than 99%*** of the compositions available for public performance.  To get their writers' songs played on U.S. terrestrial radio, all three PROs must negotiate with a single entity: the Radio Music License Committee ("RMLC"), a Tennessee-based company that represents the overwhelming majority of terrestrial radio station owners in the United States and *90%* of U.S. terrestrial radio revenue.

Global Music Rights ("GMR") saw an opportunity to compete in this decades-old, highly concentrated marketplace.  Its business plan was to provide concierge service to a select group of key songwriters and publishers, offer them more attractive financial and personalized service packages than the gargantuan PROs could provide, and then negotiate with radio stations for license rates commensurate with the quality of GMR's writers' works.  GMR was formed in 2013 as a Delaware limited liability company.  It has a single office in Los Angeles, seventeen employees, and no connection to the State of Pennsylvania.  GMR was, is, and, by design, will remain small—infinitesimally small when compared to ASCAP, BMI, and SESAC.  GMR has just under seventy-five writers as clients and a repertory of approximately 30,000 compositions and cues.  This is but a sliver of the performance-rights business—about one-tenth of one percent of the available compositions and a single-digit share of all songs played on the radio.

Radio stations—represented by RMLC—do not want real competition concerning the music they play, nor do they want to pay GMR writers for the value they bring to the table.

1

Instead, they sought to bully GMR into accepting contractual terms and licensing procedures similar to those of ASCAP, BMI, and SESAC.  GMR resisted RMLC's blatantly anticompetitive maneuver.  But rather than negotiate, RMLC sued.  Without a hint of irony, the industry giant that represents 90% of the country's terrestrial radio station revenue called the tiny startup company with fewer than seventy-five writers a "monopolist."  But RMLC's factual allegations about GMR actually describe an *increase* in competition—competition among PROs and competition between radio stations—not competitive harm.  RMLC's real complaint is that radio stations might have to compete for GMR's business in the previously staid PRO marketplace.

Under the guise of an "antitrust" lawsuit, RMLC asks this Court to take the radical step of imposing on GMR a compulsory license scheme with a "rate court" to decide license prices.  To support this radical request, RMLC's First Amended Complaint ("the FAC") offers conclusory allegations, divorced from industry reality and unsupported by antitrust law.  More importantly, the *facts* RMLC alleges demonstrate an increase in competition, not any cognizable competitive harm.

An innovator such as GMR entering a legacy market makes that market more competitive, not less.  This is especially true for a small newcomer like GMR.  A PRO that represents fewer than 100 songwriters can hardly be said to monopolize an industry dominated for nearly a century by three other PROs with 1,000,000-plus songwriters among them.  And no matter what fee GMR chooses to seek for its writers, it certainly cannot (and has not) "forced" a sophisticated broker like RMLC, which represents nearly all of the thousands of U.S. terrestrial radio stations, to accept contractual terms.  Because RMLC's allegations describe GMR as behaving pro-competitively at all times, the FAC does not plausibly allege a violation of the antitrust laws.

RMLC's antitrust claims also fail because they rely on a fanciful and implausible market definition. GMR currently has agreements with seventy-four writers. Not 74,000 or even 7,400. Seventy-four. Those writers have copyrighted approximately 30,000 compositions and cues—or roughly 0.125% of the 22 million-plus copyrighted compositions and cues in existence today. That does not describe a monopolist. By RMLC's logic, every PRO, every music publisher, and indeed, ***each and every songwriter*** who has ever produced a "unique" composition is a "monopolist" in his or her own right. However popular GMR's songs may be, radio stations obviously can exist without GMR's catalog—as the FAC now acknowledges—because they can access 22 million other compositions. The premise that one who controls copyrights over a sliver of popular compositions is necessarily a monopolist is contrary to law, logic, and sound economics.

The relief sought by RMLC is extraordinary, unsupported by the antitrust laws, and underscores the vacuous nature of the FAC itself. RMLC asks the Court to impose industry-wide regulation where Congress has prescribed none. Specifically, RMLC asks this Court to subject GMR to judicial rate regulation because GMR is a "monopolist," and because ASCAP and BMI, who are exponentially larger than GMR, agreed to similar conditions in consent decrees dating back to the 1940s. RMLC glosses over both ASCAP's and BMI's size and their anticompetitive conduct that bears no semblance to anything GMR even is alleged to have done. In the 1940s, ASCAP and BMI controlled nearly 100% of the copyrighted compositions in existence. That enormous market power, coupled with ASCAP's and BMI's marketplace conduct, established an antitrust violation.

GMR plainly does not fit that paradigm. GMR controls less than 1% of musical compositions available for public performance in the United States, and has no history of

anticompetitive conduct whatsoever.  There is nothing in the FAC from which the Court could conceivably infer an antitrust violation.

RMLC essentially says, "GMR may be new and small, but they are powerful," and they demand a "premium" for their works.  This proves GMR's point, not RMLC's.  GMR's writers are talented.  Their talent, ingenuity, creativity, and popularity are precisely why these composers and GMR can fairly seek a premium from stations performing their works.  This only increases competition and innovation.  Writers who know they can get a higher advance and increased rates from GMR (as opposed to other PROs) are incentivized to write and market better songs.  Subjecting GMR to RMLC's proposed regulatory scheme, by contrast, would restrict copyright owners' ability to license their works in a free market and in the manner they choose, thereby limiting competition and reducing economic incentives for artistic innovation.

Of course some radio stations may not want to pay for GMR's premium content.  That is their choice and nobody is forcing them to do so.  They can simply opt not to license GMR's works and perform, instead, any of the 22 million other works administered by other PROs.  Radio stations who do choose to license GMR's works may be able to attract different listeners and advertisers.  Along these same lines, every television network does not choose to broadcast every available television show, and movie theaters do not all screen the exact same group of movies.  Rather, selecting their content is part of how they compete.  These are the kinds of choices that are made every day in free markets.

In the end, RMLC asks this Court to rewrite the Copyright Act, where Congress declined to do so.  Certain provisions of that law require that a copyright owner license his or her work; for example, the a copyright owner must grant a license for mechanical reproduction (*i.e.*, creating records) at a set statutory rate once the author has enjoyed the first opportunity to

reproduce and distribute the work. After the first right to reproduce a song, the owner may not deny a license and may not charge a higher price for it. But Congress declined to impose a compulsory license and statutory rate for *public performances* of compositions. Congress chose to do just the opposite: the Copyright Act grants owners of compositions the right to license performances for whatever fee the market bears. This is precisely what GMR's writers have done. To call that an antitrust monopoly is an assault on free market principles and a transparent request that this Court effectively amend the Copyright Act. RMLC may not use the Sherman Act to force GMR to license its works through a judicially imposed rate-regulation scheme whenever RMLC considers its price negotiations unsuccessful.

## II.  FACTUAL BACKGROUND

The facts relevant to this motion are set forth in detail in GMR's concurrently filed Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, or to Transfer Venue. Rather than repeat them here, GMR incorporates by references Section II of that filing.

## III.  RMLC FAILED TO PLEAD A PLAUSIBLE ANTITRUST CLAIM

Section III addresses all allegations in the FAC, except those that relate or refer to the Interim License Allegations, which are the subject of GMR's motion to strike.

### A.  RMLC Does Not Plausibly Allege Harm to Competition[1]

Harm to competition is the *sine qua non* of an antitrust claim. An antitrust complaint must be dismissed unless it plausibly alleges competitive harm. Even where a private plaintiff plausibly alleges harm to competition, there is no claim unless the plaintiff's own injury stems from the competitive harm. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 344

---

[1] RMLC cites this Court's denial of SESAC's motion to dismiss monopolization claims that RMLC brought against SESAC. (*See* FAC ¶ 36.) Setting aside the enormous differences between GMR and SESAC, SESAC's motion did not address antitrust injury and advanced only limited arguments regarding harm to competition.

(1990). These two requirements—harm to competition and injury to the plaintiff deriving from harm to competition—are collectively referred to as "antitrust injury," which is a "necessary precursor" to standing in antitrust cases and a threshold issue to be established at the outset of litigation. *See McCullough v. Zimmer, Inc.*, 382 F. App'x 225, 230 (3d Cir. 2010). Put simply, "[i]f antitrust injury is not found, further inquiry is unnecessary." *Id.* This requirement is designed to screen out antitrust claims that seek to protect particular **market participants**, rather than competition—and to do so at the earliest stage of a litigation. *See Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996). RMLC makes precisely such a claim: it complains that radio stations cannot get the exact terms they want in licensing negotiations with GMR.

This does not satisfy the antitrust injury element every antitrust plaintiff must plausibly allege. As discussed below, (a) GMR's unwillingness to accept the terms of consent decrees that bind **other, very different** market participants does not harm competition; (b) higher prices (even if RMLC had plausibly alleged them) do not, in and of themselves, harm competition; (c) competing aggressively for premium inputs—which is what GMR has done, and what radio stations should do in a free market—defines competition; it does not "harm" it; (d) GMR's alleged conduct has not foreclosed potential competitors; (e) GMR's alleged conduct has caused no harm to consumers; and (f) GMR's alleged conduct is procompetitive.

