**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RADIO MUSIC LICENSE COMMITTEE, INC., | Civil Action |
| Plaintiff, | No. 2:16-cv-06076-CDJ |
| v. | Judge C. Darnell Jones, II |
| GLOBAL MUSIC RIGHTS, LLC, | |
| Defendant. | |

**PLAINTIFF RADIO MUSIC LICENSE COMMITTEE, INC.'S OPPOSITION
TO DEFENDANT GLOBAL MUSIC RIGHTS, LLC'S MOTION TO
DISMISS FOR FAILURE TO STATE A CLAIM**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................1

RELEVANT FACTUAL ALLEGATIONS ............................................................2

PROCEDURAL HISTORY.....................................................................................7

ARGUMENT ..........................................................................................................9

I.     THE COMPLAINT SUFFICIENTLY ALLEGES BOTH DIRECT AND
INDIRECT EVIDENCE OF GMR'S MARKET POWER ............................10

       A.     The Complaint Alleges Ample Direct Evidence Of GMR's Market Power ........10
       B.     The Complaint Also Alleges Sufficient Indirect Evidence Of GMR's
Market Power...........................................................................................14
       C.     GMR's Attacks On RMLC's Product Market Fail For The Same Reason
That SESAC's Same Arguments Failed .................................................16
       D.     RMLC Has Plausibly Alleged Barriers To Entry .................................19

II.    THE COMPLAINT PLAUSIBLY ALLEGES HARM TO COMPETITION .................20

       A.     GMR Has Harmed And Threatens To Continue To Harm Competition By
Charging Supracompetitive Prices For A Product Of Inferior Quality ................21
       B.     GMR's Exclusive Contracts With Its Affiliate-Competitors Harm
Competition..............................................................................................23
       C.     GMR Has Harmed Competition By Reducing Consumer Choice........................25
       D.     GMR Has Harmed Competition By Creating Economic Inefficiency .................27
       E.     The Complaint Alleges Antitrust Injury .................................................28

III.   THE COMPLAINT DOES NOT RELY ON THE INTERIM LICENSE AS AN
INDEPENDENT BASIS TO PROVE GMR'S VIOLATION OF THE
ANTITRUST LAWS .................................................................................28

CONCLUSION.....................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
441 U.S. 1 (1979)................................................................................12

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007) ...................................................10, 13, 14

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984)............................................................................29

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
658 F.2d 139 (3d Cir. 1981).............................................................24, 25

*Full Draw Prods. v. Easton Sports, Inc.*,
182 F.3d 745 (10th Cir. 1999) ............................................................27

*Gordon v. Lewistown Hosp.*,
423 F.3d 184 (3d Cir. 2005)................................................................21

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
806 F.3d 162 (3d Cir. 2015)................................................................14

*In re Horizon Healthcare Servs. Inc. Data Breach Litig.*,
846 F.3d 625 (3d Cir. 2017)................................................................22

*Marchbanks Truck Serv., Inc. v. Comdata Network, Inc.*,
2011 WL 11559549 (E.D. Pa. Mar. 24, 2011)......................................28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 575 (1986)............................................................................19

*Mediacom Communications Corp. v. Sinclair Broadcast Group, Inc.*,
460 F. Supp. 2d 1012 (S.D. Iowa 2006) ..............................................18

*Meredith Corp. v. SESAC LLC*,
1 F. Supp. 3d 180 (S.D.N.Y. 2014) ........................................... *passim*

*Meredith Corp. v. SESAC LLC*,
No. 09-cv-9177, 2011 WL 856266 (S.D.N.Y. Mar. 9, 2011)......................... *passim*

*Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*,
596 F.2d 573 (3d Cir. 1979).............................................................13, 21

*In re Mushroom Direct Purchaser Antitrust Litig.*,
   514 F. Supp. 2d 683 (E.D. Pa. 2007) ...................................................................28

*Mylan Pharmaceuticals Inc. v. Warner Chilcott Public Ltd.*,
   838 F.3d 421 (3d Cir. 2016) ..............................................................................10

*Palmer v. BRG of Georgia, Inc.*,
   498 U.S. 46 (1990) (per curiam) ........................................................................23

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
   392 U.S. 134 (1968) ...........................................................................................29

*RMLC v. SESAC, Inc.*,
   29 F. Supp. 3d 487 (E.D. Pa. 2014) ............................................................ *passim*

*RMLC v. SESAC, Inc.*,
   No. 12-cv-5807, 2013 WL 12114098 (E.D. Pa. Dec. 23, 2013).................... *passim*

*Satnam Distributors LLC v. Commonwealth-Altadis, Inc.*,
   140 F. Supp. 3d 405 (E.D. Pa. 2015) ..................................................................18

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
   530 F.3d 204 (3d Cir. 2008) ..............................................................................21

*United States v. Archer-Daniels-Midland Co.*,
   866 F.2d 242 (8th Cir. 1988) .............................................................................18

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005).................................................................12, 23, 26

*United States v. Johns-Manville Corp.*,
   259 F. Supp. 440 (E.D. Pa. 1966) ......................................................................13

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .............................................................................13

*W. Penn Allegheny Health Sys. v. UPMC*,
   627 F.3d 85, 100 (3d Cir. 2010) ...................................................................21, 27

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012)...............................................................................23

## RULES

Fed. R. Civ. P. 12(b)(6)...............................................................................................10

## OTHER AUTHORITIES

U.S. Dep't of Justice, *Statement of the Department of Justice on the Closing of the Antitrust Division's Review of the ASCAP and BMI Consent Decrees* at 3 (Aug. 4, 2016) ("DOJ Statement"), *available at* https://www.justice.gov/atr/file/882101/download.................................................................12

## INTRODUCTION

GMR's motion to dismiss for failure to state a claim runs right into two decisions of this Court, and two decisions in the Southern District of New York, all of which held that substantially similar allegations relating to SESAC, another unregulated performing rights organization ("PRO"), stated a plausible claim for relief under the antitrust laws. *RMLC v. SESAC, Inc.* ("*SESAC I*"), No. 12-cv-5807, 2013 WL 12114098 (E.D. Pa. Dec. 23, 2013) (Sitarski, J.); *RMLC v. SESAC, Inc.* ("*SESAC II*"), 29 F. Supp. 3d 487 (E.D. Pa. 2014) (Jones, J.); *Meredith Corp. v. SESAC LLC* ("*Meredith I*"), No. 09-cv-9177, 2011 WL 856266 (S.D.N.Y. Mar. 9, 2011) (Buchwald, J.); *Meredith Corp. v. SESAC LLC* ("*Meredith II*"), 1 F. Supp. 3d 180 (S.D.N.Y. 2014) (Engelmayer, J.).   If the arguments that GMR makes throughout its motion sound familiar to the Court, that is for good reason; they are the same arguments that SESAC made and four separate judges rejected.  The fifth time is not a charm.

GMR's argues that it is different from SESAC because its business model is new, or "innovat[ive]," or something, but on the allegations of the complaint, GMR's conduct is not new or innovative at all.  Mem.[1] at 2.  GMR offers radio stations nothing new except higher prices. Like the other three PROs, GMR grants radio stations and other consumers the right to perform works that it claims are owned by the songwriters and publishers who are its affiliates.   But unlike the other PROs, GMR is not subject to any restraints on its pricing and, so, is deploying a calculated scheme to extort the radio industry.  GMR has publicly bragged that it intentionally created a repertory of copyrighted songs that it knows radio stations "cannot exist without." Without  this  Court's  intervention,  GMR  will  succeed  in  forcing  radio  stations  to  pay

---

[1]     GMR's Memorandum of Law in Support of Motion to Dismiss for Failure to State a Claim, Dkt. No. 58-1 ("Mem.").

supracompetitive rates for a license to play those songs or else face the risk of catastrophic infringement suits.

