IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RADIO MUSIC LICENSE COMMITTEE, INC., <br><br> Plaintiff, <br><br> v. <br><br> GLOBAL MUSIC RIGHTS, LLC, <br><br> Defendant. | Civil Action No. 16-6076 |

**DEFENDANT GLOBAL MUSIC RIGHTS, LLC'S
REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT
FOR FAILURE TO STATE A CLAIM**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................................ 1

II. RMLC'S ALLEGED FACTS DO NOT SUPPORT ITS CONCLUSIONS THAT GMR POSSESSES "MARKET POWER" OR "HARMED COMPETITION." .............. 2

    A. GMR HAS NO MARKET POWER ................................................................... 2

        1. Direct Evidence: No Allegation of Higher Prices Without Lost Sales ........................................................................................................ 3

        2. Indirect Evidence: No Clearly-Defined and Cognizable Market ............... 4

    B. NO HARM TO COMPETITION ......................................................................... 7

        1. Higher Prices Alone Do Not Comprise Competitive Harm ....................... 7

        2. Exclusive Contracts Must Foreclose Competitors in Order to Harm Competition ................................................................................................ 9

III. CONCLUSION .................................................................................................................. 10

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Nat'l Farmers Org.*,
  687 F.2d 1173 (8th Cir. 1982) ...................................................................................................10

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
  592 F.3d 991 (9th Cir. 2010) .......................................................................................................9

*Barr Labs., Inc. v. Abbott Labs.*,
  978 F.2d 98 (3d Cir. 1992)...........................................................................................................9

*BMI v. CBS*,
  441 U.S. 1 (1979).........................................................................................................................1

*Bordelon v. Chicago Sch. Reform Bd. of Trustees*,
  233 F.3d 524 (7th Cir. 2000) .......................................................................................................6

*Church & Dwight Co., Inc. v. Mayer Labs., Inc.*,
  868 F. Supp. 2d 876 (N.D. Cal. 2012), *vacated in part on other grounds,* No.
  C-10-4429 EMC, 2012 WL 1745592 (N.D. Cal. May 16, 2012) ...............................................8

*Cinema Village Cinemart, Inc. v. Regal Entm't Grp.*,
  No. 15-cv-05488 (RJS), 2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016) ....................................8

*In re Ebay Seller Antitrust Litig.*,
  No. C 07–01882 JF (RS), 2010 WL 760433 (N.D.Cal. Mar. 4, 2010).......................................8

*F.T.C. v. Mainstream Marketing Services, Inc.*,
  345 F.3d 850 (10th Cir. 2003) .....................................................................................................6

*L.A.P.D., Inc. v. Gen. Elec. Corp.*,
  132 F.3d 402 (7th Cir. 1997) .......................................................................................................4

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007).....................................................................................................................8

*McCullough v. Zimmer, Inc.*,
  382 F. App'x 225 (3d Cir. 2010) .................................................................................................2

*Mediacom Commc'ns Corp. v. Sinclair Broadcast Group, Inc.*,
  460 F. Supp. 2d 1012 (S.D. Iowa 2006) ......................................................................................5

*Meredith Corp. v. SESAC LLC*,
  1 F. Supp. 3d 180 (S.D.N.Y. 2014) .........................................................................................3, 7

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Mogul v. Gen. Motors Corp.*,
   391 F. Supp. 1305 (E.D. Pa. 1975), *aff'd*, 527 F.2d 645 (3d Cir. 1976)...................5

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
   838 F.3d 421 (3d Cir. 2016)............................................................................................4

*Orson, Inc. v. Miramax Film Corp.*,
   79 F.3d 1358 (3d Cir. 1996)............................................................................................9

*Queen City Pizza v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)............................................................................................4

*R.J. Reynolds Tobacco Co. v. Phillip Morris, Inc.*,
   199 F. Supp. 2d 362 (M.D.N.C. 2002) ...........................................................................8