### 1. The ASCAP and BMI Consent Decrees Are Not a Competitive Baseline from Which to Measure Harm to Competition

A fundamental flaw in the FAC is RMLC's attempt to lump GMR together with industry giants ASCAP and BMI. RMLC claims "the fact that unregulated PROs, like GMR, violate the antitrust laws has been established for seventy-five years." (FAC ¶ 2.) That legal conclusion is stunningly wrong, and the **factual** allegations in the FAC prove it. At base, RMLC alleges that GMR does things that legacy PROs have agreed not to do, and that for this reason alone, GMR

harms competition.  (*See, e.g.*, FAC ¶ 58 (alleging GMR "refuse[s] to negotiate terms that would comply with core protections in the antitrust consent decrees and antitrust settlement"); *id.* ¶ 94 ("GMR's cartel pricing weakens any existing benefits of the ASCAP/BMI/SESAC paradigm").)  For example, RMLC seeks to enjoin GMR from employing certain competitive tools, such as exclusive writer contracts, that ASCAP and BMI promised the DOJ they would not employ.

But RMLC ignores the pivotal facts underlying the ASCAP and BMI lawsuits and consent decrees, including the undisputed fact that ASCAP and BMI represented collectively some 90+% of the PRO market at the time, and each had a documented history of exercising their market dominance.  Neither fact exists here—as RMLC itself admits.  These unique circumstances of the ASCAP and BMI cases led to restrictions on those PROs' conduct—but not every PRO's conduct.  Put another way, that ASCAP and BMI acted illegally in the 1930s and 1940s does not somehow transform all future PRO conduct into per se illegal or anticompetitive behavior.  The consent decrees are not laws or regulations.  They are not even industry guidelines.  (*See id.* ¶¶ 30, 31.)  In fact, SESAC, a PRO with 30,000 affiliates and 400,000 compositions, has operated for eighty years without being subject to any DOJ consent decree.

Instead, RMLC asks this Court to take the extraordinary step of ***imposing*** compulsory licensing and judicial rate regulation via a private antitrust suit.  That RMLC *wants* this is unsurprising.  Its members have benefitted handsomely by dealing with two PROs restricted by consent decrees.  They do not want to compete to do business with the first new PRO in seventy-four years.  But RMLC's desire to avoid competition does not justify forcing GMR to be bound by decades-old agreements that derive from marketplace conduct wholly unlike GMR's, by PROs with market shares nowhere near GMR's.  Nor would subjecting GMR to these third-party agreements prevent or correct any harm to competition.

## 2.    Higher License Fees Do Not Constitute Harm to Competition

As a preliminary matter, RMLC has not plausibly pled that it or any of its members has actually paid excessive prices.  The only actual license fees the FAC alleges GMR has successfully negotiated before RMLC filed its original complaint are those reflected in GMR's long-term license agreements with iHeart and TownSquare.  But RMLC alleges simply that the iHeart license is "anticompetitive" (FAC ¶ 16(g)), and that GMR's iHeart and Townsquare deals both "affected" the "unlawful monopoly prices" GMR charges or "demands" from others, (*id.* ¶ 63.)  This is pure *ipse dixit* and cannot help establish competitive harm.  *See Willey v. J.P. Morgan Chase, N.A.*, No. 09 Civ. 1397 (CM), 2009 WL 1938987, at \*4 (S.D.N.Y. July 7, 2009) ("ipse dixit pleading is insufficient").  RMLC does not plead a single fact in support of this conclusion that these two deals—let alone the specific fees they involve—are anticompetitive. (*See* FAC ¶¶ 16(g), 52, 63.)  Nor does it make logical or economic sense:  iHeart and TownSquare are sophisticated industry participants—indeed, members of the RMLC executive committee—and are incentivized to negotiate the best deal possible for the right to perform GMR compositions, in order to better compete with other terrestrial radio broadcasters.  The few facts RMLC does allege about them—that they negotiated and obtained "most favored nation" clauses that ensure no broadcasters will receive a better license rate from GMR than they received—destroys the notion that these powerful, savvy market players "succumbed" to the supracompetitive demands of the supposed monopolist with a tiny fraction of the market.  (*Id.* ¶ 63.)

The FAC primarily alleges that GMR has ***demanded*** "stations pay rates multiples higher than they would pay if ASCAP, BMI, or SESAC licensed the exact same number and quality of works," and higher than ASCAP and BMI actually did charge for licenses to these same works when ASCAP and BMI held the rights to them.  (FAC ¶ 52.)

But even if RMLC could somehow establish that any of GMR's pricing (actual or requested) was by some indeterminate measure excessive, "excessive price alone does not establish a violation of the antitrust laws, because imposition of a high price is not, in and of itself, an anticompetitive act." *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 252 (D.C. Cir. 1987); *see, e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895 (2007) (holding that antitrust law does not prohibit charging high prices, which can have procompetitive effects); Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles & Their Application, ¶ 307(d) ("Most selling prices or buyer resistance to higher prices are not reached by antitrust law."). In fact, courts have specifically held that increases in the prices a PRO charges for licenses do not "alone . . . constitute anticompetitive behavior," even where the PRO in question "is a formidable presence in the music performing rights market." *Nat'l Cable Television Ass'n, Inc. v. Broadcast Music, Inc.*, 772 F. Supp. 614, 643 (D.D.C. 1991) (discussing BMI's pricing).

Here, for example, quality differences can readily explain differences in pricing. As any shopper knows, "[g]enerally you must pay more for higher quality," *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995), and "a firm's comparatively high price may simply reflect a superior product." *Harrison Aire, Inc. v. Aerostart Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005); *see Blue Cross*, 65 F.3d at 1411-12 ("when dealing with a heterogeneous product or service…[higher prices] may reflect a higher quality more costly to provide"); *see also In re Elec. Books Antitrust Litig.*, Nos. 11 MD 2293 (DLC), 2014 WL 1282298, at *10 (S.D.N.Y. Mar. 28, 2014) (observing that multiple factors affect pricing). RMLC admits as much, alleging that GMR has an "indispensable repertory of 'must-have' musical works"—"essential works that stations must be able to play to stay competitive." (FAC

¶¶ 4, 86.) These allegations themselves explain any possible higher pricing and say nothing about the existence of anticompetitive conduct.[2] *See Cinema Village Cinemart, Inc. v. Regal Entertainment Grp.*, No. 15-cv-05488 (RJS), 2016 WL 5719790, at *5 (S.D.N.Y. Sept. 29, 2016) (rejecting as "wholly conclusory" plaintiff's allegations that competition was harmed by defendant's higher prices).

The FAC also suggests that because ASCAP and BMI license fees are approved in rate-court proceedings under the DOJ consent decrees, any higher prices are necessarily supracompetitive. Not so. It is precisely because of the consent decrees and the compulsory scheme that ASCAP's and BMI's prices *cannot* be used as benchmarks for free market pricing. Unlike ASCAP and BMI, GMR is not required to license any of its works to anyone. In contrast, the decrees impose rate regulation because the DOJ believed that ASCAP and BMI had and would continue to abuse their market power. The fees that result from a regulated process are not market rates, and GMR's demands for allegedly higher prices cannot be deemed "supracompetitive."

### 3. GMR's Alleged Conduct Stimulates Competition, Increases Efficiency, and Supports Innovation

RMLC alleges that GMR has reduced competition by entering into express exclusive licenses with songwriters and publishers. (FAC ¶ 8.) As an initial matter, *all* PROs prohibit their writers from signing simultaneously with another PRO for the same works and in the same

---

[2] While RMLC alleges GMR songs reflect a 5-7.5% "weighted percentage of total plays," RMLC does not allege how this percentage accounts for quality differences in various PROs' works and licenses. (FAC ¶ 52.) Using number of plays alone to measure the value a PRO's repertory generates for a radio station is not only illogical, it is contrary to RMLC's entire theory of recovery, which relies on a change in value proposition when multiple licenses are aggregated, such that a PRO with 5-7.5% of the market somehow supposedly has market power.

territory.[3]  GMR is not unique or advantaged in this manner.  More importantly, to the extent

GMR's licenses are alleged to prevent the writers from directly licensing their works for

performance, they are not anticompetitive.  To the contrary, it is "well established that

competition among businesses to serve as an exclusive supplier should actually be

*encouraged*."  *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir.

2010); *Paddock Publ'ns, Inc. v. Chi. Trib. Co.*, 103 F.3d 42, 45 (7th Cir. 1996) ("Competition-

for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is

common.").  RMLC alleges GMR paid creators of premium content consideration to enter into

an exclusive contract.  Even if these allegations are true, paying to secure premium inputs would

help GMR compete with its PRO rivals, resulting in "the benefits of exclusivity and rivalry

simultaneously."  *Paddock Publ'ns*, 103 F.3d at 47.  Further, competing for premium inputs

stimulates competition among the PROs and promotes artistic innovation.  *Id* at 45.  Writers are

encouraged to write more catchy songs if they can make more money from a PRO like GMR.