Cutting through its rhetoric, GMR's motion to dismiss raises only a limited challenge to the sufficiency of the First Amended Complaint, Dkt. No. 52 ("FAC"). GMR focuses on two points: has RMLC plausibly alleged that GMR has market power? And, has RMLC plausibly alleged that GMR's conduct harms competition? The answer to both questions is yes.

GMR argues that the complaint fails to state a claim because, on the face of the complaint, RMLC cannot plausibly allege that it, as a PRO with a limited number of songwriter-copyright holders, is exercising market power in a market and has engaged in exclusionary conduct by virtue of that power. The complaint allegations refute that argument. The Court should deny GMR's motion and permit this case to proceed promptly to discovery so that RMLC can move forward to stop the monopolistic abuse that GMR seeks to inflict on the U.S. commercial radio industry.

## RELEVANT FACTUAL ALLEGATIONS

GMR's motion to dismiss runs right into a long history of the antitrust implications of the conduct of PROs in this country. It has been well-established for more than 75 years that PROs, if left unregulated, are anticompetitive and violate the Sherman Act. FAC ¶ 29. The two largest PROs, ASCAP and BMI, have been operating under consent decrees overseen by DOJ since the early 1940s. *Id.* ¶ 30. Those consent decrees require monitoring of ASCAP and BMI's license rates by a federal court to make sure that they are not anticompetitive. *Id.* ¶ 31; *see also SESAC II*, 29 F. Supp. 3d at 492. The consent decrees also prohibit, among other things, each of those PROs from interfering in any way with the ability of music users, like radio stations, to license copyrights directly from the copyright owners, instead of licensing through a PRO. FAC ¶ 31, 46. In August 2016, after a two-year review, DOJ concluded that both the ASCAP and BMI

consent decrees should not be amended because they are still necessary to prevent harm to competition. *Id.* ¶¶ 64-65.

GMR is not the first to try to ignore the relevant PRO history.  In October 2012, RMLC brought suit against the third PRO, SESAC, which is not subject to any consent decree, in this Court.  *Id.* ¶¶ 32-33.  SESAC, much like GMR years later, thought that because it was unregulated, it could exploit a repertory of works that U.S. radio stations could not reasonably avoid broadcasting.  RMLC brought a motion for a preliminary injunction against SESAC and, following a three-day hearing with live testimony from fact witnesses and expert economists for both sides, U.S. Magistrate Judge Lynne Sitarski found that RMLC had shown a likelihood of success on its Section 2 claim.  *SESAC I*, 2013 WL 12114098, at *13-20.  Judge Sitarski agreed with RMLC that "there are no substitutes for a SESAC license and the relevant market is the market for SESAC's blanket license."  *Id.* at *10.  Additionally, she found that SESAC monopolized the market by "offering only blanket licenses without any real alternatives and setting prices without restriction," and "by failing to disclose its repertory and ensuring that users have no alternatives but to purchase their licenses."  *Id.* at *19-20.[2]  On February 20, 2014, this Court adopted Judge Sitarski's report and recommendation "in full" (except for one change to one factual finding).  *See* Order, RMLC v. SESAC Inc., Civ. A. No. 12-cv-5807 (E.D. Pa. Feb. 20, 2014), Dkt. No. 68.

This Court later denied SESAC's motion to dismiss RMLC's Section 2 claim.  *SESAC II*, 29 F. Supp. 3d at 499-502.  The Court found that the complaint "cogently portray[ed]" illegal monopolization in violation of Section 2 of the Sherman Act by alleging that "SESAC excludes

---

[2]    Despite finding that RMLC had a likelihood of success, Judge Sitarksi ultimately recommended against a preliminary injunction after finding that the harm SESAC threatened was not irreparable.  *Id.* at *20-22.

competitors by obtaining a critical mass of must-have works, selling them exclusively in the blanket license format, discouraging direct licensing by not offering carve-out rights and obscuring the works in its repertory." *Id.* at 501.

Following the Court's denial of SESAC's motion to dismiss and the Court's adoption of Judge Sitarski's findings that RMLC was likely to succeed on its Section 2 claim, SESAC decided to settle the litigation.  FAC ¶ 37.  In July 2015, RMLC and SESAC entered into a 20-year settlement agreement that prevents SESAC from imposing supracompetitive rates on RMLC-represented stations and restores copyright owners' ability to competitively license their works directly to radio stations.  *Id.*  Under the agreement, SESAC and RMLC agreed to negotiate in good faith to set rates and licensing terms through the year 2037, and if negotiations fail, rates are determined through binding arbitration.  *Id.*  Additionally, SESAC committed to provide greater transparency regarding the songs in its repertory and to cease entering into agreements with affiliates amounting to *de facto* exclusive licenses.  *Id.*

SESAC engaged in a nearly identical course of anticompetitive licensing practices with respect to U.S. television stations.  *Id.* ¶ 38.  In 2009, a group of local television stations brought a class action in the Southern District of New York alleging that SESAC violated Sections 1 and 2 of the Sherman Act by forcing stations to accept "all or nothing" blanket licenses and engaging in other actions "to close off to stations alternative or less expensive sources of performance rights."  *Meredith II*, 1 F. Supp. 3d at 194-95.  The Honorable Naomi Reice Buchwald denied SESAC's motion to dismiss, *Meredith I*, 2011 WL 856266, and the Honorable Paul A. Engelmeyer denied in part SESAC's motion for summary judgment based on evidence showing that SESAC "engaged in an overall anti-competitive course of conduct designed to eliminate meaningful competition to its blanket license" and monopolized the market for the performance

4

rights to the music in its repertory, 1 F. Supp. 3d at 196, 222.  Following that ruling, SESAC settled the suit by paying $58.5 million to the television industry and by agreeing to an arbitration procedure to determine reasonable rates.  *See* Meredith Corp. v. SESAC LLC,  No. 09-cv-9177 (S.D.N.Y. Oct. 15, 2014), Dkt. No. 175, Ex. 1.

GMR has eagerly copied the unlawful SESAC tactics that were the subject of this Court's rulings and the *Meredith* litigation.  FAC ¶ 39.  From its inception in 2013, GMR's goal has been to lure a relatively small but strategically selected group of coveted songwriters away from ASCAP and BMI with a promise to pay them at least 30% more than ASCAP or BMI can pay them.  *Id.* ¶ 41.  To fund this promise, GMR intends to price gouge radio stations and force them to pay exorbitant rates for licenses to perform those songwriters' works.  *Id.*

GMR purposefully amassed a bundle of 30,000 essential works (that continues to grow), from 70+ songwriters, enjoying even more success than SESAC did in its own similar effort.  *Id.* ¶¶ 42, 44.  That repertory includes works written or performed by stars Adele, Aerosmith, the Beatles, Bruno Mars, Jay-Z, Madonna, Pharrell Williams, Ryan Tedder, Steve Miller Band, Taylor Swift, Tom Petty & The Heartbreakers, and U2, among many others.  *Id.* ¶ 44.  GMR's goal was to create an indispensable repertory of "must-have" musical works that radio stations, as a practical matter, could not avoid playing, so that those stations would have no choice but to purchase a license from GMR at whatever rate GMR demanded.  *Id.* ¶ 4.  GMR accomplished its goal.  In the words of its founder, Irving Azoff:  "We have a full roster of songwriters that **<u>nobody can, shall we say, comfortably exist without</u>**."  *Id.*

GMR has doubled-down on its scheme by taking extra steps to insulate itself from any attempt that a radio station might make to try to "comfortably exist without" a GMR license.  *Id.* ¶ 5.  ***First***, GMR does not enable radio stations to determine reliably what works are in its

repertory at any given time. *Id.* Thus, even where a station is willing to try to operate without using GMR's "must have" repertory, GMR does not make available a feasible and reliable method that radio stations can use to determine, with any level of confidence, what works they would need to avoid playing in order to operate without risk of copyright infringement. *Id.*

**Second**, GMR does not offer the kind of blanket license to all the works in their repertories that ASCAP and BMI are required to offer under the consent decrees. *Id.* ¶ 6. GMR does not tell radio stations, in any reliable, transparent way, which of its works it has the full right to license and which works it only offers to license "fractionally," at any given time. *Id.* ¶ 7. This obfuscation is intentional; if GMR were truly transparent about the works in its repertory, some stations may seek to avoid playing works that are not covered by their licenses from other PROs (to the extent it is possible to do so) and thus conclude that they do not need to purchase a GMR license. *Id.* That, however, would be contrary to GMR's business model, so it has taken steps to make sure that stations cannot do so. *Id.* GMR's behavior is intentional and designed to insulate and grow its market power.