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
   614 F.3d 57 (3d Cir. 2010)..............................................................................................2

*Richter Concrete Corp. v. Hilltop Concrete Corp.*,
   691 F.2d 818 (6th Cir. 1982) ......................................................................................1, 3

*RMLC, Inc. v. SESAC, Inc.* ("*SESAC II*"),
   29 F. Supp. 3d 487 (E.D. Pa. 2014) ........................................................................1, 3, 6

*RMLC, Inc. v. SESAC, Inc.* ("*SESAC I*"),
   No. 12-cv-5807, 2013 WL 12114098 (E.D. Pa. Dec. 23, 2013)......................................7

*Satnam Distribs., LLC v. Commonwealth-Altadis, Inc.*,
   140 F. Supp. 3d 405 (E.D. Pa. 2015) ...........................................................................6, 7

*SolidFX, LLC v. Jeppesen Sanderson, Inc.*,
   935 F. Supp. 2d 1069 (D. Colo. 2013)............................................................................9

*Spinelli v. Nat'l Football League*,
   96 F. Supp. 3d 81 (S.D.N.Y. 2015) ................................................................................5

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
   959 F.2d 468 (3d Cir. 1992)............................................................................................5

*U.S. v. ASCAP*,
   1993 WL 60687 (S.D.N.Y. 1993), *vacated in part on other grounds*, 157
   F.R.D. 173 (S.D.N.Y. 1994) ...........................................................................................9

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*U.S. v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005)...........................................................................................3, 4

*United States v. ASCAP*,
   No. 1:41-cv-01395-DLC (S.D.N.Y.) .................................................................................9

*White & White, Inc. v. Am. Hosp. Supply Corp.*,
   540 F. Supp. 951 (W.D. Mich. 1982), *rev'd on other grounds*, 723 F.2d 495
   (6th Cir. 1983).....................................................................................................................7

*Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*,
   810 F.2d 243 (D.C. Cir. 1987) ..........................................................................................8

**Other Authorities**

Areeda and Hovenkamp, Fundamentals of Antitrust Law § 5.01 (4th ed. 2011) ............................3

**I.     INTRODUCTION**

RMLC's opposition rests on the incorrect proposition that "it has been well-established for more than 75 years that PROs, if left unregulated, are anticompetitive and violate the Sherman Act." (Opp. at 2.)  But nearly 40 years ago, the Supreme Court rejected the argument that PROs are inherently anticompetitive. *BMI v. CBS*, 441 U.S. 1, 15-18 (1979).  Each PRO must be judged based on its constituency and its conduct.  That is where the RMLC's complaint fails.  A brand-new PRO with a scant 74 songwriters, less than 2% of all compositions, a single-digit share of radio spins, and no history of price increases is not a "monopolist" exercising "market power" and "harming competition." ***As a matter of law***.

GMR is not ASCAP or BMI.  And RMLC's dependence on the ASCAP and BMI consent decrees highlights a fatal flaw in its opposition.  (*See* Opp. 2, 3, 6, 11, 12, 19, 24.)  GMR is not the only game in town, as was the case in the 1940s when those PROs controlled 99% of the compositions available for public performance.  Just the opposite, GMR is the first new entrant in the staid PRO market in 80 years.  That new blood is helpful, not harmful, to competition.

Also telling is RMLC's effort to stretch the *SESAC* decisions to cover this case.  Those decisions rely heavily on SESAC's established history of arbitrary price increases that consumers were forced to accept.  *See, e.g.*, *RMLC, Inc. v. SESAC, Inc.*, 29 F. Supp. 3d 487, 500 (E.D. Pa. 2014) (relying on allegations that SESAC "profitably and *sustainably maintained* exorbitant prices" and was able to charge "exorbitant prices" "without suffering a loss of sales") (emphasis added).  Such allegations are essential to establishing direct evidence of market power.  *See Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826-27 (6th Cir. 1982).  Here, RMLC does not allege GMR has increased prices without losing sales—nor could it, since GMR is brand new, and only has deals with two of RMLC's nearly 3,000 members.  Two.