    RMLC alleges absolutely no facts suggesting that the alleged exclusive GMR contracts

harm competition.  In order for exclusive contracts to be anti-competitive, they must preclude

entry in the marketplace.  *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 335

(1961) (exclusive dealing arrangements do not violate antitrust law "unless the court believes it

probable that performance of the contract will foreclose competition in a substantial share of the

---

[3] In their consent decrees, ASCAP and BMI agreed that any writer whose works they represent can directly license his or her works for performance.  But an ASCAP writer cannot sign with another PRO, like BMI, SESAC, or GMR. *See* ASCAP Consent Decree - Second Amended Final Judgment, *U.S. v. Am. Soc. of Composers, Authors, & Publishers*, Civ. Action No. 41-1395, at 6 (S.D.N.Y. 2001), available at https://www.justice.gov/atr/case-document/file/485966/download ("ASCAP is hereby enjoined and restricted from . . . limiting, restricting, or interfering with the right of any member to issue, directly or through an agent other than a performing rights organization, non-exclusive licenses to music users for rights of public performance.").  In other words, their agreements are "PRO-exclusive."

line of commerce affected"); *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 110-11 (3d Cir. 1992) (legality of exclusive dealing arrangements depends on "whether the competition foreclosed constitutes a substantial share of the relevant market"); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 996 n.1 (9th Cir. 2010) (exclusive dealing arrangements may violate the Sherman Act only when they actually foreclose competition).  The alleged agreements between a GMR and its writers could affect at most 5-7.5% of the songs on the radio and thus cannot materially prevent entry or expansion into the performance rights marketplace.  Nor does RMLC allege restrictions on any new entrant PRO's or potential competitor's ability to compete with GMR for exclusive arrangements after the alleged current agreements expire.  *See Race Tires Am., Inc.*, 614 F.3d at 84 (rejecting challenge to the exclusive contracts for which other market participants "had the clear opportunity to compete").  Indeed, as a new entrant, GMR competed with legacy PROs for the business of its writers.  This is competition, not anticompetitive.  Thus, that RMLC alleges new entrants "would not engage in *anticompetitive* exclusive dealing," (FAC ¶81 (emphasis added)) does not mean a new entrant cannot compete in the same way GMR does, nor does it put a new entrant at an unfair competitive disadvantage.  RMLC's argument to the contrary reflects the rankest circular logic.

RMLC attempted to augment its initial complaint on this point by alleging in the FAC that "GMR has foreclosed both the ability of its affiliates to direct license [through GMR's exclusive licenses] and also the option for radio stations to purchase an adjustable fee blanket license (or another alternative to the blanket license), and thus has foreclosed competition." (FAC ¶91.)  However, parties retain freedom to contract and foreclose their options by contract as the songwriters here have chosen to do.  And exclusive contracts are not per se illegal.  *See Pac. Bell. Tel. Co. v. Linkline Commc'ns. Inc.*, 555 U.S. 438 (2009) (parties are free to conduct

business, and to refrain from conducting business, with whomever they wish); *see also Race Tires Am., Inc.*, 614 F.3d at 76 ("[I]t is widely recognized that in many circumstances [exclusive dealing arrangements] may be highly efficient . . . and pose no competitive threat at all."); *E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006) (exclusivity arrangements are "presumptively legal").

RMLC acknowledges that only a minuscule percentage of writers actually left BMI and ASCAP to affiliate with GMR, exclusively or otherwise. The FAC alleges that GMR "lured" away from ASCAP and BMI approximately "70 songwriters" (FAC ¶¶ 4, 44), while nearly 600,000 writers remain with ASCAP, and 750,000 writers remain with BMI. (*Id.* ¶ 27.) Competition thus has not been foreclosed; the legacy PROs "had the clear opportunity to compete and did compete, sometimes successfully," for writer contracts. *Race Tires Am., Inc.*, 614 F.3d at 84. That legacy PROs chose, when they signed their consent decrees, not to seek *exclusive* contracts with writers does not negate their demonstrated ability to compete. They are competing and competing well. The vast majority of writers continue to affiliate with ASCAP and BMI, not GMR, which demonstrates beyond doubt the legacy PROs' continuing ability to compete for writer contracts. Exclusive contracts earned in such competitive marketplaces are encouraged by the antitrust laws, and they do not support antitrust injury.[4] *See id.*; *CAE Inc. v. Gulfstream Aerospace Corp.*, Civ. A. No. 15-924-LPS, 2016 WL 4497057, at *5 (D. Del. Aug. 26, 2016) (exclusive agreement did not support an antitrust injury because exclusive agreements are "generally permissible," especially "where the exclusive provider is chosen through a competitive process").

---

[4] It is telling that RMLC, not ASCAP or BMI, is suing GMR. If RMLC's theory of competitive harm were correct, ASCAP and BMI would be the market participants more directly injured by GMR's alleged conduct.

The Third Circuit reached a similar conclusion in *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139 (3d Cir. 1981), a case analogous to the facts RMLC alleges here. Fleer, a bubblegum manufacturer, alleged that its competitor, Topps, had engaged in "an assiduous program of obtaining exclusive license agreements with every major and minor league baseball player" to use their images and information on baseball cards that accompanied chewing gum. *Id.* at 149. These exclusive agreements lasted five years, with staggered termination dates. *Id.* The court held that this "accumulation of exclusive licenses" did not foreclose competition, because Fleer and other potential competitors remained free to "compete with Topps for minor league players or even persuade the present major league players not to renew their Topps' contracts." *Id.* at 150, 154. In reaching this conclusion, the Third Circuit acknowledged that Fleer could not compete with Topps for baseball player contracts immediately or without restriction. But the court attributed this to preexisting market conditions and structures: "That such a program of head to head competition might take six or seven years to bear fruit does not make Topps' agreements anti-competitive; it is simply a function of modern-day baseball." *Id.* at 150. Topps exploited the existing market structure to gain a competitive advantage and "managed to obtain license agreements with all major league players," but that "[did] not make the aggregation of these contracts an unlawful combination in restraint of trade." *Id.* at 149-50 (*citing Lawlor v. Nat'l Screen Serv. Corp.*, 270 F.2d 146 (3d Cir. 1959).[5]

So too here. Both existing PROs and new entrant PROs are free to persuade writer affiliates not to renew their allegedly exclusive agreements with GMR, and also to compete for new writers, just as Topps' competitors could compete for contracts with ball players. Even if PROs may not be able to do so immediately, or in any way they prefer, this is a function of the

---

[5] The court also rejected the argument that Topps' aggregation of exclusive licenses, when combined with other behavior, was anticompetitive. *Id.* at 150-51.

"modern-day" market at issue, "not an indictment of" GMR's alleged exclusive licensing. *See Fleer*, 658 F.2d at 150. Even if GMR's contracts allegedly "exploit" this market structure (FAC ¶¶ 4, 45, 46), that is insufficient under *Fleer* to establish competitive harm.

Although exclusive contracts may, under different circumstances, contribute to competitive harm, RMLC has not (and could not) allege the kind of coercion or other improper conduct needed to support such a theory. *See Race Tires Am.*, 614 F.3d at 77 (noting that unlawful exclusive dealing cases typically involve evidence of coercion). RMLC does not allege that the GMR contracts at issue create or were the result of coercion, or that they otherwise involved fraud or deception. Offering the highest licensing fees to writers "is no more an act of coercion, collusion, or improper interference . . . than it is . . . to offer the lowest." *Id.* at 79. GMR wooed writers from their longstanding PRO homes with a more attractive offering, not coercion. (*See* FAC ¶¶ 44, 51.) RMLC alleges nothing to suggest that those writers were not "free to pick the [PRO] that [they] believe[d] will provide the best deal." *Race Tires Am.*, 614 F.3d at 79. Nor does RMLC allege collusion among the writers to enter into agreements with GMR. *Cf. Paddock Publ'ns*, 103 F.3d at 44-45. GMR obtained its contracts through "a competitive process that was open to" all potential competitors. *Gulfstream Aerospace*, 2016 WL 4497057 at *6.

### 4.    RMLC Do Not Plausibly Allege GMR Foreclosed Potential Competitors

RMLC offers the self-serving conclusion that GMR's conduct has "foreclosed potential competitors (including its own affiliates) from licensing indispensable copyrighted works." (FAC ¶ 108.) RMLC fantasizes that, absent GMR's challenged conduct, GMR-affiliated writers would suddenly begin competing with one another by offering direct deals to RMLC or its member stations, thereby driving down license prices. (*Id.* ¶ 89.) Those allegations are

implausible, since there is no allegation that, in the decades prior to GMR's existence or since GMR came into existence, GMR-affiliated writers (or any other writers) have *ever* directly licensed their works to radio stations.[6] Nor does RMLC allege any other facts suggesting writers would be inclined do so for the first time, absent GMR's entry into the marketplace or any of its alleged conduct. Indeed, the FAC alleges the *opposite*: that before GMR existed, these writers negotiated with radio through ASCAP or BMI. (*See id.* ¶ 46.) The logical "but-for world," absent some factual allegation suggesting otherwise, is that current GMR writers would still be negotiating through one of the legacy PROs. RMLC attempts to address this deficiency in the FAC by adding allegations that do little more than reiterate why *RMLC* would prefer a direct licensing option. (*See* FAC ¶ 91.) But this does not speak to the likelihood that affiliate artists will emerge as competitors, absent GMR's conduct.