**Third,** GMR has admitted that it has express exclusive licenses with its affiliates— meaning that GMR and its affiliates have each agreed, by express contract, that the affiliate cannot enter into a direct license with any radio stations. *Id.* ¶ 8. GMR's affiliates are its potential competitors, so these exclusive contracts represent potential competitors expressly agreeing not to compete with each other. *Id.* ¶ 78. This Court has already held that similar exclusive contracts contribute to a PRO's monopoly power. *SESAC II*, 29 F. Supp. 3d at 501 (SESAC's de facto exclusive dealing qualified as exclusionary conduct for Section 2 claim).

**Fourth**, GMR has made clear that it will not offer RMLC members any practicable form of license other than a blanket license. *Id.* ¶ 9. It will not offer per-program licenses, adjustable

fee blanket licenses or any other alternatives to its blanket license. *Id.* ASCAP's and BMI's ability to engage in direct license transactions (facilitated by the fact they may only license on a non-exclusive basis on behalf of their members) and the availability of these alternatives to blanket license structures, are characteristics central to those PROs' success in surviving antitrust challenges. GMR licensing offers no such pro-competitive features. *Id.* As a result, GMR improperly derives immense monopoly power from the bundle of copyrighted music in its repertory. *Id.* ¶ 10.

GMR's creation of a bottleneck to public-performance-right licenses for the works in its repertory contributes no efficiency benefits of any kind. Instead, GMR has extracted and will continue to extract monopoly rents for copyrighted music that would otherwise be available at competitive rates. *Id.* ¶ 11.

## PROCEDURAL HISTORY

After negotiating with GMR on behalf of its member stations, RMLC ultimately determined that GMR threatened to perpetrate the same anticompetitive harms that SESAC wrought on the industry. FAC ¶ 50. GMR has exerted its monopoly power by demanding outrageous fees that are grossly disproportional to the underlying share of works in its repertory. First, although GMR's share is approximately between 5% and 7.5% based on a weighted percentage of total plays, GMR has demanded fees based on an artificial and inflated "value share" that equates to more than 15% of U.S. radio public performance license fees. *Id.* ¶ 52. Second, GMR offers only a fractional license, which means that, for a majority of the works within GMR's repertory which consist of co-owned works only partially controlled by GMR, its blanket license would not protect a station from an infringement lawsuit by the owners of the remaining fractions. *Id.* ¶ 53. Third, GMR has demanded additional rate increases for each of 2018 and 2019, regardless of the future contents of its repertory. *Id.* ¶ 55.

GMR's scheme also threatens to lead to higher prices on an industry-wide level, far beyond GMR and its own repertory.  *Id.* ¶ 106.  Even since the filing of this suit, two other PROs—BMI and SESAC—have made clear that they will try to extract higher license fees from radio stations by benchmarking their rate demands to those GMR seeks to extort from RMLC stations.  *Id.*  Thus, if GMR succeeds in imposing its artificially inflated rates, radio stations could be forced to pay monopoly rents to these regulated PROs as well.  *Id.*

GMR also implicitly threatened that, if RMLC did not agree to its demands, any RMLC stations that had not signed a license with GMR by January 1, 2017 would be at risk of potential infringement suits.  *Id.* ¶ 51.  In early November 2016, GMR definitively refused RMLC's offer to pay an interim, reasonable royalty and have a neutral arbitrator set final rates.  *Id.* ¶ 57.

Because it wields complete market power, GMR's refusal left RMLC no choice but to file this lawsuit and to seek emergency preliminary injunctive relief before the December 31, 2016 deadline.  RMLC did so on November 18, 2016.  *Id.* ¶ 58.  When RMLC filed its original complaint on November 18, 2016, it said that, unless this Court issued the preliminary injunction that RMLC was seeking concurrently with the complaint, most radio stations would have no choice but to accede to GMR's demands because they could not risk bankrupting themselves to defend copyright infringement claims.  And that is what happened.  *Id.* ¶ 59.

On November 23, 2016, the Court referred RMLC's preliminary injunction motion to Magistrate Judge Sitarski for a hearing.  At Magistrate Judge Sitarski's urging (*see* Dkt. No. 9), and to obviate RMLC's pending preliminary injunction motion, GMR agreed to offer a nine-month interim license to all radio stations that did not already have one; that license would not prejudice RMLC member stations or GMR from seeking relief based on a claim that the interim license rates are too high or too low.  FAC ¶ 60.  GMR unilaterally dictated the interim license

price (it was not subject to negotiation) and GMR only agreed to offer it on the condition that RMLC withdraw its preliminary injunction motion. *Id.*

On December 24, 2016, RMLC announced to its members the terms of the interim license that GMR had agreed to offer them, and then withdrew its preliminary injunction motion without prejudice. *Id.* ¶ 61. Lacking any choice, RMLC member stations were forced to take-or-leave GMR's unilaterally-dictated terms for that interim license, and many purchased the interim license. *Id.* Still other RMLC member stations contacted GMR before the January 31, 2017 deadline for taking an interim license in an effort to purchase one, but GMR did not respond to them to them before that date. *Id.* And GMR continues to demand supracompetitive rates for a non-interim license. *Id.*

As detailed in RMLC's opposition to GMR's motion to strike, GMR is in material breach of the interim license agreement and has refused even to acknowledge, much less to cure, that breach. RMLC Opp. to Mot. to Strike at 5-6 (filed concurrently herewith).

## ARGUMENT

This is not new territory. The Court should deny GMR's motion to dismiss for the same reasons that it (and the *Meredith* court) previously found merit in Section 2 claims against SESAC. *See SESAC I*, 2013 WL 12114098, at *13-20; *SESAC II*, 29 F. Supp. 3d at 497-502; *Meredith Corp.*, 2011 WL 856266, at *14-15; *Meredith Corp.*, 1 F. Supp. 3d at 222-23. GMR's conduct is like SESAC's, only worse. Like SESAC, GMR intentionally pooled copyrighted musical works into a single must-have blanket license that it offers without meaningful alternatives, and it insulates itself from competition by not enabling stations to determine with reliability the works in its repertory and by entering into exclusive contracts with its affiliates. Doing all this enables it to demand supracompetitive license fees.

GMR moves to dismiss on only two grounds; RMLC supposedly fails to allege: (1) market power, and (2) harm to competition.   Because GMR thus concedes that RMLC adequately pled all of the other elements of its claims, we address only those two issues below.

## I.   THE COMPLAINT SUFFICIENTLY ALLEGES BOTH DIRECT AND INDIRECT EVIDENCE OF GMR'S MARKET POWER

Monopoly power may be established either through "direct evidence" of anticompetitive effects, such as the ability to dictate supracompetitive prices or to restrict output,[3] or though "indirect evidence" of a dominant share in the relevant market.  *Broadcom*, 501 F.3d at 307.  The complaint sufficiently alleges both.