1

RMLC is left to argue that GMR "demanded" supracompetitive prices, and that those "demands," coupled with alleged "threats" to enforce copyrights, and alleged exclusive licenses from copyright-holder artists, are sufficient to establish "harm to competition." (Opp. 5, 7, 8, 10.) Unsurprisingly, RMLC cites no authority for this proposition. High prices do not harm competition. Quality products command premiums, and intellectual property holders may exercise and enforce their rights. That is a competitive market at work, something encouraged by the law, and why RMLC's lawsuit must be dismissed with prejudice.[1]

## II. RMLC'S ALLEGED FACTS DO NOT SUPPORT ITS CONCLUSIONS THAT GMR POSSESSES "MARKET POWER" OR "HARMED COMPETITION."

RMLC does not dispute that, to avoid dismissal, it must plead facts to establish **both** [a] that GMR possesses "market power," and [b] that GMR's conduct has harmed competition. *See Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 75 (3d Cir. 2010) (monopoly power an element of Section 2 claims); *McCullough v. Zimmer, Inc.*, 382 F. App'x 225, 230 (3d Cir. 2010) (antitrust injury is a threshold issue in an antitrust case). RMLC has not and cannot allege facts establishing either. RMLC invokes the talismanic phrases "market power" and "harm to competition," but offers no facts to support them. Facts matter, not labels.

### A. GMR HAS NO MARKET POWER.

A plaintiff must establish market power directly or indirectly. RMLC does neither.

---

[1] The RMLC also argues that the interim licenses GMR offered to RMLC members as part of a settlement encouraged by Magistrate Judge Sitarski evidence market power and harm to competition. (Opp. at 29.) This argument must be disregarded because it constitutes a clear breach of the parties' agreement not to use the settlement "in any way," and that the settlement and related agreements constituted Rule 408 settlement communications. (*See* Reply in Support of Motion to Strike.) But, even if the Court were to consider the interim licenses, only ~800 of ~2800 RMLC members licensed GMR works, disproving RMLC's erroneous "must have" conclusion. (Supplemental Decl. of Randy Grimmett ("Grimmett Decl.") ¶19.)

2

1.      **Direct Evidence: No Allegation of Higher Prices Without Lost Sales.**

To establish market power directly, a plaintiff must plead the defendant was able to increase prices without suffering lost sales. *Richter Concrete Corp.,* 691 F.2d at 826-27 (no market power where "[t]wice during the relevant period [defendant] raised prices but then rescinded these increases because of lost sales"); *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) (firm with monopoly power can profitably raise prices).[2]  In its opposition brief, RMLC *argues* it has alleged GMR has raised prices without losing share (Opp. at 10), but alleges no *facts* to support that contention.  RMLC alleges GMR "demanded" high prices for an "inferior product" on a "take it or leave it" basis, and that RMLC was forced to file this lawsuit to protect its members from infringement litigation.  (*Id.* at 10-11.)  Even assuming that were true—it is not[3]—those allegations do *not* reflect GMR's ability to raise prices without losing sales.  To the contrary, prior to filing this lawsuit, only two of ~2,800 RMLC members signed licenses with GMR.  (FAC ¶ 63.)  If GMR has sufficient market power to force price increases, why are the vast majority of RMC's members not buying GMR's licenses?