### 5. RMLC Does Not Plausibly Allege Consumer Harm

RMLC alleges that GMR's conduct will harm competition by "restrict[ing] consumer choice" as to the variety of music that radio stations can license and the forms of licenses available to radio stations. But RMLC does not (and cannot) allege that GMR has refused to license any works to RMLC stations. (FAC ¶¶ 108-09.) Instead, it alleges that GMR has declined to license its works to RMLC stations *on the terms RMLC would prefer*. Likewise, RMLC does not (and cannot) allege that GMR is the only source of premium content on the radio, or even most of it. If RMLC member stations choose not to contract with GMR, they still have their pick of more than 22 million songs from the ASCAP, BMI, and SESAC repertoires.

---

[6] RMLC claims RMLC stations have not been seeking direct licenses from artists because there has been "no occasion" for them to do so, since all PROs have been regulated by consent decree or settlement. (FAC ¶ 91.) Even if true, this in no way suggest *artists* would be more or less inclined to seek such arrangements, and to act as the independent PRO competitors RMLC envisions, absent GMR's challenged conduct.

Radio stations are not deprived of any choice—they just do not like their options.  Indeed, RMLC alleges that some of its member stations do not need a license to GMR works.  (FAC ¶¶ 86, 105, 115, 59 (referring only to "most" or "virtually all" radio stations).)  To the extent radio stations choose not to license GMR writers' works, it is *radio stations*—not GMR—who are choosing to limit the content they broadcast.[7]  While RMLC offers the conclusory allegation that listener access to GMR artists' works has been impeded, it alleges no *facts* to suggest that other broadcasters, such as satellite or digital radio, have been unable to license GMR artists' works and make them available to the public.

The FAC offers nothing to suggest GMR's conduct harms the radio-listening public in any other way.  Paying higher prices, in particular for higher quality products, does not alone constitute consumer harm.  *See supra*, Section III.A.2.  And any cost savings RMLC seeks for its members would not render radio more affordable for listeners, who already listen for free.  Instead, listeners would be *worse* off, since the relief RMLC seeks would prevent GMR from compensating its writers commensurate with the value of their works and would lessen economic incentives for writers to innovate, resulting in a less robust pool of music.  *See*, *Data Gen. Corp.*

---

[7] Nor do RMLC's allegations that it faces a "Hobson's choice" reflect consumer harm.  RMLC claims most of its member stations are forced to either pay the licensing fees GMR offered in negotiations or risk being sued by GMR for copyright infringement, because they cannot avoid infringing on GMR artists' works, and thus "have no choice."  (FAC ¶¶ 105, 115.)  RMLC alleges that radio stations have entered into the GMR Interim Licenses because they "had no choice" in this way as well.  (*E.g.*, FAC ¶¶ 16(i), 60-62.)  But there are no facts alleged to support a conclusion that an inadvertent performance of a single work has resulted in or will result in this supposed onslaught of copyright infringement litigation.  Moreover, RMLC does not allege that the majority of RMLC member stations have entered into the interim license.  If this is not the case, it vastly undercuts the idea that these stations are economically coerced into accepting any terms GMR offers.

Relatedly, the FAC alleges that *RMLC* had no choice but to agree to the terms of the interim license agreement.  (FAC ¶ 60.)  As discussed *infra*, Section IV, RMLC freely chose to pursue an interim license rather than continue to prosecute its preliminary injunction motion, and negotiated, co-drafted, approved, and communicated to its members the final terms of that interim license.

*v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1186-87 (1st Cir. 1994) ("in passing the Copyright Act, Congress itself made an empirical assumption that allowing copyright holders to collect license fees and exclude others from using their works creates a system of incentives that promotes consumer welfare in the long term by encouraging investment in the creation of desirable artistic and functional works of expression"). The Seventh Circuit reached a similar conclusion in reviewing an antitrust challenge to exclusive agreements between newspapers and their respective content providers, holding that "a market in which the creators of intellectual property . . . [can] not decide how best to market it for maximum profit would be a market with less (or less interesting) intellectual property created in the first place." *Paddock Publ'ns*, 103 F.3d at 454.

### 6. RMLC's Alleged "Injury" Stems from the Competition-Enhancing Aspects of GMR's Conduct

Finally, the FAC turns the antitrust laws on their head, alleging it will suffer harm because an ***additional*** competitor has entered the marketplace.[8] RMLC is complaining about an ***increase*** in competition. To establish antitrust injury, however, a plaintiff must plausibly allege it has suffered injury as a result of a "competition-***reducing*** aspect or effect of the defendant's behavior." *Atl. Richfield*, 495 U.S. at 344 (emphasis added). If a plaintiff is harmed by ***increased competition*** flowing from the challenged conduct, there is no antitrust injury and no antitrust claim. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 484-85 (1977). In *Brunswick*, for example, the plaintiffs alleged that the defendant's acquisition of several smaller bowling alleys saved those alleys from defaulting. *Id.* at 479-80. Under their theory of

---

[8] Indeed, in its Motion for a Preliminary Injunction, Dkt. No. 3, RMLC claims GMR should not exist. (*See* Mot. at 20 ("GMR, as a new PRO in a field that already includes three incumbents, has no pro-consumer justification for its existence.").) And the relief it seeks neutralizes any competitive effect GMR might have on other PROs, the effective equivalent of GMR ceasing to exist. (*See, e.g.*, FAC ¶¶ 45-46.)

injury, the plaintiffs asserted that they would have been able to charge higher prices if the defendants had not saved the defaulting alleys, since there would have been fewer competitors and less price competition, but for the acquisition. *Id.* at 481. The Supreme Court concluded that this did not constitute antitrust injury because it "did not occur 'by reason of' that which made the acquisitions unlawful." *Id.* at 488 (quoting 15 U.S.C. § 4).

So too with RMLC's claimed injury. This is reflected in its prayer for relief, which asks this Court to prohibit GMR from competing vigorously with behemoth PROs like ASCAP and BMI for writers. Such relief is "designed to provide [RMLC stations] with the profits they would have realized, had competition been ***reduced***," not enhanced. *Brunswick*, 429 U.S. at 488 (emphasis added). That is, RMLC seeks the profits and opportunities it believes it would have enjoyed, were GMR's competition-enhancing effects on other PROs neutralized. Thus, "[at] base [RMLC] complain[s] that. . .[the challenged conduct] ***preserved*** competition, thereby depriving [the RMLC stations], of the benefits of increased ***concentration***." *Id.* at 488 (emphasis added). Such losses resulting from increased competition cannot constitute antitrust injury.

### B.    RMLC Does Not Adequately Allege Market Power

None of the pre-Complaint conduct alleged suggests that GMR possesses or exercises market power, an essential element of any monopolization or attempted monopolization claim. *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 433-38 (3d Cir. 2016); *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512-13 (3d Cir. 1994).

Market power can be demonstrated directly or indirectly. *Mylan*, 838 F.3d at 434-38. The direct method requires "direct evidence of supracompetitive prices and restricted output," and must include "an analysis of the defendant's costs, showing both that the defendant had an 'abnormally high price-cost margin' and that the defendant 'restricted output.'" *Id.* at 434 (quoting *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) and *Geneva*

*Pharm. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 500 (2d Cir. 2004)). The indirect method

requires "structural evidence of a monopolized market." *Id.* at 435 (quoting *Harrison Aire, Inc.*,

423 F.3d at 381). Specifically, the plaintiff must plead and prove that defendants have a

cognizably high share of a properly defined relevant market, in which there are barriers to entry.

*Id.*; *Broadcom*, 501 F.3d at 307 & n.3.

### 1. No Direct Evidence of Market Power

RMLC purports to allege that supracompetitive pricing provides direct evidence of

GMR's market power. But as discussed above, RMLC fails to allege any facts to support its

claims that license fees GMR has requested or successfully negotiated are ***actually***

supracompetitive—as opposed to merely being higher than what RMLC would like to pay.

Apart from the Interim License Allegations (which also do not provide evidence of market power

for the reasons discussed in Section V below), RMLC's supposed "direct evidence" of market

power consists only of **(i)** licensing offers and other "demands" GMR allegedly made to RMLC

or its members, including a request for "yearly rate increases" that RMLC rejected (FAC ¶¶ 52,

63, 86–87), and **(ii)** direct licensing agreements between GMR and two RMLC members, which

RMLC claims have somehow "cause[d] the unlawful monopoly prices that GMR demands from

other RMLC member stations to be even higher" (*id.* ¶¶ 63, 16(g).) None of these vague, quasi-

factual allegations comes remotely close to pleading that GMR has the power to "control prices"

without forfeiting market share—the nub of market power. *Harrison Aire*, 423 F.3d at 380

(quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)); *see*

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107-08 (2d Cir. 2002) ("The more competition a

company faces, the less it can control prices because competitors will undercut its prices to

secure market share.").