### A.   The Complaint Alleges Ample Direct Evidence Of GMR's Market Power

As was true for SESAC, direct evidence of GMR's monopoly power abounds in the form of GMR's supracompetitive pricing.  GMR has (and continues to threaten to exercise) the power to impose and maintain exorbitant prices that are proportionately greater than those charged for most of the same works by the much larger ASCAP and BMI, without suffering any loss of sales.  FAC ¶¶ 52, 77-79, 81.  Indeed, GMR admits that its entire purpose is to charge radio stations *more* than PROs that are subject to antitrust constraints that ensure their rates are fair and reasonable.  *Id.* ¶ 81, 84, 101.

GMR has demanded that RMLC member stations enter into licensing agreements and pay outrageous fees; because there is no substitute for a GMR license, radio stations would have had

---

[3]       GMR is wrong that, to allege direct evidence of monopoly power, a complaint must include "an analysis of the defendant's costs, showing both that the defendant had an 'abnormally high price-cost margin' and that the defendant 'restricted output.'" Mem. at 19.  No court in this Circuit has ever held that to be a requirement at the pleading stage.  *Mylan Pharmaceuticals Inc. v. Warner Chilcott Public Ltd.*, 838 F.3d 421, 434 (3d Cir. 2016), merely discussed the type of evidentiary proof that could constitute direct evidence at the summary judgment stage when analyzing an expert report.  It did not address the sufficiency of complaint allegations, but reaffirmed *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) which actually addressed a Rule 12(b)(6) motion.

no choice but to accept those demands, absent this lawsuit. *Id.* ¶¶ 52-53, 59, 80, 86. In particular, GMR has demanded supracompetitive rates of over $42 million in 2017 alone from a subset of RMLC's member stations representing only about 75-80% of total U.S. radio revenues. *Id.* ¶ 52. GMR also demands that this amount increase each of the next two years. *Id.* ¶ 55, 87. Neither the fee demands nor the proposed fee increases are remotely proportional to GMR's relative share of public performances on radio, nor are they influenced by any price competition from others; they are based on GMR's ability to insulate itself from any competition. *Id.* ¶ 52, 81, 86. GMR's demands imply that it values its repertory two to three times higher than its actual share of radio performances. *Id.* ¶ 52, 86, 104. GMR, in other words, is engaging in "take it or leave it" pricing fully divorced from market constraints. Similar evidence of SESAC's ability to control prices led the Court in *SESAC II* to conclude that RMLC had "directly allege[d] sufficient facts from which the court could make a plausible inference that defendant possesses monopoly power." 29 F. Supp. 3d at 500.

The licensing fees that GMR demands far outstrip the actual weighted share of its repertory even if it were licensing full rights to those works; they are even more disproportionate because GMR is only willing to license works on a "fractional" basis, and most of the works in GMR's repertory are co-owned by multiple copyright owners, not all of which are affiliated with GMR. FAC ¶¶ 53, 95. As DOJ found after an extensive review of the ASCAP and BMI consent decrees, blanket licenses that convey fractional interests "would not provide *immediate* use of covered compositions; users would need to obtain additional licenses before using many of the covered compositions," and they "would *not* avoid the delay of additional negotiations, because users would need to clear rights from additional owners of fractional interests in songs." *Id.* ¶ 65

(quoting DOJ Statement[4] at 12).  As DOJ noted, it was these "immediate use" efficiencies that caused the Supreme Court to conclude, in *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979), that full-work blanket licenses are not per se violations of the antitrust laws, but rather are subject to the rule of reason.  FAC ¶ 65; DOJ Statement at 7, 12. GMR's blanket license does not provide radio stations with the "immediate use" efficiencies that the Supreme Court found controlling in *BMI*.  So not only is GMR demanding a grossly disproportionate price for its license, it is also offering a significantly inferior product, and one that likely constitutes a per se violation of the antitrust laws.[5]  FAC ¶ 52, 55, 95, 97.

Left unchecked, GMR's actions herald a dark future for the industry.  Radio stations that historically have paid ASCAP, BMI, and SESAC for the right to play works now face the threat of having to take a license from another PRO in order to continue playing those same works— and have to pay more for them.  *Id.* ¶¶ 10, 26, 52, 112.  But despite its empty claim of innovation, GMR offers no new procompetitive benefits to the marketplace; three other PROs were already offering everything GMR does, but with greater flexibility.  GMR instead seeks to impose a one-way transfer from radio stations to itself and its affiliates.  *Id.* ¶ 65, 101.

Thus, the complaint alleges ample direct evidence of monopoly power, in the form of supracompetitive prices that do not reflect the commercial reality of GMR's portfolio of works. *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) (evidence that the defendant "sets prices with little concern for its competitors" established monopoly power because it is "'something a firm without a monopoly would have been unable to do'") (quoting

---

[4]    U.S. Dep't of Justice, *Statement of the Department of Justice on the Closing of the Antitrust Division's Review of the ASCAP and BMI Consent Decrees* at 3 (Aug. 4, 2016) ("DOJ Statement"), *available at* https://www.justice.gov/atr/file/882101/download.

[5]    RMLC reserves the right to pursue a per se claim against GMR, though it is not relying on such a claim for purposes of opposing this motion to dismiss.

*United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001)); *Broadcom*, 501 F.3d at 307 ("The existence of monopoly power may be proven through direct evidence of supracompetitive prices and restricted output."); *SESAC II*, 29 F. Supp. 3d at 500 (upholding allegations of market power because "SESAC has raised prices . . . without any contemporaneous increase in the size or popularity of its repertory").

Ignoring all of these allegations, GMR argues that the complaint does not allege direct evidence of monopoly power because it does not allege that RMLC's member actually paid GMR the extortionate prices that it demanded before RMLC filed its complaint.  Mem. at 20-21.  Nonsense.  Victims need not wait to suffer actual harm before they can sue; the imminent threat of such injury is sufficient for the injunction that RMLC seeks.  *See Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 591 n.72 (3d Cir. 1979) (explaining that an injunction under Clayton Act Section 16 "is characteristically available even though the plaintiff has not yet suffered actual injury; [a plaintiff] need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur") (citation omitted); *cf. United States v. Johns-Manville Corp.*, 259 F. Supp. 440, 448 (E.D. Pa. 1966) ("The remedy of injunction looks to the future.  Its 'sole function' in antitrust cases is to forestall future violations.") (citations omitted).

RMLC's choice to sue GMR before the December 31, 2016 deadline, to protect its members against GMR's supracompetitive prices, in no way diminishes all of the indisputable direct evidence of GMR's monopoly power.  The complaint expressly alleges that, if RMLC had not filed the complaint, RMLC's member stations would have had no choice but to pay the supracompetitive prices that GMR demanded.  FAC ¶¶ 59, 69, 96.  (And, of course, that is what actually happened.  *Id.* ¶¶ 59, 86.)  Indeed, the fact that a lawsuit coupled with a preliminary

injunction motion was necessary to forestall GMR's pricing demands is further direct evidence of GMR's ability to dictate prices.

      **B.**    **The Complaint Also Alleges Sufficient Indirect Evidence Of GMR's Market Power**

The complaint also alleges ample indirect evidence of GMR's monopoly power.  GMR controls 100% of the market for the copyrighted musical compositions and performances in its repertory, there are no substitutes for a GMR license to that repertory, and there are insurmountable barriers to entering that market.  FAC ¶¶ 76-85; *see Broadcom Corp.*, 501 F.3d at 307 (indirect evidence of monopoly power from evidence of "a dominant share in a relevant market, and that significant 'entry barriers' protect that market").

By GMR's own telling, licenses sold by ASCAP, BMI, and SESAC are not reasonably interchangeable with those that GMR sells (FAC ¶ 77), and so GMR's repertory occupies its own market.  *See Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 183 (3d Cir. 2015) ("Competing products are in the same market if they are readily substitutable for one another; a market's outer boundaries are determined by the reasonable interchangeability of use between a product and its substitute, or by the cross-elasticity of demand." (citing *Broadcom*, 501 F.3d at 307)); *Meredith II*, 1 F. Supp. 3d at 218-19 (finding evidence that the SESAC license was not reasonably interchangeable with other PRO licenses because "despite a material increase in the price of a SESAC blanket license . . . . the relevant consumers (local television stations) did not respond by substituting another product (ASCAP or BMI licenses)").