This glaring deficiency in RMLC's complaint is dispositive and distinguishes this case from *SESAC II*.  As this Court noted in that case, RMLC alleged that "SESAC has profitably and sustainably maintained exorbitant prices that are far greater than those charged by ASCAP and BMI, *and has done so without suffering a loss of sales*."  *SESAC II*, 29 F. Supp. 3d at 500 (emphasis added); *Meredith II*, 1 F. Supp. 3d 180, 192 (S.D.N.Y. 2014).  No similar allegation

---

[2] *See also* Areeda and Hovenkamp, Fundamentals of Antitrust Law § 5.01 (4th ed. 2011) ("A defendant firm has market power if it can raise price without a total loss of sales.  Market power exists in degrees.  Power is small when more than a slight increase in price would lead to an unacceptable loss of sales.  It is large when a firm can profit by raising prices substantially without losing too many sales.")

[3] It is patently untrue that RMLC members were "forced" or "coerced" into accepting GMR's supposedly above-market license fees.  The Complaint concedes that, before filing this lawsuit, GMR secured direct licenses with only two of RMLC's thousands of members.  (FAC ¶ 63.)

exists here.

RMLC seeks to excuse this critical failure by arguing that, absent the instant preemptive lawsuit, GMR would have successfully raised prices without losing sales.  (Opp. at 10-11.)  This argument confuses standing with liability.  A plaintiff can establish standing using an alleged "imminent" threat, but in assessing market power, "the economic reality of the market" controls, not plaintiff's speculation about what might have happened in other circumstances.  *Dentsply*, 399 F.3d at 189 (citations omitted); *see L.A.P.D., Inc. v. Gen. Elec. Corp.*, 132 F.3d 402, 405 (7th Cir. 1997) ("Thus proof of market power is essential; without it, any case under the Rule of Reason collapses because consumers could not be injured by the defendants' **hypothetical reduction in output**.") (emphasis added).[4]

2.  **Indirect Evidence: No Clearly-Defined and Cognizable Market**

To establish market power indirectly, a plaintiff must plead a clearly-defined and cognizable market, defendant's dominant share of that market, and barriers to entry.  *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 435 (3d Cir. 2016).  Failure to adequately plead *one* of these is fatal.  *Id.*  GMR's motion described how RMLC's complaint lacks all three; we focus here on RMLC's flawed attempt to define a "relevant market."

A plaintiff cannot rely on indirect market power evidence without first properly defining a relevant market; failure to do so requires dismissal.  *Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).  Here, the market that "encompass[es] all interchangeable substitute products"—even accepting RMLC's allegations as true—is a market for licenses to broadcast copyrighted music on terrestrial commercial radio stations.   As RMLC concedes,

---

[4] If the Court considers the interim license allegations—something GMR believes is inappropriate—the fact that only ~800 of ~2800 RMLC members took an interim license disproves RMLC's contention that GMR can "demand" supracompetitive prices without losing sales.  (Grimmett Decl. ¶ 19.)

4

GMR has but 74 songwriters, less than 2% of all the compositions available for public performance licensing, and a single-digit share of "spins" on the radio.  GMR undeniably does not possess a dominant market share.

To avoid this fatal flaw, the RMLC shifts the goal posts and advances a "single-brand" market definition.  RMLC argues the relevant market is "licenses to the copyrighted musical compositions and performances in GMR's repertory."  (FAC ¶ 76.)  RMLC's says GMR's catalog is "unique," describes it as a "must have," and quotes an article stating that radio stations cannot "comfortably live without" GMR's catalog as "evidence" that GMR's repertory is the proper "relevant market."  (Opp. 14-16.)  But these allegations do not support RMLC's legal conclusions that GMR licenses are not reasonably interchangeable with any other licenses.

First, two products may be interchangeable, even if each is unique.  *See Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81 (S.D.N.Y. 2015); (Mot. at 30-31.)  For example, contrary to RMLC's glib assertion that "not all automobiles are in the same relevant product market," (Opp. at 18 n.9), the Third Circuit has upheld a relevant product market encompassing "all new automobiles sold in the United States."  *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 480 (3d Cir. 1992).  A black Cadillac may be unique and different from, say, a purple VW beetle.  But this Court has rejected the idea "that the Cadillac automobile, by reason of its uniqueness and desirability, is the relevant product market."  *Mogul v. Gen. Motors Corp.*, 391 F. Supp. 1305, 1313 (E.D. Pa. 1975), *aff'd*, 527 F.2d 645 (3d Cir. 1976); *see also Town Sound*, 959 F.2d at 479-80 (limiting the relevant market to Chrysler cars "makes no sense in terms of real world economics," even though "Chrysler cars may be 'unique' in a broad sense of the term").