First, it is hornbook law that market power cannot be inferred from price ***demands*** that

were rejected.  Market power means customers have no choice but to accede to the demand.

Even the lowliest of competitors can "demand[] rates many multiples higher" than its rivals

(FAC ¶ 86)—but that does not make it a monopolist.  As the Third Circuit has recognized,

negotiating to "get the best deal possible" amounts to "no more than conduct[ing] [one's]

business as every rational enterprise does."  *Travelers Ins. Co. v. Blue Cross of W. Pa.*, 481 F.2d

80, 84 (3d Cir. 1973).  Mere "statement[s] of bargaining terms" and similar "bargaining ploys"

cannot give rise to an antitrust violation.  *Am. Mfrs. Mut. Ins. Co. v. Am. Broadcasting—*

*Paramount Theatres, Inc.*, 446 F.2d 1131, 1137 (2d Cir. 1971); *see also Nat'l Cable Television*

*Ass'n v. Broadcast Music, Inc.*, 772 F. Supp. 614, 643 (D.D.C. 1991) ("[T]hat BMI *sought*

certain fee levels does not make it an antitrust violator.  An asking price is a bargaining

position.").  Ironically, RMLC characterizes GMR's alleged "demand" for license fees of "over

$42 million for 2017 alone" as "'take it or leave it' pricing fully divorced from market

constraints," but glosses over the fact that RMLC itself apparently chose to "leave it."  (FAC ¶

52.)  This is the exact opposite of controlling prices.

Second, RMLC's allegation that GMR's license deal with iHeart is "anticompetitive"

(FAC ¶ 16(g)), and that GMR's iHeart and Townsquare deals both "affected" the "unlawful

monopoly prices" that GMR charges or "demands" from others (*id.* ¶ 63), is supported by neither

factual allegations nor logic, as discussed *supra*, in Section III.A.2.

All of this points to a critical distinction between GMR's alleged pricing conduct and the

allegations that RMLC previously leveled against SESAC.  In the *SESAC* case, RMLC alleged

that "SESAC ha[d] raised prices from 8% to 20% each year since 2009."  *Radio Music License*

*Comm., Inc. v. SESAC, Inc.*, 29 F. Supp. 3d 487, 500 (E.D. Pa. 2014) (Jones II, J.).  In ruling on

SESAC's motion to dismiss, this Court held that RMLC's claims about SESAC's ***actual price***

*increases* "directly allege[d] monopoly power," thus satisfying RMLC's pleading burden. *Id.* Here, in contrast to the *SESAC* case, RMLC has not alleged—and cannot allege—that GMR instituted *any* price increases, supracompetitive or otherwise. In fact, GMR's license agreements with iHeart and TownSquare are GMR's inaugural agreements with terrestrial radio—far from reflecting an increase in GMR's fees, these two deals represent the *very first fees* GMR successfully negotiated with any RMLC member.

The direct evidence of market power on which this Court's analysis hinged in the *SESAC* case is therefore totally lacking here. At bottom, RMLC alleges only that GMR asked RMLC for license fees in excess of what RMLC *wanted to pay*, and that GMR negotiated direct deals with a small number of RMLC stations for license fees in excess of *what RMLC thinks those stations should pay*. This is plainly insufficient to establish market power.

### 2.      No Indirect Evidence of Market Power

Indirect evidence of market power starts with a "definition of the relevant market." *Id.* at 435 (quoting *Broadcom*, 501 F.3d at 307). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).

RMLC here fails to define a relevant market in terms of reasonable interchangeability or cross-elasticity of demand and fails to allege facts demonstrating high entry barriers.

### a. RMLC's Market Is Implausibly Narrow

#### (1) Licenses to "Unique" Copyrighted Works Are Reasonably Interchangeable

RMLC alleges an implausibly narrow relevant market, consisting solely of "licenses to the copyrighted musical compositions and performances in GMR's repertory." (FAC ¶ 76.) "Courts routinely reject Sherman Act claims at the motion to dismiss stage where such claims involve single-brand or single-manufacturer product markets." *Satnam Distribs., LLC v. Commonwealth-Altadis, Inc.*, 140 F. Supp. 3d 405, 419 (E.D. Pa. 2015). RMLC pleads no facts and furnishes no reason why its market definition should not likewise be rejected.

RMLC's market definition hinges on the allegation that "licenses sold by ASCAP, BMI, and SESAC are not reasonably interchangeable with those that GMR sells"—and therefore do not compete in the same market with GMR—because GMR's repertory comprises a "unique set of copyrighted musical works." (FAC ¶¶ 76-77.) But every copyrighted song is by definition "unique" or it would not be eligible for a copyright. *See CBS, Inc. v. Am. Soc'y of Composers & Publishers*, 400 F. Supp. 737, 771 (S.D.N.Y. 1975), *rev'd on other grounds by* 562 F.2d 130 (2d. Cir. 1977) ("[E]very copyrighted composition is philosophically or aesthetically 'unique' and its uniqueness is dignified by copyright"). It is meaningless to allege, as RMLC does, that because "GMR controls 100% of the performance rights" for a "critical number" of works, a radio station with "licenses from ASCAP, BMI, **and** SESAC . . . still would not have the right to play the GMR exclusive works." (FAC ¶ 77 (emphasis in original).) The same could be said if GMR had just one copyrighted song in its repertory, so long as RMLC stations subjectively considered that song to be "critical." RMLC's approach would make a PRO with a single "unique" song a market unto itself, because no two "unique" songs would ever be deemed reasonably interchangeable.

"Merely asserting that a commodity is in some way unique is insufficient to plead a relevant market." *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 171 (S.D.N.Y. 1995). The Supreme Court has ruled out anything approaching literal equivalence as a standard for identifying product markets. *See E.I. du Pont de Nemours*, 351 U.S. at 394 ("[I]llegal monopoly does not exist merely because the product said to be monopolized differs from others. If it were not so, only physically identical products would be a part of the market."). Coke and Pepsi are not each monopolists because their colas have unique flavors and most cola consumers have a preference for one beverage or the other. *See id.* at 393 ("[T]his power that, let us say, automobile or soft-drink manufactures have over their trademarked products is not the power that makes an illegal monopoly."). The correct standard is **reasonable** interchangeability, which requires only that "one product [be] roughly equivalent to another for the use to which it is put." *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 206 (3d Cir. 1994).

Because of this, the "natural monopoly [a company] owns over its own product" cannot, by itself, constitute a relevant market for purposes of antitrust liability. *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992). In the *TV Communications* case, the Tenth Circuit held that the relevant market could not be limited to the TNT cable channel, *id.*—even though TNT presumably offered a "unique" package of copyrighted programs, such that consumers with access to ESPN, HBO, and the History Channel "still would not have the right to [view TNT's] exclusive works." (FAC ¶ 77.)

Courts consistently have rejected the argument that particular copyrighted works—or bundles of copyrighted works—can be so "unique" as to constitute their own relevant market.[9]

---

[9] *See, e.g.*, *Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227, 1234 n.6 (C.D. Cal. 2013) ("Even though there might not be an identical game on the market, the Court is not convinced that there are no market substitutes for [World of Warcraft]."); *Whitehurst v.*

The Supreme Court, Third Circuit, and other authorities similarly hold that market power may not be presumed from the presence of intellectual property.[10] These principles led the court in *Mediacom Communications Corp. v. Sinclair Broadcast Group, Inc.*, 460 F. Supp. 2d 1012 (S.D. Iowa 2006), to reject allegations that were virtually identical to those made by RMLC. Mediacom, a cable television system owner, sued Sinclair, a television broadcaster, after negotiations for rights to retransmit to Sinclair's television stations fell through. *Id.* at 1015-17. Mediacom alleged that Sinclair derived market power from its "exclusive hold" on thirteen stations that carried "popular network programming [that was] considered essential by Mediacom subscribers." *Id.* at 1026. Mediacom further asserted that the retransmission rights for each of the thirteen stations constituted a separate market, on the ground that "much of the network programming" on each station was "so unique and 'must see' that there [was] no substitute product." *Id.* at 1027. The court rejected this market definition as implausible,

*Showtime Networks, Inc.*, Civ. A. No. 1:08-CV-47, 2009 WL 3052663, at \*11 (E.D. Tex. Sept. 22, 2009) ("The Plaintiff has cited no authority supporting his proposition that the single film at issue creates a relevant market sufficient to state a claim for monopolization."); *Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*, 312 F. Supp. 2d 379, 391-92 (E.D.N.Y. 2004) (where plaintiff argued that a "single movie" or "single supplier's movies" could constitute a market, on the ground that "each movie is a unique product [and] has no adequate substitute," court held that "[t]his is exactly the sort of argument courts have routinely rejected in the past") (collecting cases); *Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 264-65 (S.D.N.Y. 2000) (market could not be limited to "licensing the Makeup Designs and other *Cats*-related intellectual property"); *Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.) (NBC could not constitute a market unto itself just because consumers might prefer "Friends," "Seinfeld," and "E.R." to the shows on other networks); *Theatre Party Assocs., Inc. v. Shubert Org., Inc.*, 695 F. Supp. 150, 154-55 (S.D.N.Y. 1988) (rejecting market definition that was limited to tickets to the early run of a particular Broadway show, nothing that "other forms of entertainment, namely other Broadway shows, the opera, ballet or even sporting events" could be "adequate  substitute products").