A radio station cannot substitute a license from ASCAP, BMI, or SESAC for a license from GMR because there are a critical number of works in GMR's repertory for which GMR controls 100 percent of the nondramatic public performance rights.  FAC ¶ 77.  Even if a radio station were to obtain licenses from ASCAP, BMI, **and** SESAC, it still would not have the right

14

to play those particular GMR works.  *Id.*  Thus, a license from another PRO is not a substitute for a license from GMR and the other PROs' repertories are not in the same market as GMR's repertory.  *Id.*

Additionally, there are significant barriers to entry into GMR's market by potential competitors.  FAC ¶¶ 81, 83, 85.  Because GMR has the exclusive ability to license the essential musical works in its repertory, and because GMR intends to share part of its monopoly profits with its affiliates, no other PRO can successfully lure significant numbers of GMR's affiliates away from it.  *Id.* ¶ 81.  But even if a hypothetical new entrant could induce some GMR affiliates to defect at the end of their contracts, that would merely add another inefficiency to the mix—the GMR monopoly would remain in full effect so long as GMR maintained control over a critical mass of "must have" or "can't avoid" works.  *Id.*  And because GMR could replace lost affiliates with new members that it lures away from other PROs, it could continue to acquire exclusive licensing rights over a critical mass of indispensable works even if some affiliates departed for a new entrant.  *Id.*  So in the unique context of PROs, adding new entrants merely adds costs to license buyers, and imposes no competitive constraints on license pricing.

In reality, there is little likelihood of GMR losing affiliates to existing PROs based on price; because ASCAP, BMI and SESAC are price constrained, they cannot meaningfully compete with GMR for affiliates.  *Id.*  And any potential new entrant, acting lawfully and not anticompetitively, similarly could not compete meaningfully with GMR because it would not have access to the supracompetitive monopoly rents that GMR intends to use to fund its acquisition of affiliates and would not engage in anticompetitive exclusive dealing.  *Id.*  In any event, a potential new entrant would not be a substitute for a GMR license because it would by

15

definition have a different repertory of works, a license to which would not be a substitute for a license from GMR.  So it could not constrain GMR's prices for its own unique repertory.  *Id.*

In *SESAC I*, Magistrate Judge Sitarksi found that a PRO's own repertory can be the relevant market for antitrust purposes and that a PRO like GMR obviously would have monopoly power in it.  2013 WL 12114098, at *16 (finding sufficient evidence to make a prima facie showing that "the relevant product market is the SESAC blanket license").  Judge Buchwald and Judge Englemayer each independently reached the same conclusion in the *Meredith* litigation.  *See Meredith II*, 1 F. Supp. 3d at 218-220, 223; *Meredith I*, 2011 WL 856266, at *5-10, 15.

### C.    GMR's Attacks On RMLC's Product Market Fail For The Same Reason That SESAC's Same Arguments Failed

GMR ignores the unbroken line of authority that is directly on point and resurrects the same unsuccessful SESAC arguments rejected by three separate judges.  First, GMR argues, like SESAC did, that the alleged market is "implausibly narrow" because "licenses to 'unique' copyrighted works are reasonably interchangeable" with GMR's repertory.  Mem. at 23; *see* SESAC MTD at 17-18, 25; SESAC Proposed Findings at 38-39.[6]  Also like SESAC, GMR cites cases that did not find allegations of a single-product market to be sufficient.  Mem. at 24-26; *see* SESAC MTD at 17-18, 25.  But the fact that single-brand markets may not *always* exist is irrelevant.  GMR ignores the many cases that have found a single-brand market sufficient based on the specific facts alleged, including three courts that considered facts virtually identical to those here.  *See SESAC I*, 2013 WL 12114098, at *13-16; *Meredith II*, 1 F. Supp. 3d at 217-20; *Meredith I*, 2011 WL 856266, at *5-10.  Indeed, Magistrate Judge Sitarksi was not persuaded by

---

[6]    *See* the following pleadings filed by SESAC in *RMLC v. SESAC, Inc.*, No. 2:12cv05807 (E.D. Pa.):   (1) Memorandum in Support of SESAC's Motion to Dismiss the Complaint ("SESAC MTD") (Dec. 17, 2012) (Dkt. No. 23); (2) SESAC's Supplemental Proposed Findings of Fact And Conclusions of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction ("SESAC Proposed Findings") (Dec. 13, 2013), attached as Exhibit 1.

this argument even after hearing the testimony of SESAC's economic expert. *SESAC I*, 2013 WL 12114098 at *10 (rejecting opinion of SESAC's expert that "the market should be much broader, and encompass the rights to all musical works like to be broadcast").

Magistrate Judge Sitarski correctly rejected the argument that RMLC's product market is too narrow because, as she found, "a typical radio station could not realistically consider forgoing a SESAC license due to the combination of two factors: an inability to exercise total control over what they play, and an inability to determine what songs are in SESAC's repertory. The two factors work in tandem."[7] *SESAC I,* 2013 WL 12114098, at *10. Both factors exist here, as the complaint alleges. FAC ¶¶ 76, 78, 86.

Contrary to GMR's claim (Mem. at 28 & n.12), it is absolutely true (as the complaint alleges) that virtually all radio stations cannot avoid a GMR license and that GMR does not enable radio stations to determine reliably the works that are in it repertory at any given time; RMLC has never said anything to the contrary. Indeed, as RMLC advised its members in the very post on which GMR relies (Decl. of David Marroso in Supp. of GMR Mots. to Strike & Dismiss (Dkt. No. 59), Ex. J), the repertory "spreadsheet" that GMR provided to RMLC "earlier in 2016" was out-of-date almost as soon as RMLC received it because the catalog is "ever-changing." *Id.* at 2. GMR appears to have added as many as 10,000 works in just the four months since RMLC filed its original complaint in November.[8] The complaint details GMR's

---

[7]      The *Meredith* courts likewise found the same product market was plausible given that (1) virtually all composers affiliate with only one PRO, (2) almost all stations take licenses from all PROs, (3) as a practical matter stations must buy all such licenses because they do not necessarily control all of the music they broadcast, and (4) stations could not substitute away from SESAC when it demanded price increases. *Meredith II,* 1 F. Supp. 3d at 218; *Meredith I,* 2011 WL 856266, at *10. These same factors also exist here with GMR. FAC ¶¶ 76-81, 86.

[8]      RMLC's original complaint alleged approximately 20,000 works; after GMR stated in January 2017 that the number was actually 26,000, RMLC amended its complaint to state 26,000. FAC ¶ 44. Now GMR states that its repertory has grown to over 30,000 works (Mem.

own unwillingness to stand behind the reliability of its repertory listings. FAC ¶¶ 45, 76, 78. But even if GMR were to reliably disclose the contents of its repertory in real time, it would not matter; because GMR has all of its affiliates locked up in exclusive contracts, no radio station could substitute direct licenses from those affiliates for a GMR blanket license. *Id.* ¶¶ 76-79. These facts materially distinguish this case from the two primary cases on which GMR relies (neither of which involved PROs): *Mediacom Communications Corp. v. Sinclair Broadcast Group, Inc.*, 460 F. Supp. 2d 1012 (S.D. Iowa 2006) and *Satnam Distributors LLC v. Commonwealth-Altadis, Inc.*, 140 F. Supp. 3d 405 (E.D. Pa. 2015). Neither case alleged that the buyers could not avoid the sellers' product, nor was it true that the sellers refused to reliably identify the precise contours of the products they were selling.