Second, GMR's small catalog of popular compositions is not its own market simply because it is desirable and valuable to radio stations. *See Mediacom Commc'ns Corp. v. Sinclair Broadcast Group, Inc.*, 460 F. Supp. 2d 1012, 1027-28 (S.D. Iowa 2006) (network programming that was allegedly "unique and 'must see'" could not constitute relevant market unto itself). Radio stations compete by programming the popular works their listeners want to hear. Thus, when a classic rock station considers whether to pay GMR's fee, it should take into account [a] whether its competitors have access to GMR's repertory; and [b] the thousands of classic rock compositions available through other PROs. Such cost-benefit decisions are merely the building blocks of competitive behavior. Even if some radio stations may not be "comfortable" without a GMR license, this does not define a market. *See Satnam Distribs., LLC v. Commonwealth-Altadis, Inc.*, 140 F. Supp. 3d 405, 419 (E.D. Pa. 2015) (rejecting single product market for a cigar brand where cigar sellers were required to sell—and thus could not avoid buying—all cigar brands).

Courts "routinely" dismiss claims "involv[ing] single-brand or single-manufacturer product markets"—***even markets premised on "unique" bundles of copyrighted works***. *See Satnam Distribs.*, 140 F. Supp. 3d at 419. RMLC whistles past this mountain of authority, arguing that the SESAC decisions accepted RMLC's single brand PRO license argument. This is demonstrably wrong:

- *SESAC II* did not address relevant market. The Court expressly avoided defining a market, having concluded RMLC had alleged direct evidence of market power through increased prices without losing sales. 29 F. Supp. 3d at 500.

- *SESAC I,* Magistrate Judge Sitarski's report and recommendation denying RMLC's motion for preliminary injunction, tentatively accepted RMLC's single-brand theory in the "likelihood of success" portion of the report. *SESAC I*, No. 12-cv-5807, 2013 WL 12114098, at *16 (E.D. Pa. Dec. 23, 2013). However, that recommendation is of limited precedential value. *See Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 528 n.4 (7th Cir. 2000) ("[A] court's findings and conclusions at the preliminary

injunction stage … are typically based on an incomplete record, using a different standard (likelihood of success on the merits), and therefore are not binding at summary judgment."); *F.T.C. v. Mainstream Marketing Services, Inc.*, 345 F.3d 850, 852 n.2 (10th Cir. 2003) (same). Magistrate Judge Sitarski acknowledged this limitation herself.[5]

- *Meredith II* depended on allegations that the television industry had been forced to accept SESAC's arbitrary price increases year-over-year. This allegation was essential to the court's accepting a single-brand market definition. *Meredith II*, 1 F. Supp. 3d at 218-19; *accord SESAC I*, 2013 WL 12114098, at *16 (noting as support for narrow market definition the allegation that "annual increases in SESAC's prices" had not resulted in "corresponding increase in the demand for any other products"). There is no similar history and no similar allegation here.

- Like any market power analysis, these decisions naturally account for the defendant's size. *White & White, Inc. v. Am. Hosp. Supply Corp.*, 540 F. Supp. 951, 1000 (W.D. Mich. 1982) ("[M]any actions which are not anticompetitive if done by a small firm may have anticompetitive effects if done by a dominant firm."), *rev'd on other grounds*, 723 F.2d 495 (6th Cir. 1983). SESAC is a giant compared to RMLC—licensing over 16 times the number of compositions.