[10] *See Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 44-46 (2006) (rejecting "the 'patent equals market power' presumption"); *Lexmark Int'l, Inc. v. Impression Prods., Inc.*, 816 F.3d 721, 753 (Fed. Cir. 2016) (*Illinois Tool Works* overturned "antitrust presumption that patent (and copyright) owners have market power"); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 480 n.15 (3d Cir. 1992) ("modern courts and commentators reject [the] position" that trademarks "creat[e] presumptions of market power").

holding that market power could not be premised on the "uniqueness" of the copyrighted material that appeared on each of the thirteen stations. *Id.* at 1027-28.

The same goes for RMLC, which, like Mediacom, alleges that GMR possesses "exclusive rights" to a "unique set of copyrighted musical works" that consumers consider "must have." (FAC ¶¶ 76-78); *see Mediacom*, 460 F. Supp. 2d at 1026-27. The works in GMR's repertory are by definition "unique," and they may very well be "must have," but that does ***not*** mean the repertory is a market unto itself. *Mediacom*, 460 F. Supp. 2d at 1027-28.

By RMLC's logic, ***every*** songwriter would be a monopolist under the Sherman Act—an absurd proposition.[11] For example, Smokey Robinson could be said to have a "unique set of copyrighted musical works," for which he controls "100% of the public performance rights." (FAC ¶¶ 76-77.) Many radio stations consider Mr. Robinson's "prominent" works to be "must have" and "indispensable." (*Id.* ¶¶ 4, 70, 75, 81.) Since "many stations [allegedly] do not have total control over the songs they play," then without a license to Mr. Robinson's works, they "may risk infringement from the inadvertent broadcast of music in [his] repertory." (*Id.* ¶ 86.) Assuming Mr. Robinson did not affiliate with a PRO, then "[e]ven if a radio station were to obtain licenses from ASCAP, BMI, **and** SESAC"—and from GMR, for that matter—"it still would not have the right to play [Mr. Robinson's] exclusive works." (*Id.* ¶ 77 (emphasis in original).) While another writer might write fantastic songs of her own, a license to that writer's songs "would not be a substitute for a [Robinson] license, in any event, because [that writer] would by definition have a different repertory of works." (*Id.* ¶ 81.) The Court should reject this

---

[11] *Cf. Smith v. Network Solutions, Inc.*, 135 F. Supp. 2d 1159, 1169 (N.D. Ala. 2001) (granting summary judgment for defendants where "[p]laintiff's argument implie[d] that each individual domain name is a relevant market unto itself for antitrust purposes, subjecting the entity 'controlling' the name at a particular time, be it a registrar or even a legitimate registrant, to a charge of monopolization.").

market definition.

To the extent RMLC's market definition relies on the aggregation of intellectual property rights, its position produces the same perverse results. Every copyrighted song is unique, and any writer who has written more than one song could be characterized as a copyright "aggregator." Moreover, any PRO that obtained rights to more than one "must have" composition—say, for example, all of Drake's and Taylor Swift's works—would present the exact same situation that RMLC complains of. Although a radio station with licenses from SESAC, ASCAP, BMI, and GMR could choose from *over 22 million* compositions, it still would not be able to play any songs written by Drake or Ms. Swift. Under RMLC's logic, this lack of perfect substitution would render the repertory of this new two-songwriter PRO a discrete, but minuscule, relevant market. (*See* FAC ¶¶ 76-78.) And minuscule markets are "too unreliable a basis for a finding of monopoly power." *Lockheed Martin Corp. v. Boeing Co.*, 390 F. Supp. 2d 1073, 1080 (M.D. Fla. 2005) (citing *United States v. Baker Hughes Inc.*, 908 F.2d 981, 986 (D.C. Cir. 1990)).

RMLC itself seems to recognize the incoherence of its proposed market definition, implicitly conceding that GMR's "unique" works are interchangeable with songs under the control of other PROs. RMLC alleges that "even if a hypothetical new PRO entrant could induce some GMR affiliates to defect at the end of their contracts," GMR could maintain its supposed market power by simply "replac[ing] lost affiliates with new members that it lures away from other PROs." (FAC ¶ 81.) In other words, RMLC would apparently have this Court believe that GMR's songs are so "unique" that the 22 million songs in ASCAP's and BMI's repertories cannot substitute for them, but not sufficiently "unique" to preclude GMR from swapping in new, unnamed songwriters to make up for departed affiliates. Such internal

contradiction and incoherence warrant dismissal. *See Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, No. 13 C 1129, 2013 WL 4599903, at *4 (N.D. Ill. Aug. 29, 2013) (dismissing antitrust claims where allegations in plaintiff's complaint "contradict[ed] its narrow market definition").

### (2)    Licenses to "Essential" Copyrighted Works Are Reasonably Interchangeable

RMLC further alleges that licenses to the larger PROs' repertories are no substitute for a GMR license because GMR's repertory includes many "essential" works.  (FAC ¶¶ 76, 79.) These conclusory allegations appear to be based on two premises, both of which are flawed.

*First*, RMLC claims that GMR's works are essential because consumers demand them. For example, RMLC alleges that "virtually all" RMLC "stations must be able to play [GMR's 'must-have' works] to stay competitive." (*Id.* ¶¶ 105, 115, 4, 86.)  But the fact that "there might be some degree of preference" for certain songs in GMR's repertory does not render them a separate market. *Allen-Myland*, 33 F.3d at 206.  To the extent GMR has "spent time and energy differentiating [its] creation from the panoply of products in the market," that does not alter the fact that GMR competes with all other PROs. *Global Discount*, 960 F. Supp. at 705.

*Second*, RMLC claims that GMR's works are essential because "virtually all" stations cannot avoid playing them.  (*See e.g.*,  FAC ¶86 ("***virtually*** all stations cannot even try to program around those songs") (emphasis added); *see also id.* ¶¶ 105, 115, 59.)  Specifically, RMLC states that GMR "does not provide radio stations with any reliable, transparent . . . way to determine" the works in its repertory—a plainly inaccurate allegation, as RMLC as publicly admitted[12]—and "does not identify which of its works it controls 100%, and which it licenses

---

[12] On November 21, 2016, RMLC posted to its website a communication to radio stations (dated November 23, 2016), stating that GMR had provided a "spreadsheet including information about GMR's repertory" to RMLC "earlier this year."  (Mar. 3, 2017 Declaration of David Marroso, filed concurrently herewith ("Marroso Decl."), Ex. J.)  On November 22, 2016, RMLC posted a new version of the communication that omitted the reference to GMR having provided any

only fractionally." (FAC ¶ 45.)  According to RMLC, this makes it "effectively impossible for radio stations to avoid the risk of copyright infringement claims absent taking a license from GMR."  (*Id.*)

Even if the Court accepts that radio stations have no choice but to purchase a license from GMR, that still would not justify RMLC's proposed single-brand market.  In *Satnam Distributors v. Commonwealth-Altadis*, the court rejected this same argument.  The plaintiff there alleged that the relevant market was limited to "the distribution of CA's mass-market cigars."  *Satnam*, 140 F. Supp. 3d at 416 n.10.  "Plaintiff support[ed] this market definition by alleging that there are no substitutable products for any manufacturer's brands, including CA's, because convenience stores and wholesalers who purchase from distributors must carry ***all*** major brands of mass market cigars to satisfy end-user demand."  *Id.* at 419.  In dismissing the complaint, the court held that even if retailers had no choice but to "buy the ***full line*** of all manufacturers' mass market cigar brands," the market would "consist[] of every brand produced by every major manufacturer, rather than any subset thereof."  *Id.* at 420.  In other words, "where it is recognized as necessary in an industry to carry a full line of products," the relevant market consists of the "full line" of those products.  *Id.*; *see also*, *JBL Enters., Inc. v. Jhirmack Enters., Inc.*, 698 F.2d 1011, 1017 (9th Cir. 1983) (where "[t]he industry generally considers it necessary to carry a full line" of products, the relevant market consists of the full line; holding that relevant market was "full line of beauty products," rather than merely shampoos and conditioners).

---

spreadsheet earlier in the year.  (Marroso Decl., Ex. K.)  The Court may consider these documents in ruling on GMR's motion to dismiss because they show that the allegations in FAC are "demonstrably false."  *See, e.g.*, *Vavro v. Albers*, No. 2:05-cv-0321, 2006 WL 2547350, at *3 n.8  (W.D. Pa. Aug. 31, 2006) (considering documents submitted by defendants in support of motion to dismiss and noting "the Court is not required to accept as true a factual allegation that is clearly not true"); *White v. B.A.C. Home Loans Servicing, L.P.*, No. 4:10-cv-2137-CAS, 2011 WL 1483919, at *6 (E.D. Mo. Apr. 19, 2011) (considering evidence submitted by defendants which demonstrated that plaintiff's allegations were "simply inaccurate").