Courts have also previously and correctly rejected GMR's fallback argument that stations can substitute a license from ASCAP, BMI or SESAC for a GMR license. Mem. at 30-31. First, GMR is not free to disregard the allegations in the complaint, which detail the reasons why a license from another PRO is not a substitute for a license form GMR. FAC ¶¶ 77-79. Second, it impermissibly ignores GMR's own admissions that other PROs' licenses are not a substitute. *Id.* ¶ 77. Indeed, GMR publicly brags that radio stations cannot "exist without" a GMR license, thus confirming its own position that there are no substitutes. *Id.* ¶ 79. This is more than sufficient at the pleading stage.[9]

---

at 3)—an increase of 10,000 works in just the four months since RMLC filed its original complaint in November 2016.

[9] GMR also argues simplistically that licenses from all PROs are substitutes because they supposedly can be used "for the same purpose," which, in GMR's view, is merely to "entertain[] listeners." Mem. at 30-31. This, again, misconstrues the allegations in the complaint, and ignores economic reality. The complaint explains that radio stations do not fully control the works that they play and details the ways in which they broadcast music for reasons beyond feature music for merely "entertaining their listeners." FAC ¶¶ 21, 86. Because radio stations do not fully control the works that they play in advertising, for example, a license from another PRO

### D.        RMLC Has Plausibly Alleged Barriers To Entry

Despite RMLC's detailed and plausible allegations as to why there are barriers to entry (FAC ¶ 81, 83, 85), GMR nonetheless claims that these allegations are insufficient because another PRO could easily compete with GMR for its affiliates.  Mem. at 31-32.  The complaint alleges precisely the opposite.  The complaint explains that existing PROs cannot compete for those exclusive relationships because of the antitrust constraints to which they are subject, and to which GMR currently is not.  FAC ¶ 81.  Indeed, the complaint describes an example where ASCAP tried to compete but could not and had to pay a fine for violating its consent decree.  *Id.* ¶ 47.  The complaint also describes how a new entrant who, unlike GMR, presumably would feel compelled to abide by the law and not act anticompetitively, could not compete with GMR because it would not have supracompetitive revenues or anticompetitive exclusive contracts with which to compete.  *Id.* ¶ 81.  GMR may disagree with these allegations, but that is not a basis on which to dismiss the complaint.

GMR's argument likewise misunderstands the underlying purpose of the barriers-to-entry analysis, which is to determine whether a hypothetical new PRO could enter the market in response to GMR's high prices and exert pressure on GMR to lower its own supracompetitive prices.  *See Broadcom*, 501 F.3d at 307 ("Barriers to entry are factors . . . that prevent new competition from entering a market in response to a monopolist's supracompetitive prices."); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 575, 591 n.15 (1986) ("[W]ithout barriers to entry it would presumably be impossible to maintain supracompetitive prices for an

---

cannot necessarily be used for the "same purpose" as a license from GMR. And, of course, GMR's "same purpose" test proves far too much and is not the law:  for example, all automobiles could be said to serve the "same purpose" of "moving passengers," but not all automobiles are in the same relevant product market.  *Cf. United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246-47 (8th Cir. 1988) (finding that sugar and high-fructose corn syrup, while "functionally interchangeable," did not belong in the same product market because neither product could constrain the price of the other).

extended time."). As described above, that is impossible because PRO licenses are not substitutes. FAC ¶ 77. If a new PRO entered, and even if it could lure away some affiliates from GMR, it would not constrain GMR's monopoly power so long as GMR is able to contain a critical mass of "can't avoid" works.

## II.     THE COMPLAINT PLAUSIBLY ALLEGES HARM TO COMPETITION

GMR devotes most of its brief to arguing that the complaint fails to allege "harm to competition." GMR for some reason claims that these are new arguments that SESAC never raised and that this Court never previously had occasion to consider. Mem. at 5 n.1. That is false. SESAC made all of the same "harm to competition" arguments that GMR makes here when SESAC unsuccessfully moved to dismiss RMLC's complaint and when it unsuccessfully argued that RMLC did not have a likelihood of succeeding on the merits of its Section 2 claim for purposes of the preliminary injunction. SESAC MTD at 17-23, 24-27; SESAC's Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction at 9-12, RMLC v. SESAC, Inc., No. 2:12cv05807 (Nov. 1, 2013) (Dkt. No. 34); SESAC Proposed Findings at 75-86.

In denying SESAC's motion to dismiss on the Section 2 claim, this Court held that "[t]he most common characteristics of unlawful monopolies are price increases, output decreases, and a deterioration in quality and service, all of which the antitrust laws seek to minimize." *SESAC II*, 29 F. Supp. 3d at 502. And the Court found "that is precisely what [RMLC] alleged." *Id.* RMLC alleged that "SESAC's anticompetitive conduct has driven up the price of copyright licenses and deteriorated the quality of service insofar as customers only have the option of purchasing a blanket license." *Id.* The Court concluded that RMLC "has alleged a plausible claim for which relief can be granted under § 2 of the Sherman Act." *Id.* Because RMLC

alleges the same anticompetitive effects from GMR's behavior, it is already settled that RMLC has stated a viable claim for relief.

### A.   GMR Has Harmed And Threatens To Continue To Harm Competition By Charging Supracompetitive Prices For A Product Of Inferior Quality

The complaint alleges that GMR has used its monopoly power to impose supracompetitive license fees that radio stations have been forced, and will continue to be forced, to accept.  FAC ¶¶ 104-107.  GMR is not only charging exorbitant prices, it is doing so for a product that is lower in quality (*i.e.,* provides fewer rights, less flexibility and higher transaction costs) than when most of those exact same rights were available through BMI and ASCAP licenses.  *Id.* ¶¶ 52, 55, 95, 97, 112, 115.  A monopolist's ability to dictate supracompetitive prices is competitive harm.  *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 226 (3d Cir. 2008) ("[P]roof of anti-competitive effects 'can be achieved by demonstrating that the restraint . . . raised prices or reduced quality.  Alternatively, . . . proof of the defendant's market power will suffice.'") (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005).  Indeed, Magistrate Judge Sitarksi found that SESAC's ability to dictate price "produced anticompetitive effects in the relevant market."  *SESAC I*, 2013 WL 12114098, at *18.  And, reducing the quality of the product sold is a separate and independent established type of competitive harm, as this Court previously held.  *SESAC II*, 29 F. Supp. 3d at 502; *see also W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010) ("Anticompetitive effects include increased prices, reduced output, and reduced quality.").

GMR tries to dodge these allegations in two ways.  First, GMR says that stations had not yet paid the supracompetitive prices that it demanded at the time that RMLC filed its complaint.  Mem. at 8.  But GMR ignores that antitrust victims do not have to wait until they have actually suffered harm to sue for an injunction; it is enough that the harm is imminently threatened, which

was certainly true when RMLC filed its complaint and remains true today.  *Mid-West Paper Prods.*, 596 F.2d at 591 n.72.  The complaint alleges that, but for this lawsuit, RMLC member stations would have no choice but to pay the supracompetitive fees that GMR demanded, and that is why RMLC sought an emergency preliminary injunction.  FAC ¶ 59.  The Court must accept these allegations as true at this stage.[10]  *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017).