### B.      NO HARM TO COMPETITION.

RMLC does not dispute that harm to competition is the *sine qua non* of an antitrust claim. But RMLC says it has alleged adequate facts to establish harm to competition by accusing GMR of [a] demanding a higher price for what RMLC says is an "inferior product" (Opp. 21-22); and [b] entering "exclusive agreements" with its writers, which prevent GMR artists and potential new PROs from entering the marketplace. (*Id.* at 24.) Even if accepted as true, neither allegation establishes harm to competition.

#### 1.     **Higher Prices Alone Do Not Comprise Competitive Harm.**

RMLC alleges that GMR seeks to charge more than ASCAP and BMI would charge to license the same works. (Opp. at 21-22.) But higher prices—even for the same or an inferior

---

[5] "[A]lthough I conclude – based on the current record – that Plaintiff has established a likelihood of success, this showing certainly was not 'overwhelming.' Indeed, this is a complex case and the current record is far from comprehensive; discovery was expedited and Defendants' expert was retained with little time in which to offer an opinion on critical matters such as the relevant market." *SESAC I*, 2013 WL 12114098, at *21 n.27.

product—do not harm competition *unless they result from a reduction in competition or are supracompetitive.* See, e.g., *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895 (2007) (antitrust law does not prohibit charging high prices); *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 252 (D.C. Cir. 1987) ("excessive price alone does not establish a violation of the antitrust laws, because imposition of a high price is not, in and of itself, an anticompetitive act.").

RMLC does not claim that GMR's price demands "resulted from a reduction in competition." Quite the opposite—RMLC concedes that GMR is the first new competitor in in 80 years. Instead, RMLC rests on the allegation that GMR's prices are higher, and thus "supracompetitive." But "high prices are not equivalent to supracompetitive prices." *Church & Dwight Co., Inc. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 897 (N.D. Cal. 2012), *vacated in part on other grounds,* No. C-10-4429 EMC, 2012 WL 1745592 (N.D. Cal. May 16, 2012); *In re Ebay Seller Antitrust Litig.*, No. C 07–01882 JF (RS), 2010 WL 760433, at *5 (N.D.Cal. Mar. 4, 2010) (raising prices "too high" over a period of years "proves nothing with respect to whether the prices are supracompetitive."); *R.J. Reynolds Tobacco Co. v. Phillip Morris, Inc.*, 199 F. Supp. 2d 362, 382 (M.D.N.C. 2002) ("artificially high" prices not supracompetitive). And merely invoking the words "supracompetitive prices" does not satisfy the law. *See Cinema Village Cinemart, Inc. v. Regal Entm't Grp.*, No. 15-cv-05488 (RJS), 2016 WL 5719790, at *5 (S.D.N.Y. Sept. 29, 2016) (rejecting as "wholly conclusory" plaintiff's allegations that competition was harmed by defendant's higher prices).

To justify its "supracompetitive" label, RMLC alleges that rate courts dictate ASCAP and BMI license prices, and that GMR seeks to charge more than ASCAP or BMI could charge for the same works. (Opp. at 11.) This is wrong in every respect. Rate courts resolve negotiation

impasses and "are not required to search for or construct a theoretical model of a perfectly competitive market. Neither the antitrust laws nor the Consent Decree requires such a result. Indeed, the Decree speaks only of setting a 'reasonable' rate, a term that appears intended to offer the rate court some discretion to take account of a variety of potentially relevant considerations" vis-à-vis the consumer and the particular PRO. *U.S. v. ASCAP*, 1993 WL 60687, at *18 (S.D.N.Y. 1993), *vacated in part on other grounds*, 157 F.R.D. 173 (S.D.N.Y. 1994); *United States v. ASCAP*, No. 1:41-cv-01395-DLC (S.D.N.Y.), Dkt. 540, (excerpted as Appendix A) at 34 ("Mobi's payment to SESAC is a poor yardstick to measure the fairness of any fee to ASCAP and has limited relevance to this proceeding"). License fees deemed "reasonable" in a particular set of circumstances may not be reasonable under other circumstances—and they certainly do not reflect a competitive baseline for all PROs.