The same outcome follows here. RMLC alleges that the relevant consumers (radio stations) cannot pick and choose between multiple suppliers (PROs), but rather must purchase from **all** of them. (*See* FAC ¶ 77.) Likewise, RMLC alleges that the necessity of purchasing from each supplier means that no PRO license can substitute for any other. (*See id.*) RMLC's Sherman Act claim fails for the reason stated in *Satnam*: namely, the relevant market necessarily includes every license from every PRO, "rather than any subset thereof." 140 F. Supp. 3d at 420.

(3)     **Licenses to Different PRO's Repertories Are Reasonably Interchangeable by Radio Stations for the Same Purpose**

RMLC repeatedly characterizes GMR's works as "unique" and "essential," but apart from these superlatives, pleads no **facts** showing that licenses to other PROs' repertories could not reasonably substitute for a license to GMR's repertory. The operative question is whether the various PROs' licenses are "reasonably interchangeable by consumers **for the same purpose**." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513 (3d Cir. 1998) (emphasis added). The indisputable answer is **yes**.

RMLC alleges that radio stations "use a vast array of musical works," and that to gain access to them, they obtain performance licenses from PROs rather than directly from songwriters. (FAC ¶¶ 21-22.) As RMLC concedes, all of the PROs offer licenses, and radio stations use those licenses for the **exact same purpose**—to publicly perform the "vast array of musical works" in the PROs' repertories. (*Id.* ¶¶ 21-23.) By RMLC's own allegations, the PROs' licenses are reasonably interchangeable by radio stations for the same purpose.

The fact that the PROs do not offer licenses to **identical** compositions does not mean that their licenses do not serve the "same purpose" or are not "reasonably interchangeable." In *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81 (S.D.N.Y. 2015), the court held that an alleged market for "commercial licensing of NFL-related stock photographs" was implausible,

since it excluded such alternatives as licenses to other "sports-related photographs." *Id.* at 111-13.  Just as consumers obtain licenses to professional football photos for the "same purpose" as they do professional hockey or basketball photos—despite the fact that the respective sets of photos are not only "unique," but depict entirely different sports—radio stations obtain licenses to GMR's repertory for the "same purpose" as they do ASCAP's, BMI's, or SESAC's repertories.  To put this in concrete terms, while photographs of Flyers' great Eric Lindros and Lower Merion's Kobe Bryant may be unique, they are, in the eyes of antitrust law, "interchangeable."  *See Spinelli*, 96 S. Supp at 111-13.  The same is true for compositions written by Pharrell Williams (GMR) and Beyonce' (ASCAP)—they may be unique but they serve the same purpose (entertaining listeners) and are interchangeable in this market.

Because RMLC has not plausibly alleged that GMR, ASCAP, BMI, and SESAC licenses are not reasonably interchangeable, its proposed market definition necessarily fails.

### b.    RMLC Has Not Plausibly Pled Any Cognizable Barriers to Entry

Defining a relevant market is a necessary but insufficient requirement for proving market power.  RMLC must also plead facts demonstrating the existence of entry barriers.  *Parker v. Viacom Int'l, Inc.*, 605 F. Supp. 2d 659, 668 (E.D. Pa. 2009).  RMLC alleges two: "GMR's exclusive contracts and GMR's ability to share part of its monopoly profits with its cartel affiliates."  (FAC ¶ 85.)  Neither of these supposed "barriers" passes muster.

First, GMR's alleged "exclusive contracts with its members" are not a cognizable entry barrier.  (FAC ¶ 71.)  GMR entered the market and convinced writers to join GMR and enter into agreements with the new entrant after the artists' PRO-exclusive agreements with ASCAP, BMI, and SESAC expired.  Competitors can do the same by offering a better product or service after GMR's alleged exclusive arrangements with these artists expire.  The only barrier to entry

is the quality of the product being offered by the entrant. Nothing GMR does or is doing stands in the way. As this Court put it, any upstart competitor could "compete against [GMR] for subsequent contracts . . . or even persuade the present [GMR affiliates] not to renew their [GMR] contracts." *Fleer*, 658 F.2d at 150. Because exclusive agreements are often pro-competitive, any such a new entrant could seek exclusive commitments from writers as a means of competing with GMR. RMLC's allegation that new entrants "would not engage in anticompetitive exclusive dealing" is both utter speculation and wholly conclusory. But even if true, it does not present a barrier to entry; to the contrary, the ability to secure exclusive rights of writers incentivizes new entrants to join the competition. (FAC ¶ 81.)

Nor does GMR's alleged "ability to share part of its monopoly profits" with songwriters constitute a plausible entry barrier. RMLC claims that because GMR pays its songwriters more—by allegedly "shar[ing] part of its monopoly profits" with them—"no other PRO can successfully lure significant numbers of GMR members away from GMR." (FAC. ¶ 81.) This allegation is belied by GMR's own recent entry into the PRO market and the fact that GMR "lured" away several dozen songwriters, even before it had allegedly begun reaping monopoly profits. *See Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792-93 (2d Cir. 1987) (concluding as a matter of law that, where a new competitor had entered the market and existing competitors had expanded their operations, entry barriers were low). RMLC does not allege any facts to support the notion that other upstart PROs cannot offer terms—financial or otherwise— that rival GMR's. RMLC does not allege GMR has been successful in signing every writer to whom it has extended an offer, or that any other new entrant has been *un*successful in any attempts to sign writers. That those PROs might have to spend money to get there is of no instance, since even multimillion-dollar capital expenditures are not a cognizable barrier to entry.

*See Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1200-01 (3d Cir. 1995) ("couple of million dollars" capital requirement did not pose barrier to entry); *see also Int'l Distrib. Ctrs.*, 812 F.2d at 792-93 ("relatively large" capital outlays not a high entry barrier). The Third Circuit has held that "the pharmaceutical drug market" does not have high entry barriers, notwithstanding the notoriously lengthy and expensive FDA approval process. *See Barr Labs., Inc.*, 978 F.2d at 113. It strains credulity to think that the alleged market here is characterized by entry barriers higher than those in the pharmaceutical industry.[13]

## IV. THE INTERIM LICENSE ALLEGATIONS FAIL TO STATE A CLAIM.

This section addresses the allegations in the First Amended Complaint that relate or refer to the Interim License Allegations, which are the subject of GMR's Motion to Strike. If the Court grants that Motion to Strike, it need not consider this Section. As we explain immediately below, however, even with the Interim License Allegations, the RMLC failed to plead plausible harm to competition or market power.

### A. The Interim License Agreement and GMR Interim Licenses are Creatures of This Litigation and Are Not Reflective of General Market Conditions.

In citing the Interim License Agreement and GMR Interim Licenses as evidence of monopoly power and anticompetitive conduct, RMLC employs transparently circular logic. In essence, RMLC argues that this action is necessary to fix market problems—then uses a settlement *in this action* as proof those market problems exist. But RMLC cannot, with a

---

[13] RMLC also alleges that "even if a hypothetical new PRO entrant could induce some GMR affiliates to defect at the end of their contracts, the GMR cartel would remain in full effect," since GMR could simply "replace lost affiliates with new members that it lures away from other PROs." (FAC ¶ 81.) But what RMLC is describing is the essence of competition—rivals "luring" away customers from one another, jockeying to maintain and expand their market shares. The allegation only further underscores the incoherence of RMLC's market definition. *See Satnam*, 140 F. Supp. 3d at 418 (dismissal is appropriate where plaintiffs' allegations "'make[] no economic sense'") (quoting *Theatre Party*, 695 F. Supp. at 154).

straight face, ask this Court to believe RMLC's claims in this litigation *because of an agreement settling a dispute in this litigation.*

Like any injunctive relief RMLC might have secured,[14] the Interim License Agreement was born of this litigation. They are flip sides of the same coin. Magistrate Judge Sitarski presented RMLC with two options for dealing with the harm RMLC claimed its stations would suffer absent an injunction: Either litigate the preliminary injunction or negotiate an interim license with GMR. (Dec. 8, 2016 Hrg. Tr. 13:14-17, 18:21-25.) Either option would temporarily alleviate RMLC members' fears of copyright infringement litigation, while allowing RMLC stations to continue playing GMR artist works. Ultimately, the Interim License Agreement between RMLC and GMR settled the preliminary injunction dispute. The two are fundamentally intertwined as creatures of this litigation, as are the GMR Interim Licenses that followed.

Had RMLC secured an injunction, GMR could hardly have defended against claims in this antitrust suit by pointing to GMR's compliance with that injunction. So, too with the Interim License Agreement, which effectively replaced the injunction effort. It would be illogical to use compliance with a court order to establish market conditions; likewise, RMLC's reliance on the Interim Agreement to establish an alleged lack of competition in that market defies logic.