Next GMR disputes that the prices it demands are supracompetitive and defends those prices as justified based its own subjective view that it is selling a superior product.  Mem. at 9-10.  But the complaint allegations, which this Court must accept, flatly contradict both of these points.  Despite GMR's imagination, the complaint does not merely allege that GMR is selling a product for a "high price."   The complaint alleges that GMR is demanding a price that is unjustifiably *above the competitive level* for a product *of inferior quality*.  FAC ¶¶ 52, 55, 95, 97, 104, 112, 115.  GMR brushes aside the considered decisions by federal judges as to the fairness of ASCAP's and BMI's rates for most of the same rights that GMR is selling on the basis that those rates were not set in a purportedly "free market" so they cannot operate as a benchmark.  Mem. at 6-7, 10.  But the complaint does not allege that GMR is competitively setting prices in a "free market"; it alleges that GMR is unlawfully wielding its immense monopoly power to price gouge radio stations far above any competitively reasonable price, in the same way that ASCAP and BMI did before they were subject to rate court oversight, and in the same way that SESAC did to RMLC-represented stations before it settled RMLC's claims.  FAC ¶¶ 41, 73, 104.  The rate courts are designed to prevent ASCAP and BMI from doing the precise anticompetitive

---

[10]     As everyone now knows, many RMLC member stations ultimately did not have a choice and had to buy the interim blanket license from GMR.  *Id.* ¶ 61.

things that GMR is doing, so of course those proceedings are relevant in judging the anticompetitive nature of GMR's prices.  *Id.* ¶¶ 30-31, 37, 104.

      **B.**      **GMR's Exclusive Contracts With Its Affiliate-Competitors Harm Competition**

GMR also has harmed competition by engaging in exclusive dealing with its affiliates, who are its potential competitors.  *Dentsply*, 399 F.3d at 191; *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 286 (3d Cir. 2012) (market foreclosure from *de facto* exclusive dealing harms competition).  GMR seeks to defend its exclusive dealing by noting that not all exclusive contracts are necessarily anticompetitive and arguing that its exclusive contracts merely reflect pro-competitive competition on the merits with other PROs.  Mem. at 10-15.  The former is irrelevant and the latter is, again, directly at odds with the complaint.

The contracts at issue here are not garden-variety exclusive dealing contracts between a supplier and a distributor.  As this Court found in *SESAC II*, GMR's affiliates are its potential *competitors* because if GMR did not preclude it, they also could independently license rights to the same works that GMR licenses through its blanket license.  29 F. Supp. 3d at 501.  That means the exclusive contracts at issue here are express agreements between competitors not to compete with each other.  FAC ¶¶ 89-94.  That, by definition, harms competition.  29 F. Supp. 3d at 501.  Indeed, these agreements between competitors are likely *per se* violations of the antitrust laws.  *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990) (per curiam) (holding that agreement not to compete in competitor's territory is per se "anticompetitive regardless of whether the parties split the market within which both do business or whether they merely reserve one market for one and another for the other").

RMLC was not required to allege (as GMR claims, Mem. at 15-16) that these agreements were the product of "coercion," when it clearly alleged that they are a product of *collusion*

between competitors.  *SESAC II*, 29 F. Supp. 3d at 501 (fact that SESAC "utilizes a carrot rather than a stick approach to retaining affiliates" did not insulate its *de facto* exclusive agreements). If, as this Court found, SESAC, *de facto* exclusive contracts with its potential competitors harm the "competitive process" (*id.*), then GMR's *express* exclusive contracts with its potential competitors clearly do as well.  None of GMR's cases (Mem. 13-14) dealt with collusive exclusive contracts between competitors, so they are all irrelevant to the facts that exist here.

GMR's claim that it was merely competing on the merits with other PROs on equal footing for these exclusive contracts (*id.* at 12-13) is simply false.  As the complaint alleges, existing PROs cannot compete with GMR at all because they operate under antitrust constraints (by consent decree or settlement) that GMR currently does not.  FAC ¶¶ 46-48, 81.  Indeed, the complaint details a recent example where ASCAP tried to compete, but could not and had to pay a fine for violating its consent decree.  *Id.* ¶ 47.  The complaint also explains why a potential new entrant, acting lawfully and not anticompetitively, similarly could not compete meaningfully with GMR because it would not have access to the supracompetitive monopoly rents that GMR intends to use to fund its acquisition of affiliates and would not engage in anticompetitive exclusive dealing.  *Id.* ¶ 81.  The fact that many songwriters still remain with ASCAP and BMI despite GMR's existence has nothing to do with those PROs' ability to compete with GMR (Mem. at 13); those songwriters remain because GMR does not want them.  FAC ¶ 42.

The primary case on which GMR relies (which was decided after a trial on merits), *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139 (3d Cir. 1981), is completely off point.  There, the Third Circuit held that Topps's exclusive contracts with baseball players for the rights to use their likenesses on baseball cards did not foreclose competition because "rival manufacturers *could compete* against Topps."  *Id.* at 154 (emphasis added).  GMR ignores the facts of that case

and the rich history of competition between the parties and others in the baseball card market. Fleer and Topps were competitors in the market until Fleer voluntarily sold its exclusive rights to Topps, not because of Topps' anticompetitive conduct, but simply because Fleer wanted to focus on selling other products. *Id.* at 142. Fleer later turned down an offer for exclusive rights from the Major League Players' Association ("MLBPA") that MLBPA later awarded to Topps (and also gave to others). *Id.* at 143-44. The facts here are not remotely similar; there is no history of competition, and for good reason. From the perspective of radio station consumers (and by GMR's admission), other PROs' licenses are not substitutes, and therefore they do not compete with each other. FAC ¶ 77.

Finally, GMR claims that the complaint does not allege any plausible claim that its affiliates ever would directly license their works, regardless of their exclusive contracts with GMR. Mem. at 15-16. But GMR, again, ignores the actual allegations in the complaint, which explain how direct licensing is a credible potential avenue of competition between and among a PRO and its affiliates. FAC ¶ 91. The complaint details a real world example where ASCAP and BMI were so concerned about the prospect of their affiliates directly licensing their works, that they reduced their feed demands for their blanket licenses in exchange for RMLC's members agreeing to forgo the option of an adjustable-fee blanket license. *Id.* If, as GMR claims, there truly were no risk of GMR's affiliates directly licensing their works to radio stations, then there would be no reason for GMR to enter into contracts preventing those affiliates from directly licensing in the first place.

### C.   GMR Has Harmed Competition By Reducing Consumer Choice

GMR has also harmed competition by reducing consumer choice (remembering, as GMR neglects, that radio stations are the consumers of licenses here). FAC ¶¶ 108-109. GMR's exclusive contracts with its affiliates foreclose RMLC's members from the option to obtain

licenses directly from those affiliates, who are also GMR's potential competitors. *Id.* ¶ 108. GMR's anticompetitive conduct has also limited consumer choice as to the form of license to copyrighted musical works. GMR does not provide alternatives to its blanket license; it does not offer per-program licenses or adjustable fee blanket licenses. *Id.* ¶ 109. GMR gives RMLC members an "all-or-nothing choice"—purchase the blanket license at a supracompetitive rate, or purchase nothing at all. *Id.* This sort of elimination of consumer options is an established form of competitive harm, as this Court previously concluded. *SESAC II,* 29 F. Supp. 3d at 502; *see also Dentsply*, 399 F.3d at 196 (de facto exclusive dealing policy harmed competition by "impos[ing] an 'all-or-nothing' choice" on customers). Indeed, in opposing RMLC's motion to dismiss its own retaliatory complaint in California, GMR itself argued that such an all-or-nothing "Hobson's choice" constituted antitrust injury.[11]

GMR disputes that consumer choice has been reduced because, according to GMR, RMLC stations have the *choice* not to buy a GMR license at all. Mem. at 16. But the complaint alleges exactly the opposite; the vast majority of stations have no choice but to buy a license. FAC ¶¶ 52-53, 59, 80, 86. Next GMR argues that it has not harmed the "radio-listening public" because it is merely charging "higher prices" for "higher quality products." Mem. at 17. That, again, simply ignores the allegations in the complaint. The complaint alleges that GMR is selling an inferior product (licenses) at supracompetitive prices to relevant consumers (radio stations). FAC ¶¶ 52, 55, 95, 97. 104, 112, 115.