        2.    **Exclusive Contracts Must Foreclose Competitors in Order to Harm Competition.**

Exclusive agreements can be pro-competitive. Accordingly, an exclusive contract harms competition ***only*** where it "forecloses" competitors from the relevant market.[6] *See, e.g., Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 110-11 (3d Cir. 1992); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 n.1 (9th Cir. 2010) (exclusive dealing may violate the Sherman Act only when it actually forecloses competition); (Mot. at 10-15). RMLC says that GMR enters "exclusive contracts" with its songwriter affiliates which foreclose two

---

[6] RMLC's attacks on GMR's alleged exclusive agreements fail for the additional reason that GMR's affiliates are copyright holders, to whom the Copyright Act grants the right to exclusively license their intellectual property as they choose. "[A]ntitrust laws do not negate the intellectual property holder's right to exclude others from intellectual property." *See, e.g., SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1081 (D. Colo. 2013); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1369-70 (3d Cir. 1996) (distributor of copyrighted motion pictures did not violate Sherman Act Section 1 by granting an exclusive distribution license to one exhibitor, while refusing to license another exhibitor).

types of "competitors": [a] other PROs and [b] the songwriters themselves. This is nonsense. A new entrant could "lure away" writers once GMR's agreements expire, just as RMLC alleges GMR did. (*See* Mot. at 31-32.) This *is* competition, not harm to it.[7] That RMLC may have to secure a license from the "new" PRO *and* from the existing ones is not "inefficient." *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1187-88 (8th Cir. 1982) (idea that more competition is "inefficient" effectively "employ[s] the antitrust laws [to stifle] the very competition which such laws are designed to encourage").[8]

Finally, GMR's writers do not compete with GMR in RMLC's alleged relevant market. By definition, no *individual* GMR writer possesses the same combination of works contained in a license for *all* GMR works. A radio station consumer looking to broadcast GMR's classic rock catalog will not consider a license to Ira Gershwin's compositions a substitute for a GMR license. Ira Gershwin would not and could not compete with GMR for that radio station's business.

### III. CONCLUSION

Harm to competition and market power are indispensable elements of RMLC's causes of action. Because RMLC fails to plausibly allege either, it fails to state a claim. The complaint must be dismissed.

---

[7] In fact, RMLC's argument proves GMR's point. According to RMLC, if a new PRO successfully lured writers away from GMR, GMR would simply replace the writers it lost with other writers and maintain a "must have" catalog. (Opp. at 15-16.) Exactly, the works in GMR's repertory are interchangeable with the millions that are not.

[8] RMLC's argument also extinguishes RMLC's single-brand market definition: if GMR can so easily replace existing writers with new ones, other PROs can do the same.

| | |
|---|---|
| Dated:  April 7, 2017 | By: */s/ Daniel M. Petrocelli*<br>        Daniel M. Petrocelli |

DANIEL M. PETROCELLI (*pro hac vice*)
dpetrocelli@omm.com
DAVID MARROSO (*pro hac vice*)
dmarroso@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, California  90067-6035
Telephone:    (310) 553-6700
Facsimile:     (310) 246-6779

RICHARD G. PARKER (*pro hac vice*)
rparker@omm.com
EDWARD D. HASSI (*pro hac vice*)
ehassi@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006-4001
Telephone:    (202) 383-5300
Facsimile:     (202) 383-5414

NEILL C. KLING
nkling@harkinscunningham.com
HARKINS CUNNINGHAM LLP
4000 Two Commerce Square
2001 Market Street
Philadelphia, Pennsylvania 19103-7044
Telephone:    (215) 851-6700

*Attorneys for Global Music Rights, LLC*