Finally, even if the court determines that Federal Rule of Evidence 408 does not bar reliance on the Interim License Agreement and GMR Interim Licenses entirely, RMLC cannot point to terms of an interim settlement of claims *in this litigation* as plausible support for claims *in this litigation*. ven if such allegations are properly before this Court, they are irrelevant to and do not save RMLC's otherwise flawed claims.

---

[14] GMR disputes that the RMLC's Preliminary Injunction Motion had any merit, or would have been granted under any circumstances, and accepts the contrary premise here solely for the purpose of argument.

**B.** **Like the Pre-Complaint Conduct Allegations, the Interim License Allegations Fail to Plausibly Allege Harm to Competition or Market Power.**

Just as the pre-complaint conduct allegations do not support a claim of harm to competition, the Interim License Allegations do not either; nor do they provide direct or indirect evidence of market power, or do nothing to save the FAC's implausible market definition. The arguments and bases for dismissal discussed in detail above apply with equal force to the FAC's conclusory allegations that the Interim License Agreement fee and GMR Interim Licenses fees are "supracompetitive" or that these agreements are "anticompetitive." (FAC ¶62.)

**1.** **RMLC Alleges No Facts to Support Its Hollow Characterization of the Interim License Agreement and GMR Interim License Fees As "Supracompetitive"**

RMLC pleads no facts showing that the fee contemplated by the Interim License Agreement and included in the GMR Interim Licenses—the only *actual* price RMLC even bothers to characterize as "supracompetitive" (*see* FAC ¶¶ 61–63, 86–87)—exceeds competitive levels. It is simply not enough to allege that one's prices are high, or even that one's prices are higher than those of his competitor. *See Harrison Aire*, 423 F.3d at 381 (a seller's "comparatively high price" does not alone "support a reasonable inference of monopoly power"); *Leegin Creative Leather Prods.*, 551 U.S. at 895 (antitrust law does not prohibit charging high prices, which can have procompetitive effects and are not indicative of market power). Rather, under Third Circuit law, the plaintiff must furnish an "analysis of the defendant's costs," showing both an "abnormally high price-cost margin" and "restricted output." *Mylan*, 838 F.3d at 434 (quotation omitted). RMLC alleges neither here, nor could it. Lacking any such supporting facts or analysis, RMLC's claim that the interim license fee is "supracompetitive" is nothing more than the type of "label" and "conclusion" the Supreme Court has said "will not do." *See Twombly*, 550 U.S. at 555 ("labels and conclusions . . . will not do"); *Jacobs v.*

*Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010) (affirming dismissal of Sherman Act claims where "there [was] nothing establishing the competitive level above which TPX's allegedly anticompetitive conduct artificially raised prices"); *In re McCormick & Co., Inc.*, Misc. No. 15-1825 (ESH), — F. Supp. 3d —, 2016 WL 6678340, at *7 (D.D.C. Nov. 11, 2016) ("Conclusory allegations of supracompetitive prices are not sufficient."). The Interim License Allegations thus cannot help establish the crucial market power and consumer harm elements otherwise lacking in the FAC.

2. **The Record in This Action Regarding the Interim License Agreement Undermines RMLC's Theory of Market Power**

The record in this action regarding the Interim License Agreement actually ***contradicts*** a fundamental tenant of RMLC's market definition argument: namely, that RMLC and its member stations "had no choice" in dealing with GMR. RMLC alleges numerous times that it and "many" of its members had no choice but to agree to the GMR Interim Licenses in particular. (FAC ¶¶16(i), 60-62, 86, 96, 105.) But RMLC's conclusory allegations cannot manufacture a lack of choice that neither the ***facts*** it alleges, nor the record in this action, support.

RMLC alleges nothing to suggest RMLC could not have foregone seeking an interim license arrangement for its members, just as RMLC was apparently doing *before* Magistrate Judge Sitarski suggested the interim license alternative at the December 8, 2016 hearing. RMLC did not withdraw its preliminary injunction motion until after the parties had reached an agreement regarding the interim license, so at any point, RMLC could have returned to its initial plan and continued to litigate that motion. RMLC's decision to instead negotiate an interim license with GMR is inconsistent with any claim that RMLC was backed into a corner, forced to secure by litigation what it could not achieve in the open market.

The record in this action also reflects RMLC choosing to co-draft, approve, and

communicate to its members the terms of the Interim License Agreement.[15] This record—as opposed to RMLC's conclusory allegations regarding the Interim License Agreement—reveal that RMLC is not the hapless victim at the mercy of a monopolist that it claims to be.[16]

### C.    RMLC Cannot Complain of Terms RMLC Co-Drafted, Encouraged, and Assisted in Implementing.

Where a plaintiff bears "substantially equal responsibility" for the challenged conduct, his involvement is "truly complete" and that conduct cannot form the basis for an antitrust suit. *Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428, 437 (D. Del. 2011) (quoting *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1108 (1st Cir. 1994)).  The Third Circuit has recognized that such "truly complete involvement and participation in a monopolistic scheme" could bar suit on the basis of that scheme.  *Howard Hess Dental Labs. Inc. v. Dentsply Int'l., Inc.*, 424 F.3d 363, 381 (3d Cir. 2005) (quoting *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968)).

Such is the case with all conduct RMLC alleges regarding the Interim License Agreement and GMR Interim Licenses.  RMLC "bears at least substantially equal responsibility" for the Interim License Agreement because it participated in "creating, approving, maintaining, continually and actively supporting, relying upon, or otherwise utilizing and implementing" the Interim License Agreement to its benefit of RMLC members.  *Sullivan*, 34 F.3d at 1107.  RMLC

---

[15] *See* Interim License Agmt. § 7(a), Marroso Decl., Ex. A (referring to "the negotiations that led to this agreement"); *see also.,* Dec. 21, 2016 Hrg. Tr. 3:16-4:17 (RMLC counsel reporting on negotiations and informing Judge Sitarski  the two parties were very close to an agreement, which would include RMLC communicating terms to its members); *id.* 4:13-17 (RMLC counsel describing the parties as "work[ing] out" terms for the agreement, and noting "there's a strong incentive on both sides to make that happen as quickly as possible"); *id.* 5:15-19 (RMLC counsel noting the parties were "close to a deal").

[16] Further underscoring this point, RMLC does not allege that all RMLC members have entered into a GMR Interim License.  Indeed, it alleges that some have not.  This is inconsistent with RMLC's allegations that stations have no choice but to accept the terms GMR "unilaterally demands."

subsequently "actively supported" the agreement by withdrawing its preliminary injunction motion, per the terms of the Interim Agreement, and communicating the availability of the license to its members. *Wallach*, 814 F. Supp. 2d at 438; Dec. 21, 2016 Tr. at 4:7-12; 5:11-19.) And RMLC members then "relied on" and "utilized" the agreement by purchasing licenses under its terms. *See Sullivan*, 34 F. 3d at 1107. RMLC had no problem pursuing a preliminary injunction in lieu of seeking an interim license from GMR prior to Judge Sitarski's suggestion; it cannot now claim the Interim License Agreement was its *only* way "insure survival" of RMLC members. *Cf. Goldlawr, Inc. v. Shubert*, 268 F. Supp. 965, 969-70 (E.D. Pa. 1967) (finding plaintiff had no choice but to enter into agreement with defendant where the agreement was the plaintiff's only way to "insure [its] survival").

## V.    CONCLUSION

Rule 12(b)(6) exists for cases like this one—a complaint heavy with rhetoric but bereft of fact; where a plaintiff seeks to use, abuse, contort, and distort the antitrust laws for perceived tactical advantage; and where the actual facts of the complaint—not its bare legal conclusions or editorializing—establish beyond any doubt that the new entrant in the PRO industry with seventy-four writers and a tiny share of the market cannot act in a legally proscribed anticompetitive manner. RMLC is not entitled to splatter a court document with buzzwords like "monopolist," "market power," and "unilaterally dictated" and automatically impose crushing economic expense on GMR. The case must be dismissed.

Dated:  March 3, 2017                    O'MELVENY & MYERS LLP


By: */s/ Daniel M. Petrocelli*
      Daniel Petrocelli (*pro hac vice*)
      dpetrocelli@omm.com
      David Marroso (*pro hac vice*)
      dmarroso@omm.com
      O'MELVENY & MYERS LLP
      1999 Avenue of the Stars
      Los Angeles, California  90067
      Telephone:  (310) 553-6700
      Facsimile:  (310) 246-6779

      Richard G. Parker (*pro hac vice*)
      rparker@omm.com
      Edward D. Hassi (*pro hac vice*)
      ehassi@omm.com
      O'MELVENY & MYERS LLP
      1625 Eye Street, NW
      Washington, DC 20006
      Telephone:  (202) 383-5300
      Facsimile:  (202) 383-5414

      Neill C. Kling
      nkling@harkinscunningham.com
      HARKINS CUNNINGHAM LLP
      4000 Two Commerce Square
       2001 Market Street
       Philadelphia, PA 19103
      Telephone: (215) 851-6700

      *Attorneys for Global Music Rights,  LLC*