Finally, GMR spins a tale—based entirely on unsupported and fanciful allegations outside of the complaint—that if it were required to abide by the antitrust laws, then it could not

---

[11]     Plaintiff Global Music Rights LLC's Opposition to Defendant Radio Music License Committees Motion to Dismiss First Amended Complaint at 14-15, Global Music Rights, LLC v. Radio Music License Committee, Inc. & Doe 1 through 3000, No. 2:16-cv-9051 (C.D. Cal. Feb. 24, 2017) (Dkt. No. 35).

"compensat[e] its writers commensurate with the value of their works and would lessen economic incentives for writers to innovate, resulting in a less robust pool of music."  Mem. at 17.  Even if that were true (which it's not), and even if the Court could consider it on a motion to dismiss (which it can't), it would not matter.  GMR cannot violate the antitrust laws simply because it wants to share its monopoly rents with its affiliates.  And, in any event, PROs have been subject to antitrust constraints for more than 75-years and there has always been plenty of "innovation" in the music industry and a "robust pool of music" available.

### D.    GMR Has Harmed Competition By Creating Economic Inefficiency

GMR's conduct harms the competitive process because it creates significant inefficiency. Before GMR launched its anticompetitive scheme, radio stations only needed to obtain three PRO licenses.  Now that GMR has amassed an indispensable repertory of works, stations must obtain a fourth license to continue playing those same works.  FAC ¶ 86, 104.  These actions do nothing to promote efficiency in music licensing; they merely increase the total cost of PRO licenses for the same product.  *Id.*  GMR compounds this inefficiency because it only offers fractional licenses and does not control 100% of public performance rights for a significant percentage of its repertory.  *Id.* ¶ 110.  A radio station cannot immediately use these partially controlled compositions until it also obtains the additional licenses it needs from the co-owners of those works or the PROs to which those co-owners have licensed their rights.  *Id.*  GMR exacerbates this inefficiency further because it does not reliably disclose which of its works it partially licenses at any given moment, and misleadingly suggests in marketing that its license permits radio stations to play all works in its repertory without the need for any other licenses. *Id.*; *see, e.g.*, *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 755 (10th Cir. 1999) (finding that "inefficient anticompetitive" conduct caused anticompetitive effects); *W. Penn Allegheny Health*, 627 F.3d at 104 (noting that "allocative inefficiencies" are an example of

anticompetitive effects that harm competition).  GMR does not even attempt to address these aspects of competitive harm.

###     E.     The Complaint Alleges Antitrust Injury

GMR argues that the complaint fails to allege antitrust injury because RMLC is complaining about "an *increase* in competition."  Mem. at 18.  That is plainly false as detailed in Section II.B above.  From the perspective of radio stations, who are the consumers of licenses, there has been no increase in competition; merely yet another tariff and transaction for the same basic product.  The complaint cogently explains the ways in which RMLC's members have suffered "antitrust injury," *i.e.*, injury that flows from the ways in which GMR has harmed and threatens to continue to harm competition.  RMLC members have no option but to purchase the economically inefficient blanket license from GMR and they are forced to pay supracompetitive prices for that license.  FAC ¶¶ 111-112. This is paradigmatic antitrust injury.  *See, e.g.*, *Marchbanks Truck Serv., Inc. v. Comdata Network, Inc.*, 2011 WL 11559549, at *29-30 (E.D. Pa. Mar. 24, 2011); *In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 695-96 (E.D. Pa. 2007).

## III.     THE COMPLAINT DOES NOT RELY ON THE INTERIM LICENSE AS AN INDEPENDENT BASIS TO PROVE GMR'S VIOLATION OF THE ANTITRUST LAWS

GMR misconstrues the allegations in the amended complaint about the interim license. Contrary to GMR's suggestion (Mem. at 33-38), RMLC is not currently seeking to establish that the interim license is an independent basis on which to hold that GMR has violated the antitrust laws.[12]  The original complaint that RMLC filed against GMR on November 18, 2016, before the

---

[12]     As detailed in RMLC's opposition to GMR's motion to strike, RMLC would be well within its rights to rely on the interim agreement as an independent basis for liability because of

interim license agreement existed, stated viable antitrust claims against GMR.  The facts surrounding the interim license agreement (FAC ¶¶ 60-63) serve only to confirm the facts that RMLC alleged in its original complaint, *i.e.*, absent this lawsuit, the vast majority of RMLC's members would have had no choice but to purchase a license from GMR by the December 31, 2016 deadline that GMR had imposed.

RMLC does maintain that the prices that GMR unilaterally dictated for the interim license, and the prices that RMLC's member stations are currently paying for that interim license are supracompetitve and a direct result of GMR's unlawful monopoly power.  FAC ¶ 62.  However, as the parties agreed, and as GMR advised the individual RMLC members stations that elected to purchase the interim license, those stations may pursue damage claims against GMR at a later time if, as a result of this litigation, the price of the interim license is determined to have been too high.  *Id.*  (RMLC and GMR expressly agreed that despite the agreement, they each, and each RMLC member station "reserve their respective right to seek a retroactive fee adjustment in future licenses or as a result of the current litigations.").  To the extent that GMR intends to renege on that promise (which the arguments in its motion to dismiss suggest, Mem. at 37-38), that is yet more proof of GMR's material breach of the parties' agreement.  *See* RMLC Opp. to GMR's Motion to Strike at 9.

Contrary to GMR's claim (Mem. at 37-38), the facts surrounding the interim license make plain that neither RMLC, nor any of its member stations, bears "equal responsibility" for GMR's unlawful exercise of monopoly power that forced RMLC to file this lawsuit and the emergency motion for preliminary injunction that the interim license resolved.  FAC ¶¶ 58-60.  It has long been settled that when, as here, parties are forced to accept anticompetitive terms in

---

GMR's material breach of the parties' agreement, and expressly preserves its right to do so.  *See* RMLC Opp. to GMR Motion to Strike at 1-2.

order to continue doing business, they indisputably have the right to pursue legal remedies arising out of the contracts terms foisted upon them. *E.g.*, *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139-40 (1968), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).

## CONCLUSION

For all of these reasons, the Court should deny GMR's motion to dismiss for failure to state a claim in its entirety.

Dated:  March 24, 2017                Respectfully submitted,

                                      /s/ Margaret M. Zwisler
                                      Margaret M. Zwisler (*pro hac vice*)
                                      Jennifer L. Giordano (*pro hac vice*)
                                      William L. Rinner (*pro hac vice*)
                                      David L. Johnson (*pro hac vice*)
                                      LATHAM & WATKINS LLP
                                      555 Eleventh Street, N.W., Suite 1000
                                      Washington, D.C. 20004
                                      Telephone:  (202) 637-2200
                                      Margaret.Zwisler@lw.com
                                      Jennifer.Giordano@lw.com
                                      William.Rinner@lw.com
                                      David.Johnson@lw.com

                                      Alfred C. Pfeiffer, Jr. (*pro hac vice*)
                                      LATHAM & WATKINS LLP
                                      505 Montgomery Street, Suite 2000
                                      San Francisco, CA 94111
                                      Telephone:  (415) 361-0600
                                      Al.Pfeiffer@lw.com

                                      Peter J. Mooney
                                      WHITE & WILLIAMS LLP
                                      1650 Market Street
                                      One Liberty Place, Suite 1800
                                      Philadelphia, PA 19103
                                      Telephone:  (215) 864-7164
                                      mooneyp@whiteandwilliams.com

                                      *Attorneys for Plaintiff*
                                      Radio Music License Committee, Inc.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that, on March 24, 2017, a true and correct copy of the foregoing Plaintiff Radio Music License Committee, Inc.'s Opposition to Defendant Global Music Rights, LLC's Motion to Dismiss for Failure to State a Claim was served on all counsel of record by the Court's electronic filing system (CM/ECF).

/s/ Margaret M. Zwisler
Margaret M. Zwisler (*pro hac vice*)