IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RADIO MUSIC LICENSE** | : | **CIVIL ACTION** |
| **COMMITTEE, INC.,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO.  16-6076** |
| | : | |
| **GLOBAL MUSIC RIGHTS, LLC.** | : | |
| **Defendant.** | : | |

<u>**REPORT AND RECOMMENDATION**</u>

**LYNNE A. SITARSKI**                                        **November 29, 2017**
**U. S. MAGISTRATE JUDGE**

Plaintiff Radio Music License Committee ("RMLC") sues Defendant Global Music Rights, LLC ("GMR") under the antitrust laws, Section 2 of the Sherman Act, 15 U.S.C. § 2; Section 16 of the Clayton Act, 15 U.S.C. § 26; First Amended Complaint ("FAC") (ECF 52). Jurisdiction is federal question, 28 U.S.C. § 1331, and the instant motions have been referred to me for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  Order, dated August 1, 2017 (ECF 88); Order, dated November 28, 2017 (ECF 99).

GMR moves under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3) to dismiss the action for lack of personal jurisdiction and improper venue.  GMR Mot., Br., & Reply (ECF 57, 57-1, 69-3).  Alternatively, GMR requests, pursuant to 28 U.S.C. § 1404(a), that this action be transferred to the Central District of California, where GMR is located and conducts its business.[1]  Id.  RMLC opposes the motion.  RMLC Resp. (ECF 62).  Judge Jones has referred this motion to me for a Report and Recommendation.  (ECF 88). RMLC also filed a motion to

---

[1]  On December 6, 2016, GMR sued RMLC in the Central District of California under Section 1 of the Sherman Act, 15 U.S.C. § 1; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26; California's Cartwright Act, Cal. Bus. & Prof. Code § 16720; and California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 <u>et seq.</u>  Compl., <u>Global Music Rights, LLC v. Radio Music License Comm., Inc., et al.</u>, No. 2:16-cv-09051–BRO–AS (C.D. Cal.) (ECF 1).

supplement the record with "new facts," which -- in RMLC's view -- establish jurisdiction over GMR and venue in Pennsylvania.  RMLC Suppl. Mot. & Br. (ECF 90, 90-1).  GMR opposes supplementation, asserting that the proffer is an effort to "manufacture personal jurisdiction where none exists."  GMR Suppl. Resp. at 1 (ECF 92).  This motion has also been referred to me for a Report and Recommendation.  (ECF 99).

RMLC is a "trade association" that represents its members in negotiations for licenses to publicly perform copyrighted musical compositions.  FAC ¶¶ 18, 49, 113-114.  RMLC negotiates on behalf of its members with performing rights organizations ("PROs")[2] for mutually acceptable license terms, rates, and fees, as well as alternative forms of licensure to suit the needs of particular members.  William Velez Decl., dated July 21, 2017, ¶¶ 8-9 (ECF 90-22).  RMLC's membership comprises about 3,000 owners of 10,000 commercial terrestrial radio stations across the United States.[3]  Id. ¶¶ 4-5; Randy Grimmett Decl., dated Mar. 3, 2017, ¶¶ 13, 15, 16 (ECF 57-2).  RMLC's members generate "over 90% of the billions of dollars of annual revenue generated by the terrestrial radio industry in the United States."  Id. ¶ 15.

GMR's sole business is licensing rights to publicly perform musical compositions that are owned by its affiliated songwriters and publishers.  It is the smallest PRO in business today.[4]

---

[2]  The Copyright Act defines a PRO as follows:  "A 'performing rights society' is an association, corporation, or other entity that licenses the public performance of nondramatic musical works on behalf of copyright owners of such works, such as the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), and SESAC, Inc."  17 U.S.C. § 101.

[3]  The record is not fully developed as to the constituency of RMLC's membership.  See FAC ¶¶ 63, 113-114.  For purposes of this motion only, owners and other representatives of radio stations as well as radio station companies will be treated as "members" of RMLC.

[4]  BMI represents about 750,000 affiliates with a repertory of 12 million songs.  ASCAP represents about 585,000 affiliates with a repertory of 10 million songs.  SESAC represents about 30,000 affiliates with a repertory of about 400,000 songs.  Radio Music License Comm.,

GMR Reply at 1; FAC ¶¶ 2, 27.  "GMR's share of radio performances, based on a weighted

percentage of total plays, is between 5% and 7%."  Id. ¶ 52.  GMR's CEO Randy Grimmett

attests:  "GMR's repertory encompasses roughly 30,000 compositions written by 74

songwriters," which amounts to "less than 0.1% of all songwriters and fewer than 0.01% of the

compositions available for performance by radio, television, satellite, and other broadcasters."

Grimmett Decl., dated Mar. 3, 2017, ¶¶ 1, 6, 12; RMLC Suppl. Br. at 5; FAC ¶ 44.

Plaintiff alleges in the Amended Complaint that GMR's repertory of copyrighted musical

compositions occupies its own product market in which "GMR is an unlawful monopolist."  See

e.g., FAC ¶¶ 1, 67, 71, 76-77 (citing 15 U.S.C. § 2). Plaintiff avers that GMR exercises its

monopoly power by demanding "supra-competitive" prices for licenses to perform the musical

compositions in its repertory.  Id. ¶¶ 16(d)-(g), 63.  GMR allegedly made those demands to

RMLC's officers and representatives, and to some of RMLC's members that own or represent

radio stations broadcasting in various states across the nation.  Id.  RMLC asserts that its

members lack any meaningful choice for substitute copyrighted musical works, and therefore,

they are forced to accept the terms and prices unilaterally demanded by GMR.  Id. & ¶¶ 1, 4, 42,

44, 76.  RMLC contends that GMR exercises its monopoly power by offering and selling

anticompetitive license, and that GMR's conduct in this regard is an intentional antitrust

violation.  Id. ¶¶ 101-102, 120-125, 128-132.  Plaintiff seeks to enjoin GMR from the alleged

anticompetitive conduct; Plaintiff further seeks to institute judicial regulation of the terms, rates,

and prices for which GMR can offer or sell licenses, and further requests that any rate disputes

---

Inc. v. SESAC, Inc., No. 12-5807, 2013 WL 12114098, at *3 (E.D. Pa. Dec. 23, 2011) (Sitarski,
M.J.), adopted as modified, No. 12-5807, 2014 WL  12617437 (E.D. Pa. Feb. 20, 2014) (Jones,
J.).

be decided by a neutral arbitrator in binding arbitration.  Id. ¶¶ 13,126, 133 & Relief Sought

(citing 15 U.S.C. § 26).

GMR's position is that the record establishes no monopoly power, no antitrust injury, and

no antitrust violation—and in other words, GMR has not committed any intentional tort.  In

GMR's view, RMLC simply labels GMR a "monopolist" because GMR has negotiated prices for

its licenses that RMLC considers too high.  GMR Suppl. Br. at 6-7; see also GMR Rule 12(b)(6)

Mot. (ECF 58) (requesting dismissal of the antitrust claims).  GMR maintains that RMLC sues

solely to avoid innovation, and innovation actually promotes competition.

In their Amended Complaint, RMLC alleges jurisdiction over GMR in Pennsylvania and

venue in this judicial district.  RMLC contends that GMR offered anticompetitive license terms,

rates, and prices to RMLC's representatives and officers, and GMR offered or sold

anticompetitive licenses to some of RMLC's members that own, represent, or operate radio

stations broadcasting in Pennsylvania.  FAC ¶¶ 15, 16(a)-(g), 17.  In addition, RMLC asserts a

separate basis for jurisdiction:  an "interim license" that was agreed upon by the parties to

implement a settlement of the motion for preliminary injunction filed by RMLC concurrently

with the original complaint.  See, e.g., FAC ¶¶ 16(h)-(j); RMLC Mot. Prelim. Inj. (ECF 3).

Pursuant to this interim agreement, GMR offered the interim license to RMLC's members, some

of whom happen to operate some stations broadcasting in Pennsylvania.  Some of RMLC's

members purchased the interim license.  Setting aside the interim licenses for separate discussion

below, the Amended Complaint asserts that GMR offered and sold licenses to two of RMLC's

members—iHeartMedia, Inc. and Townsquare Media, Inc.—that together own or operate about

"1,100 radio stations" in more than one state.  Id. ¶¶ 16(e), 16(g), 63.  RMLC alleges that

jurisdiction exists because, *inter alia,* "at least 30" of iHeart's and three of Townsquare's stations operate in Pennsylvania.  Id. ¶¶ 16(g), 63.

RMLC's position is that GMR used RMLC as a "conduit" to impose anticompetitive licensing requirements nationwide on RMLC's members, and "in doing so, specifically targeted numerous radio stations located in Pennsylvania and in this District."  FAC ¶¶ 16(a)-(c); RMLC Resp. at 1, 3-5, 11-12, 15.  RMLC alleges that GMR "intended" that RMLC convey to its member stations the alleged "anticompetitive threats [of copyright infringement claims] and demands."  Id. at 16(a).  RMLC further alleged that "GMR has known that many of those stations are located in Pennsylvania," and GMR has been "knowingly and intentionally imposing a tortious anticompetitive scheme on hundreds of radio stations in Pennsylvania."  Id. ¶¶ 16(b),(c).

RMLC frames GMR's conduct "on a nationwide basis," arguing that GMR is "waging a nationwide anticompetitive campaign against U.S. commercial radio stations," some of which broadcast in Pennsylvania; therefore, GMR is subject to personal jurisdiction in each and every one of the 50 states, including Pennsylvania.  See, e.g., RMLC Resp. at 1-2, 16-19.  In RMLC's view, GMR "purposefully targeted Pennsylvania through the RMLC" by "us[ing] RMLC to try to impose supracompetitive license terms on *all* RMLC stations, including hundreds of member stations in Pennsylvania."  Id. at 16 (emphasis in original).

GMR responds that "Pennsylvania has no meaningful connection to this case."  GMR Br. at 1-2, 10.  GMR contends that the record presents no factual basis whatsoever for this Pennsylvania federal court to exercise personal jurisdiction over GMR.  Id. at 10-18.  In addition, GMR maintains that RMLC's theory of nationwide jurisdiction and venue is flawed, because a sovereign state's exercise of personal jurisdiction over a domestic limited liability company,

such as GMR, may not be based on nationwide contacts, as proposed by RMLC.  GMR asserts

that, because there is no personal jurisdiction over GMR in Pennsylvania, venue in this district is

improper as well.

Considering the present record, GMR's position must prevail.  Due process "does not

contemplate that a state may make binding a judgment in personam against an individual . . .

with which the state has no contacts, ties, or relations."  International Shoe Co. v. Washington,

326 U.S. 310, 319 (1945).  There is no basis in fact or law to assert personal jurisdiction over

GMR in Pennsylvania and therefore, venue in this judicial district is improper.  Furthermore, as

explained below, I conclude that the motion to supplement the record should be denied.  The

proffered supplementary materials should not be considered as relevant, material, or competent

evidence for purposes of establishing personal jurisdiction and venue.

Accordingly, I respectfully recommend that GMR's Motion to Dismiss be granted, and

that RMLC's motion to supplement the record be denied.

## I.   PROCEDURAL HISTORY

From 2014 through 2016, RMLC and GMR attempted to negotiate mutually acceptable

licensing terms, rates, and prices.  Eugene D. Levin Decl., dated July 21, 2017, ¶¶ 5-11 (ECF 90-

24).  In early November of 2016, RMLC proposed to GMR that, pending resolution of their

negotiations, each radio station should have the option to pay for a license "based on its weighted

spin share," rather than the higher price asked by GMR, and have a neutral arbitrator set final

rates.  Id. ¶ 11.  GMR declined the offered terms.

On November 18, 2016, RMLC commenced this action.  Compl. (ECF 1).  The same

day, RMLC moved for a preliminary injunction enjoining GMR "from imposing unilateral and

monopolistic licensing terms on RMLC's members."  RMLC Mot. Prelim. Inj. at 1 (ECF 3).

RMLC requested that GMR be compelled to offer all commercial terrestrial radio stations in the

United States a blanket license to publicly perform the musical compositions in GMR's repertory

at rates corresponding to those the radio station had been paying to the two largest PROs

operating in the United States—the American Society of Composers, Authors and Publishers

("ASCAP") and Broadcast Music, Inc. ("BMI").[5]  Id. at 4.  In addition, RMLC requested that

GMR be enjoined from suing any station for copyright infringement of the works contained in its

repertory during the pendency of this action, unless a station first had a fair opportunity to

purchase a blanket license offered by GMR at rates comparable to BMI's and ASCAP's, but then

rejected the offer.  Id.; RMLC Br. Prelim. Inj. at 2-3 (ECF 3).

On November 30, 2016, GMR proposed to RMLC an interim blanket license, pursuant to

which GMR would license its repertory to RMLC's members for a specified price during a

temporary interval, while the parties continued negotiations for a long-term license.  David

Marroso Decl., dated Aug. 28, 2017, ¶ 4 & Ex. 1 (ECF 92-1, 92-2).  GMR conditioned this offer

of a proposed interim license on RMLC's agreement to withdraw the motion for preliminary

injunction without prejudice.  Id.  RMLC declined GMR's offer.  Id., ¶ 5 & Ex. 2 (ECF 92-3).

RMLC countered, offering the interim relief requested by the motion for preliminary injunction.

Id.  RMLC proposed that "a neutral arbitrator" should determine "a reasonable price"—that is, a

rate "proportional to the annual rates that each station pays to ASCAP and BMI."  Id.  In

---

[5]  Since the 1940s, ASCAP and BMI have been subject to judicially monitored consent
decrees, which impose rate regulations among other requirements for licensing rights to perform
the copyrighted musical compositions of their members or affiliates.  See Broad. Music, Inc. v.
Columbia Broad. Sys., Inc., 441 U.S. 1, 10-16 (1979); Meredith Corp. v. SESAC LLC, 1 F.
Supp. 3d 180, 185 (S.D.N.Y. 2014); FAC ¶¶ 29-31.  SESAC's licensing of the performance
rights of its affiliates is subject to a settlement agreement with RMLC that governs rates among
other license terms through 2037.  William Velez Decl., dated July 21, 2017, ¶ 14 & Ex. 3,
Settlement Agreement, dated July 23, 2015 (ECF 90-22 & 90-22 at 60-93).

addition, RMLC proposed that GMR agree not to sue any radio station for copyright infringement of the works contained in its repertory during this action, unless a station first had a fair opportunity to consider a blanket license offered by GMR for the rates proposed by RMLC, but then rejected the offer.  Id.  GMR declined RMLC's counter-offer, finding that the proposed compulsory licensure, regulation of license rates and prices, and binding arbitration of disputed rates and prices by a neutral arbitrator were not acceptable.  FAC ¶¶ 57-58.

The Honorable C. Darnell Jones, II referred the motion for preliminary injunction to the undersigned.  Order, issued Nov. 23, 2016 (ECF 9).  On December 8, 2016, during the first telephone conference convened by the undersigned, RMLC contended that absent a decision on the motion for preliminary injunction by December 31, 2016, RMLC's members could be sued by GMR for copyright infringement as of January 1, 2017.[6]  Hr'g Tr., dated Dec. 8, 2016, 6:3-9 (ECF 35).  In RMLC's view, there was an imminent threat of copyright infringement litigation. Id., 6:8.  GMR's counsel described the "threat" as "simply fictitious," noting that RMLC's members had been infringing musical works in GMR's repertory since 2015, GMR had not filed an infringement suit against any of RMLC's members, and GMR had never sent the RMLC or its member radio stations a cease and desist letter.  Id., 6:8, 10:6-15.  GMR repeatedly expressed its intention to file a motion to dismiss the action for lack of personal jurisdiction and improper venue.  Id., 7:14-22, 14:20-22, 19:6-13.  GMR proposed that the dismissal motion be decided before the motion for preliminary injunction was decided.  Id., 7:25-8.2.  The undersigned urged the parties to come up with an interim solution, and asked them to discuss whether the injunction

---

[6] "GMR emphasized January 1, 2017, as the deadline for obtaining a license because, as of that date, the stations' 'license-in-effect' with ASCAP and BMI would cease to cover songs that had moved to GMR's repertory."  FAC ¶¶ 50-51.

proceedings could be avoided by an interim licensing agreement, thereby permitting the dismissal motion to be appropriately briefed and decided.  Id., 19:6-13.

During subsequent telephone conferences, the undersigned monitored the parties' efforts to reach an interim licensing agreement, which would preserve GMR's defenses to jurisdiction, protect the copyrighted materials in GMR's repertory, and ensure that RMLC's members would not be sued for copyright infringement for the duration of this action.  Hr'g Trs., dated Dec. 9, 2016; Dec. 16, 2016; & Dec. 21, 2016 (ECF 36-37, 41).  On December 21, 2017, the parties informed the undersigned that "we're actually very close to having everything ironed out," and "we'll be able to conclude this interim agreement, which would then involve the dismissal without prejudice of the motion for preliminary injunction."  Hr'g Tr., dated Dec. 21, 2017, 3:16-18, 5:11-19.  See also Marroso Decl., dated Aug. 28, 2017, ¶ 10.

On December 23, 2016, counsel for RMLC and GMR exchanged a draft term sheet for the interim license.  Marroso Decl., dated Aug. 28, 2017, ¶ 11 & Ex. 7 (ECF 92-8).  The same day, RMLC's counsel acknowledged:  "As for the term sheet, we're in agreement, I think."  Id. On December 24, 2016, the agreed interim license was memorialized by the "GMR and The RMLC Term Sheet."  Term Sheet (ECF 92-9).  On January 4, 2017, RMLC withdrew the motion for preliminary injunction without prejudice.  Withdrawal (ECF 38).

The terms of the agreed interim license state, in pertinent part, that from December 24, 2016, "until January 31, 2017, GMR will offer to any RMLC member station that does not already have a license to perform publicly the copyrighted compositions within GMR's repertory, the opportunity to enter into a[ ] license to perform those works on the terms set forth below."  Term Sheet § 1(a).  A total interim license fee is specified; however, the "parties reserve their respective rights to seek a retroactive fee adjustment in future licenses or as a result of the

current litigation." Id. § 2(a), (c). "The interim license will have a term beginning on January 1, 2017 and concluding on September 30, 2017 . . . ." Id. § 3. "RMLC members shall have until January 31, 2017 to enter an interim license," and "GMR will not initiate copyright infringement suits against any RMLC station before January 31, 2017." Id. §§ 4, 6(a). Furthermore:

> RMLC agrees it will not commence proceedings for injunctive relief prior to August 1, 2017 based on [a] circumstances as they exist as of the date of GMR agreement to offer the interim license or [b] any contention that GMR threatens to commence or actually commences an infringement lawsuit against radio stations who have performed or continue to perform GMR works without a written license from GMR. RMLC agrees that it will not assert the level of industry acceptance of the interim license, or the failure of any station(s) to accept the license as the basis for seeking preliminary injunctive relief.

Id. § 6(b) (emphasis and brackets in original).

Importantly, both sides promised that neither could use the interim licensing discussions, an offer or sale of an interim license, or the license itself "in any way"—"including to argue for or against personal jurisdiction or venue":

> (a)   GMR and RMLC agree that this agreement and the negotiations that led to this agreement are compromise negotiations protected pursuant to Federal Rule of Evidence 408.
>
> (c)   GMR and RMLC agree not to use the negotiation of or existence of any interim license with any RMLC member in any way, including to argue for or against personal jurisdiction or venue.

Term Sheet § 7(a), (c). See also Marroso Decl., dated Aug. 28, 2017, ¶¶ 7-8, 11-12 & Ex. 4, Dec. 8, 2016, emails between counsel for RMLC and GMR (ECF 92-5).

On January 5, 2017, the undersigned recommended that the motion for preliminary injunction be denied as moot. R&R. (ECF 39). On January 9, 2017, Judge Jones approved and adopted the Report and Recommendation, denying the motion for preliminary injunction as moot. Order, dated Jan. 9, 2017 (ECF 46). GMR made the interim license available to all of RMLC's members nationwide.

On January 20, 2017, GMR moved to dismiss the complaint for lack of personal jurisdiction and improper venue, and failure to state an antitrust claim upon which relief can be granted. First Mot. Dismiss (ECF 51) (citing Fed. R. Civ. P. 12(b)(2), (b)(3), (b)(6)).  In the alternative, GMR requested transfer of the action to the Central District of California.  Id. (citing 28 U.S.C. § 1404(a)).  On February 10, 2017, in lieu of a response to the dismissal motion, RMLC amended its pleading.  FAC (ECF 52).

The Amended Complaint added allegations regarding the interim licensing activity and the interim licenses themselves.  As to essential elements of the antitrust claims, RMLC alleges that GMR is a monopolist, and GMR unlawfully exercised its monopoly power by demanding "supra-competitive" prices for the interim licenses.  FAC ¶¶ 60-62, 86.  RMLC alleges that its members lacked any meaningful choice for substitute copyrighted musical compositions; therefore, they were forced to accept the interim license terms "unilaterally dictated" by GMR.  Id.  Many RMLC member radio stations purchased the interim license.  Id.  In RMLC's view, the interim license is "the product of GMR's unlawful exercise of its monopoly power" and proves an intentional antitrust violation.  Id.  In addition, RMLC alleges in the Amended Complaint that jurisdiction exists over GMR in Pennsylvania, and venue is proper in this judicial district, because GMR offered and sold interim licenses to companies whose radio stations broadcast in Pennsylvania.  Id. ¶¶ 15, 16(h)-(j), 17, 59, 60, 61, 62; see also GMR Reply, App. A (ECF 56-2) (highlighting allegations that are based on the interim licenses).

On March 3, 2017, GMR responded to the Amended Complaint by filing a motion to strike specific allegations regarding the interim licenses (ECF 56); a motion to dismiss for failure to state an antitrust claim upon which relief can be granted (ECF 58); and the present motion to

dismiss for lack of personal jurisdiction and improper venue (ECF 57).[7]  On March 24, 2017, RMLC separately responded to each motion.  RMLC Resp. (ECF 62, 63, 66).

RMLC responded to GMR's motion to strike, asserting that GMR materially breached the interim licensing agreement, which permits RMLC to use GMR's offers and sales of interim licenses to support personal jurisdiction over GMR in Pennsylvania and venue in this judicial district.[8]  RMLC Resp. Mot. Strike at 1-2, 5-6, 11-12 (ECF 63).  GMR replied that RMLC breached the interim licensing agreement by using the negotiations for the interim license and the license itself in the Amended Complaint, RMLC's responses to each of GMR's three motions to dismiss, and the California litigation.  GMR Reply Mot. Strike at 1 (ECF 70-3).  In addition, GMR replied:  "GMR breached nothing.  Not in any way and certainly not in any material way"—that "would justify jettisoning the GMR–RMLC Term Sheet."  Id. at 2, 5-9.

RMLC responds to the present motion to dismiss by asserting that GMR materially breached the interim licensing agreement; RMLC thus contends that it may use GMR's offers and sales of interim licenses to support personal jurisdiction over GMR in Pennsylvania and venue in this judicial district.  RMLC Resp. Mot. Dismiss at 11, 25-28.  For example, RMLC contends that "GMR's actions in negotiating and entering into anticompetitive interim licenses with numerous radio stations located in Pennsylvania . . . further confirms that jurisdiction is

---

[7]  Of these various motions, only the motion to dismiss for lack of personal jurisdiction and improper venue has been referred to me for a Report and Recommendation.

[8]  RMLC asserts that GMR breached the interim licensing agreement by not offering licenses to some of RMLC's members:  "RMLC member stations contacted GMR before January 31 in an effort to purchase the interim license, but GMR did not respond to them before January 31."  RMLC Resp. Mot. Strike at 4-6, 10-13 (ECF 63).  In addition, RMLC asserts that GMR refused to offer interim licenses to some owners of "station groups on an individual-station basis," as required by the interim licensing agreement.  Id. at 5-6, 11 (citing Term Sheet § 1(a)).  And "because GMR is in unrepentant breach of the RMLC-GMR agreement that contains the use restriction, RMLC is now well within its rights to use the interim license to establish jurisdiction, venue, or liability."  Id. at 1-2, 5, 8, 10, 12.

proper here." Id. at 11.  The same "material breaches" that are described in RMLC's response to GMR's motion to strike are asserted here.  Id. at 26.

In early May of 2017, RMLC proposed that GMR extend the interim license, which would terminate on September 30, 2017, likely before the resolution of this action.  Velez Decl., dated July 21, 2017, ¶ 43.  GMR responded by letter dated May 20, 2017, declining to negotiate with RMLC the terms for an extension, preferring instead to continue discussions directly with RMLC's members who were interested in "additional interim and long-term licenses."  Id. ¶ 43 & Ex. 16 (ECF 90-32 at 70-72).  On May 29, 2017, GMR announced on its website:  "Due to pending litigation with the RMLC, . . . we cannot negotiate or enter licenses with stations owned by companies headquartered or based in Pennsylvania."  Marroso Decl., dated Aug. 28, 2017, ¶ 24 & Ex. 16, GMR's "Radio License" page of GMR's website (ECF 92-17).

During June and July of 2017, the parties communicated extensively, discussing GMR's position as to interim licensure of Pennsylvania radio station companies.  As a condition to doing any business in Pennsylvania, GMR insisted upon a written commitment by RMLC and companies operating in Pennsylvania that neither the discussions for interim license extensions, nor the extended licenses themselves, could be used in any litigation in any way.  Marroso Decl., dated Aug. 28, 2017, ¶¶ 24-27 & Exs. 18 (ECF 92-19), 19 (ECF 92-20), 20 (ECF 92-21).  See also RMLC Suppl. Br., App. A (ECF 90-2 at 22-24) (summary of communications).  By letter dated July 20, 2017, GMR proposed "negotiating with Pennsylvania-based companies for the extension of interim licenses," subject to specified conditions, one of which stated:

> RMLC will agree that it cannot use any discussions, any negotiations, or the existence of any interim license with any RMLC member in any way in any litigation.  By way of example only, the RMLC will not use any discussions, any negotiations, or the existence of any interim license with any Pennsylvania-based company to argue in favor of personal jurisdiction or venue in any litigation, including the pending litigation in Pennsylvania.  Likewise, the RMLC will not

13

seek to introduce as evidence any discussions, any negotiations, or the existence of any interim license or argue that any discussions, negotiations, or the existence of any interim license constitutes evidence of GMR's alleged monopoly power or any other substantive element of the RMLC's antitrust claims.

Id. ¶ 29, Ex. 21 (ECF 92-22).  RMLC did not respond to the letter.

The next day, July 21, 2017, RMLC again moved for a preliminary injunction.  Second Mot. Prelim. Inj. (ECF 85).  This time, RMLC asserted that GMR was constructively "boycotting" or refusing to deal with Pennsylvania radio stations by conditioning an extension of the original interim licenses on RMLC's and each radio station's assurance that the extension would not be used against GMR in any way.  In RMLC's view, GMR's conditions were an exercise of "unlawful monopoly power," amounting to a separate and independent violation of the antitrust laws, and "an effort to frustrate the litigation and intimidate potential witnesses."  Id. at 1-2; RMLC Br. Second Mot. Prelim. Inj. at 1-3, 31-32 (ECF 85-1).  RMLC also asserted that GMR's "conditional refusal to deal," which "targeted" radio stations operating in Pennsylvania, is "tortious conduct giving rise to personal jurisdiction in Pennsylvania."  Id. at 20-21.

During a conference with Judge Jones on August 1, 2017, the parties agreed to postpone the second motion for preliminary injunction by employing the same solution that resolved the first motion for preliminary injunction:  GMR would offer to RMLC's members an extended interim license on the same terms as the original interim license, except for the termination date. Just like the original interim license, the extended interim license would prohibit use of the licensing discussions, an offer or sale of a license, or the license itself "in any way"—including to argue for or against jurisdiction over GMR and venue in Pennsylvania.  RMLC Suppl. Br. at 7; GMR Suppl. Resp. at 12-13; Jennifer L. Giordano Decl., dated Aug. 4, 2017, ¶ 15 & Ex. 17 (ECF 90-3, 90-20).  Judge Jones determined that the second motion for preliminary injunction would be held in abeyance, until the motion to dismiss for lack of personal jurisdiction and

improper venue was decided.  Id.  With the parties' agreement, Judge Jones referred the

jurisdictional dismissal motion to the undersigned for a Report and Recommendation.  Order,

dated Aug. 1, 2017 (ECF 88).

Beginning on August 7, 2017, GMR sent about 3,000 emails to RMLC's members,

including those radio stations operating in Pennsylvania, offering an extended license on the

same terms as the original interim license.  Marroso Decl., dated Aug. 28, 2017, ¶¶ 32-33.  On

August 11, 2017, GMR updated its website to inform the industry that offers of extended interim

licenses had been sent to all of RMLC's members, including those member radio stations

operating in Pennsylvania.  Id. ¶ 34.  The extension offered was an additional six-month period,

from October 1, 2017, to March 31, 2018.  Id., ¶ 22 & Exs. 22-31 (ECF 92-23 through 92-32).

On August 14, 2017, RMLC moved to supplement the record in opposition to the motion

to dismiss for lack of personal jurisdiction over GMR in Pennsylvania and improper venue in

this judicial district.  RMLC Suppl. Mot. (ECF 90).  The motion to supplement reasserts that

GMR constructively boycotted or refused to deal with Pennsylvania radio stations by

conditioning an extension of the interim licenses on RMLC's and each radio station's assurance

that the extension would not be used against GMR in any way.  RMLC Suppl. Br. at 9-10 (ECF

90-2).  The motion reasserts that GMR's constructive refusal to deal targeted radio stations

operating in Pennsylvania, which proves an intentional tort—that is, an antitrust violation.  Id. at

10-11.  The proffered evidence largely comprises the parties' communications during May

through July of 2017, regarding the extended interim licenses.  However, the motion does not

mention that by August 11, 2017, GMR had already offered an extended license to all of

RMLC's members, including those member radio stations operating in Pennsylvania.

Based on the proffered supplementary materials, RMLC proposes a new theory for personal jurisdiction over GMR:  "The purpose of GMR's boycott scheme is to punish and retaliate against those Pennsylvania-based entities that have already stepped forward as third party witnesses to assist RMLC in this litigation, and to intimidate other witnesses from doing the same in the future."  RMLC Mot. for Leave to File at 2-3 (ECF 90-1); RMLC Suppl. Br. at 2-3, 10-11.  Furthermore, RMLC asserts:

> GMR has never notified RMLC, stations or the Court that it has abandoned its intention to boycott Pennsylvania-based entities after the [extended] interim licenses expire [on March 31, 2018]. . . . It is this refusal-to-deal intimidation scheme, ongoing since May 29, 2017 (and not any extended interim license agreements), that cements jurisdiction and venue in this Court.

Id. at 8.  In other words, RMLC's position is that GMR's intentionally tortious, anticompetitive conduct —the alleged boycott and refusal-to-deal intimidation scheme—creates personal jurisdiction over GMR in Pennsylvania and venue in this judicial district.

GMR opposes supplementation for many reasons.  GMR Suppl. Resp. (ECF 92).  Principally, GMR maintains that given the history of this litigation and applicable legal standards, the conditions for extending the interim licenses were necessary to protect GMR's jurisdictional arguments.  GMR vehemently denies that its insistence upon the conditions was an effort to intimidate witnesses.  See id. at 2-4.  As to RMLC's assertion that "the purpose of GMR's boycott scheme is to punish and retaliate against" potential witnesses, GMR responds:  "That accusation is untrue, unwarranted, and unprofessional," being without any support in the record.  Id. at 4.  GMR also responds that the record establishes:  "There is no 'Pennsylvania boycott' and there was no 'Pennsylvania boycott.'  Period.  Full stop."  Id. at 3, 5.

## II.    FACTUAL BACKGROUND

RMLC is organized as a nonprofit corporation under Tennessee law with headquarters in

Brentwood (near Nashville), Tennessee.  Velez Decl., dated July 21, 2017, ¶¶ 1, 5.  RMLC acts a

common agent for its members with the authority to negotiate licensing terms, rates, and fees

with PROs.  Id. ¶ 9.  However, RMLC disavows authority to bind any of its individual members

to a licensing agreement:

> [A]lthough RMLC can make available to its members the proposed terms that
> PROs have indicated they will offer, RMLC cannot force any radio station to
> accept and pay for a license from any PRO at all, much less on specific terms.
> With every PRO, each radio station decides for itself whether it wishes to
> purchase a license.  And the PROs (not RMLC) bill and collect from individual
> radio stations that elect to purchase a license under the negotiated terms.

Id.  RMLC does not buy licenses for the public performance of musical compositions.  Id. ¶ 5.

"RMLC itself is not a radio station; it does not broadcast music and does not need a performing

rights license."  RMLC Resp. at 18.  "RMLC negotiates licensing rates with PROS that its

members can then accept or decline directly from the PROs themselves."  Id.

GMR is organized as a limited liability company under Delaware law.  Grimmett Decl.,

dated Mar. 3, 2017, ¶ 5.  GMR is headquartered at its sole office in Los Angeles, California.  Id.

GMR has seventeen full-time employees; fifteen are in Los Angeles, and two work from their

homes in New Jersey.  Id. ¶ 7.  No GMR employee resides or works in Pennsylvania.  Id.  GMR

is owned by Azoff MSG Entertainment LLC, a Delaware limited liability company with its

headquarters and sole place of business in Los Angeles; Randy Grimmett, a Los Angeles

resident; and a few of GMR's founding songwriters, none of whom is based or has a primary

residence in Pennsylvania.  Id. ¶ 8; Randy Grimmett Decl., dated Mar. 1, 2017, ¶ 11 (ECF 64-2).

Beginning in 2014, and at times thereafter until this action was filed on November 18,

2016, RMLC's and GMR's representatives met in person, spoke on the phone, and exchanged

emails and written proposals for a license to perform the musical compositions that are owned by GMR's affiliated songwriters and publishers.  GMR's CEO Randy Grimmett attests:  "Prior to the initiation of this lawsuit, all discussions with the RMLC were with members of the executive Committee of RMLC in their capacity as members."  Randy Grimmett Decl., dated Apr. 7, 2017, ¶ 38 (ECF 69-5).

GMR's CEO Grimmett and some of GMR's Los Angeles employees met with RMLC's representatives and members to discuss licensing GMR's repertory.  Grimmett Decl., dated Mar. 1, 2017, ¶ 45.  No meetings between RMLC and GMR occurred in Pennsylvania.  Id.  The discussions took place in various cities, including Washington, D.C.; New York City; Detroit, Michigan; Austin, Texas; Nashville, Tennessee; and Los Angeles.  Grimmett Decl., dated Mar. 3, 2017, ¶¶ 18-19.

On August 24, 2015, GMR's CEO Grimmett and his colleague, Susan Genco, met with RMLC's Chairman, Ed Christian, and Executive Director, William Velez, in Detroit.  Grimmett Decl., dated Mar. 3, 2017, ¶ 19.  RMLC officers Eugene D. Levin and John VerStandig "dialed into" that meeting by telephone conference.  Id. ¶ 20; Grimmett Decl., dated Mar. 1, 2017, ¶ 46; Eugene D. Levine Decl., dated Mar. 23, 2017, ¶ 8 (ECF 62-6); John VerStandig Decl., dated Mar. 23, 2017, ¶ 5.b. (ECF 62-1); Velez Decl., dated July 21, 2017, ¶ 28.  Levin called into the meeting from his office in Bala Cynwyd, Pennsylvania, at the headquarters of Entercom Communications Corp.  Levin Decl., dated Mar. 23, 2017, ¶¶ 1, 8.  Grimmett attests that throughout the entirety of GMR's discussions with RMLC, Levin participated telephonically in this one meeting only.  Grimmett Decl., dated Mar. 3, 2017, ¶ 20; Grimmett Decl., dated Mar. 1, 2017, ¶ 46.  VerStandig, in addition to the meeting in Detroit, participated in other discussions

among representatives of GMR and RMLC.  All of the in-person meetings occurred outside of Pennsylvania.

Levin is the Vice President, Treasurer, and Controller of Entercom Communications Corp.  Levin Decl., dated July 21, 2017, ¶ 1.  Entercom operates approximately 125 radio stations in 28 radio markets across the country, some of which are located in Pennsylvania.  Id. "Entercom is currently the fourth largest radio group in the country."  Levin Decl., dated Mar. 23, 2017, ¶ 1.  Entercom is a member of RMLC.  Levin Decl., dated July 21, 2017, ¶ 2.  Levin is a member of RMLC's Board of Directors and Executive Committee.  Id.  Entercom did not purchase a long-term license from GMR.  Instead, Entercom purchased an interim license in January 2017.  Id. ¶¶ 12, 19; Randy Grimmett Decl. dated Apr. 7, 2017, ¶ 40 ("Prior to RMLC suing GMR, GMR never conveyed a license offer to Entercom or offered to negotiate an individual license directly with Entercom.").

John VerStandig is the President and CEO of HJV Corporation, the general partner of HJV Limited Partnership, which trades as VerStandig Broadcasting from its headquarters in Greencastle, Pennsylvania.  John VerStandig Decl., ¶ 1, dated July 19, 2017 (ECF 90-21). VerStandig Broadcasting owns four radio stations, three of which operate in Pennsylvania.  Id. VerStandig Broadcasting is a member of RMLC, and John VerStandig is a member of RMLC's Board of Directors and Co-Chairman of its Executive Committee.  Id. ¶ 2.  VerStandig attests that during each of his meetings with GMR, he was acting as an executive member of RMLC— not as an individual member seeking a license from GMR for VerStandig Broadcasting. VerStandig Decl. dated Mar. 23, 2017, ¶¶ 5-6.

John VerStandig avers that on October 8, 2014, he met with GMR's CEO Grimmett in New York City.  VerStandig Decl., dated Mar. 23, 2017, ¶ 5.a.  RMLC's Chairman Christian and

its Executive Director Velez were also present.  Id.  VerStandig describes Grimmett's statements at the meeting:  "Grimmett emphasized GMR's desire to sell a license to all commercial radio stations in the United States."  Id. ¶ 6.

VerStandig further states that on October 26, 2016, he met with Grimmett and other representatives of GMR, RMLC, and the radio industry at GMR's office in Los Angeles. VerStandig Decl., dated Mar. 23, 2017, ¶ 5.c.  VerStandig contends:  "At the October [8,] 2014 meeting and again at the October 26, 2016 meeting, Grimmett made clear that . . . virtually all commercial radio stations in the United States could not avoid playing at least some songs in GMR's repertory, and thus had no choice but to purchase GMR's license."  Id. ¶ 7.  VerStandig states that during the meeting on October 26, 2016, "Grimmett said that two of VerStandig Broadcasting's stations [in Pennsylvania—92.1 WNUZ–FM and 101.5 WBHB] in particular 'absolutely need these artists.'"  Id.  According to VerStandig, Grimmett said that WNUZ "could not compete without Bruno Mars, a GMR affiliate," and WBHB–FM "absolutely needed to be able to play several GMR artists."  Id.  VerStandig opines, "Grimmett made these statements in an attempt to compel these Pennsylvania stations to enter into direct licenses with GMR."  Id. See also VerStandig Decl., dated July 19, 2017, ¶ 6 (same).

VerStandig further states that during the meetings on August 24, 2015, and October 26, 2016, "GMR demanded that unlicensed commercial radio stations across the United States accept its licensing terms."  VerStandig Decl., dated Mar. 23, 2017, ¶ 8.  VerStandig contends that after the meeting ended on October 26, 2016, "I told Grimmett . . . VerStandig Broadcasting would like to discuss a direct license, and Grimmett agreed to do so."  Id. ¶¶ 10, 13.

However, VerStandig Broadcasting did not purchase a long-term license from GMR. Instead, during January of 2017, VerStandig Broadcasting purchased an interim license.  Id. ¶¶

14, 15; VerStandig Decl., dated July 19, 2017, ¶ 7 (same); Grimmett Decl., dated Apr. 7, 2017, ¶
41 ("Prior to RMLC suing GMR, GMR never conveyed a license offer or offered to discuss an
individual license offer directly with VerStandig Broadcasting.").  Grimmett asserts:  "[P]rior to
the filing of RMLC's lawsuit, neither I nor any representative of GMR had discussions of any
kind with Mr. VerStandig except in his role as a member of the RMLC Executive Committee."
Id. ¶ 43.  In addition, Grimmett attests:  "I am not aware of any representative of GMR offering a
performance license directly to Mr. VerStandig or his companies or negotiating the terms of any
such license with Mr. VerStandig."  Id.; see also id. ¶ 44 & GMR Ex. V, Grimmett & VerStandig
email exchange, dated Dec. 30, 2016–Jan. 4, 2017, regarding the interim license (ECF 72-3 at
52-54, filed under seal at ECF 73).

 Before GMR offered and sold the interim licenses, GMR offered and sold licenses to
only two of RMLC's members—one to iHeartMedia, Inc. and the other to Townsquare Media,
Inc.  Grimmett Decl., dated Mar. 1, 2017, ¶¶ 41, 43, 69; Grimmett Decl., dated Mar. 3, 2017, ¶¶
13, 21.  Neither is a Pennsylvania-based company.  Id.  All of the meetings and negotiations for
the licenses sold to iHeart and Townsquare took place outside of Pennsylvania.  Grimmett Decl.,
dated Mar. 1, 2017, ¶ 42; Grimmett Decl., dated Mar. 3, 2017, ¶ 21.

 In March, 2016, GMR entered into the license agreement with iHeartMedia, Inc., a
Delaware Corporation with headquarters in San Antonio, Texas.  Grimmett Decl., dated Mar. 3,
2017, ¶¶ 13, 21; Grimmett Decl., dated Mar. 1, 2017, ¶ 41.a; GMR Reply at 5 & App. A, Form
10-K for fiscal year Dec. 31, 2016, for "IHeart Communications, Inc." (ECF69-6).[9]  iHeart is a
member of RMLC, but GMR negotiated and concluded the license agreement directly with
iHeart.  Grimmett Decl., dated Mar. 1, 2017, ¶ 41.  According to Grimmett, "iHeart owns

---

[9]  The record is not fully developed as to iHeartMedia, Inc.'s corporate structure, but
RMLC does not dispute that iHeart's "headquarters" are located in San Antonio, Texas.

approximately 840 radio stations in the United States." Id. ¶ 41(a).  iHeart is "the largest radio broadcaster in the U.S., with over 850 radio stations and representing an estimated 20-25% of radio industry revenues."  Levin Decl., dated July 21, 2007, ¶ 10.  It is undisputed that some of iHeart's radio stations operate in Pennsylvania.

In late November, 2016, GMR entered into the license agreement with Townsquare Media, Inc., a Delaware corporation with headquarters in Greenwich, Connecticut.  Grimmett Decl., dated Mar. 3, 2017, ¶¶ 13, 21 Grimmett Decl., dated Mar. 1, 2017, ¶ 41.b.  Townsquare is a member of RMLC, but GMR negotiated and concluded the license agreement directly with Townsquare.  Id. ¶ 41.  According to Grimmett, "Townsquare owns approximately 300 radio stations in the United States."  Id. ¶ 41(b).  It is undisputed that some of Townsquare's radio stations operate in Pennsylvania.

GMR's CEO Grimmett states:  "From the time GMR was founded in 2013 until March 2016, *no* RMLC member entered into a direct license agreement with GMR."  Grimmett Decl., dated Mar. 1, 2017, ¶ 68 (emphasis in original); see also id. ¶¶ 40-41, 43, 69.  Before GMR offered and sold the interim licenses, GMR did not enter into licensing agreements with any of RMLC's members that had headquarters or substantial business centers in Pennsylvania.  Grimmett Decl., dated Mar. 3, 2017, ¶¶ 22, 27.  Furthermore, before GMR offered and sold the interim licenses, "GMR did not enter into a license with any terrestrial radio company based in Pennsylvania."  Grimmett Decl., dated Apr. 7, 2017, ¶ 39; see also GMR Reply at 1, 3 ("GMR never entered into *any* license with *any* terrestrial radio company headquartered or based in Pennsylvania.") (emphasis in original).  Moreover, before GMR offered and sold the interim licenses, GMR did not direct any communications into Pennsylvania promoting or otherwise offering its licenses for sale to Pennsylvania radio stations or Pennsylvania residents.  Grimmett

Decl., dated Mar. 3, 2017, ¶ 26.  "GMR has not directed communications into Pennsylvania informing radio stations of the risk of infringing works in its repertory or otherwise implicitly threatening suit for infringement," and the record is devoid of any evidence suggesting otherwise.  Id. ¶ 28.

## III.     MOTION TO SUPPLEMENT THE RECORD

The motion to supplement the record requests consideration of materials regarding GMR's offer and sale of the interim licenses beginning in January of 2017, and the parties' discussions during May through July of 2017 regarding extensions of the interim licenses.  The submissions are voluminous.  In RMLC's view, GMR materially breached the parties' interim licensing agreement and violated the antitrust laws in regard to the interim license extensions, and these alleged infractions justify using the supplementary materials to establish jurisdiction over GMR in Pennsylvania.  GMR's position is that RMLC breached the interim licensing agreement in the first instance, by using the interim licensing activity to support RMLC's litigation position on jurisdiction, and there has been no antitrust violation by GMR whatsoever. In GMR's view, use of the parties' negotiations for, or the existence of, any interim license or extended interim license, would be improper for any purpose.

Each side disputes the adequacy of the other's performance of their interim licensing obligations.  But the record shows that GMR cooperated with RMLC in a ferociously contentious adversarial setting, and GMR met its interim licensing obligations.  RMLC never applied to the Court for assistance or an order to compel better performance by GMR.  In fact, as agreed upon, GMR issued interim and extended interim licenses to RMLC's member radio stations, including radio stations operating in Pennsylvania.  GMR did so before RMLC moved

to supplement.  The record suggests that interim and extended licenses were issued to all of RMLC's members that chose to purchase licenses.  RMLC's stated fear that GMR intends to boycott radio stations operating in Pennsylvania after expiration of the extended licenses on March 31, 2018, is pure speculation.  The record is also devoid of any evidence supporting RMLC's assertions that GMR intimidated, punished, or retaliated against potential witnesses.

Importantly, nothing contained in the proffered supplementary materials, and none of the cited flaws as to each side's discharge of their respective obligations, warrants departure from the promise they made to each other "not to use the negotiation of or existence of any interim license with any RMLC member in any way, including to argue for or against personal jurisdiction or venue."  Term Sheet § 7(c).  The interim licensing agreement implemented a settlement of RMLC's first motion for preliminary injunction—an "interim solution" that aimed to protect RMLC's members from copyright infringement litigation, preserve GMR's defenses to personal jurisdiction, and place GMR's dismissal motion first in line for decision.

Instead of serving the principal goals of the interim solution, consideration of the proffered supplementary argument and materials would defeat not only the parties' contractual obligations to one another, but their responsibilities to the Court under agreed case-management procedures.  Accordingly, after review of the record in its entirety, I respectfully recommend that the proffered supplementary argument and materials not be considered for purposes of determining whether there is personal jurisdiction over GMR in Pennsylvania, or venue in this judicial district.

IV.     **PERSONAL JURISDICTION AND VENUE**

A.      **Questions Presented for Decision**

 "The requirement that a court have personal jurisdiction flows . . . from the Due Process

Clause." Id.  "The Due Process Clause protects an individual's liberty interest in not being

subject to the binding judgments of a forum in which he has established no meaningful 'contacts,

ties or relations.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (quoting

International Shoe Co. v. Washington, 326 U.S. 310, 319 (1945)).  Personal jurisdiction

"represents a restriction on judicial power . . . as a matter of individual liberty." Ins. Corp. of

Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 & n.10 (1982).

Because RMLC sues under the federal antitrust laws, 15 U.S.C. §§ 2, 26, and questions

arising under federal law are presented, the jurisdictional principles of the Due Process Clause of

the Fifth Amendment guide the jurisdictional analysis.  28 U.S.C. § 1331; Max Daetwyler Corp.

v. Meyer, 762 F.2d 290, 293 (3d Cir.), cert. denied, 474 U.S. 980 (1985).  The Fifth Amendment

"impose[s] a general fairness test" that incorporates the standards of due process established by

International Shoe under the Fourteenth Amendment.  Id.  International Shoe requires that

"certain minimum contacts" exist between the non-resident defendant and the forum "such that

maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"

326 U.S. at 316 (quoting Milliken v. Myer, 311 U.S. 457, 463 (1940)).  We must first consider

whether GMR has the requisite minimum contacts to establish personal jurisdiction in

Pennsylvania.

RMLC asserts that GMR's national contacts should determine jurisdiction, rather than

GMR's specific contacts with the forum.  See FAC ¶ 15; RMLC Resp. at 1-2 (asserting an

"anticompetitive campaign to extort the U.S. commercial radio industry" and "a uniform course

of conduct that GMR has undertaken on a nationwide basis").  In RMLC's view, Section 12 of the Clayton Act, 15 U.S.C. § 22, authorizes "suit anywhere a defendant directs its anticompetitive activity."  RMLC Resp. at 24.

Under a national contacts theory, "the proper inquiry in determining personal jurisdiction in a case involving federal rights is one directed to the totality of a defendant's contacts throughout the United States."  Max Daetwyler, 762 F.2d at 293; Fed. R. Civ. P. 4(k)(2).  Section 12 of the Clayton Act permits venue of any suit under the antitrust laws "against a corporation . . . not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business."  15 U.S.C. § 22.  In addition, Section 12 "authorizes nationwide, indeed worldwide, service of process on a defendant corporation in federal antitrust litigation."  In re Auto. Refinishing Paint Antitrust Litig., 358 F.3d 288, 293 (3d Cir. 2004).  Regarding two defendant foreign-country corporations, Automotive Refinishing concluded: "personal jurisdiction in federal antitrust litigation is assessed on the basis of a defendant's aggregate contacts with the United States as a whole."  Id. at 298.

However, the Third Circuit "has never applied a 'national contacts' test for establishing personal jurisdiction over a domestic antitrust defendant."  Howard Hess Dental Labs, Inc. v. Dentsply Int'l, Inc., 516 F. Supp. 2d 324, 336-38 (D. Del. 2007), aff'd, 602 F.3d 237 (3d Cir. 2010).  And the Third Circuit has not extended the holding of Automotive Refinishing "in a manner that would counterindicate traditional long-arm jurisprudence."  Id.  Although Section 12 "is not without its ambiguities, it is clear that the provision is directed only to corporations and that it does not apply to other entities that simply share common attributes with corporations."  World Skating Fed'n v. Int'l Skating Union, 357 F. Supp. 2d 661, 664 (S.D.N.Y. 2005) (footnotes omitted).

26

The jurisdictional clause of Section 12 of the Clayton Act simply does not apply here. GMR is neither a foreign-country defendant nor a corporation—it is a domestic limited liability company.  Accordingly, GMR's contacts with states other than Pennsylvania cannot be aggregated in order to obtain personal jurisdiction over GMR in this forum.

In the absence of a federal statute authorizing nationwide service of process, the statutes and rules of the state in which a district court sits determine the minimum contacts sufficient to satisfy due process and provide amenability to suit:  "When a federal question case arises under a federal statute that is silent as to service of process," Federal Rule of Civil Procedure 4(e) "adopts an incorporative approach requiring that both the assertion of jurisdiction and the service of process be gauged by state amenability standards."  Max Daetwyler, 762 F.2d at 295, 297. Rule 4(e)(1) "authorizes personal jurisdiction over non-resident defendants to the extent permissible under the laws of the state where the district court sits."  Fed. R. Civ. P. 4(e)(1); Eurofins Pharma US Holdings v. BioAlliance Pharma SA, 623 F.3d 147, 155 (3d Cir. 2010).

Pennsylvania's long-arm statute permits courts to exercise personal jurisdiction over non-resident defendants to the constitutional limits of the Due Process Clause of the Fourteenth Amendment.  42 Pa. C.S.A. § 5322(b).  "A district court's exercise of personal jurisdiction pursuant to Pennsylvania's long-arm statute is therefore valid as long as it is constitutional." Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149 F.3d 197, 200 (3d Cir. 1998).  Accordingly, the principal question presented is whether exercising personal jurisdiction over GMR comports with federal due process.  In this case, the short answer to that question is "no."

The short answer to the question whether venue is properly laid in this judicial district is also "no," for several reasons.  Under Section 2 of the Sherman Act and Section 16 of the Clayton Act, 15 U.S.C. §§ 2, 26, RMLC sues to enjoin the pled anticompetitive monopolistic

conduct by GMR.  Section 16 permits an "association" to sue for injunctive relief in "any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . ."  Id. § 26.  Again, personal jurisdiction may not be exercised over GMR in Pennsylvania or in this judicial district, and therefore, Section 16 does not apply here.

RMLC maintains that under the general venue statute, 28 U.S.C. § 1391, venue is proper in the Eastern District of Pennsylvania.  RMLC Resp. at 28-30.  The general venue statute "permits an action not based on diversity of citizenship to be brought either in the judicial district where all defendants reside, or in the district in which the claim arose."  Myers v. Am. Dental Ass'n, 695 F.2d 716, 722 (3d Cir. 1982).  RMLC argues that personal jurisdiction may be asserted over GMR in Pennsylvania and therefore, for purposes of the general venue statute, GMR resides in this judicial district.  Id. at 29 (citing 28 U.S.C. §§ 1391(b)(2), 1391(c)(2)).  RMLC also argues that the claims pled in the Amended Complaint arose from GMR's "conduct with this District," that is, the licensing of Pennsylvania radio stations, which it is also asserted, makes venue proper in this judicial district.  Id. at 30.

For the reasons set forth below, I conclude that Pennsylvania does not have personal jurisdiction over GMR.  For purposes of the general venue statute, GMR does not reside in this judicial district.  See §§ 1391(b)(1), 1391(c).  In addition, the record establishes that none of the "events or omissions giving rise to" the antitrust claims pled in the Amended Complaint "occurred" in this judicial district.  See § 1391 (b)(2).  GMR's and RMLC's negotiations for a licensing agreement, and GMR's offers and sales of its licenses, took place outside of Pennsylvania.  The general venue statute does not lay venue at the place of the plaintiff's residence.  Leroy v. Great W. United Corp., 443 U.S. 173, 183-85 (1979).  It would be error to

rule "that an antitrust claim, in essence a form of business tort alleging business injury, can be brought under section 1391(b) where the injury occurs, i.e. at the plaintiff's residence."  Myers, 695 F.2d at 723 (citing Caribe Trailer Sys., Inc. v. Puerto Rico Maritime Shipping Auth., 475 F. Supp. 711, 719 (D.D.C. 1979) ("To hold that a cause of action necessarily arose in the district in which the plaintiff was injured is a 'simplistic rationale to which antitrust actions are not susceptible.'")).

Personal jurisdiction may be either general or specific.  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16 & n.9 (1984).  "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum state."  Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011) (quoting Int'l Shoe, 326 U.S. at 317); accord Daimler AG v. Bauman, 134 S. Ct. 746, 757 (U.S. 2014); Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 445-46 (1952).  On the other hand, specific jurisdiction depends upon the "'relationship among the defendant, the forum and the litigation.'"  Walden v. Fiore, 134 S. Ct. 1115, 1121 (U.S. 2014) (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775 (1984) (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977))).

RMLC does not argue that general jurisdiction may be exercised over GMR.  Indeed, the record is devoid of any evidence suggesting that GMR has any continuous and systematic contacts with the forum state, Pennsylvania.  The "paradigm forum" for exercising general jurisdiction over a corporation is "one in which the corporation is fairly regarded as at home."  Goodyear Dunlop, 564 U.S. at 924.  Here, GMR is a Delaware limited liability company.  Before offering and selling the interim licenses, GMR did not transact any business in Pennsylvania.

The record shows that GMR is "at home" in California at its headquarters and sole office in Los Angeles.  Thus, we next consider whether specific personal jurisdiction exists here.

### B.    Legal Standards for Determining Specific Jurisdiction

Once a defendant raises a jurisdictional defense, the plaintiff bears the burden of establishing personal jurisdiction.  O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 316 (3d Cir. 2007) (citing Gen. Elec. Co. v. Deutz, AG, 270 F.3d 144, 150 (3d Cir. 2001)).  The plaintiff must prove by affidavits or other competent evidence that jurisdiction is proper.  Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009); Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1302 (3d Cir. 1996).  Where a district court does not hold an evidentiary hearing, which is the situation here, the plaintiff need only establish a prima facie case of personal jurisdiction.  O'Connor, 496 F.3d at 316; Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004).  The well-pled factual allegations of the complaint must be accepted as true, and all disputed facts must be construed in the plaintiff's favor.  O'Connor, 496 F.3d at 316; Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 457 (3d Cir. 2003); Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992).

Specific jurisdiction is evaluated under three requirements.  "First, the defendant must have 'purposefully directed [its] activities' at the forum."  O'Connor, 496 F.3d at 317 (quoting Burger King, 471 U.S. at 472) (quotation marks omitted).  "Second, the litigation must 'arise out of or relate to' at least one of those activities."  Id. (citing Helicopteros, 466 U.S. at 414).  "And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise 'comports with fair play and substantial justice'" Id. (quoting Burger King, 471 U.S. at 476) (quoting Int'l Shoe, 326 U.S. at 320) (internal quotation marks omitted).

### C.      Specific Jurisdiction May Not Be Exercised Over GMR

At the threshold, specific jurisdiction requires that the relationship among the defendant, the forum, and the litigation "arise out of contacts that the 'defendant *himself*' creates with the forum State." Walden, 134 S. Ct. at 1122 (quoting Burger King, 471 U.S. at 475) (emphasis in original).  A "defendant must have 'purposefully directed [its] activities' at the forum." O'Connor, 496 F.3d at 317 (quoting Burger King, 471 U.S. at 472) (quotation marks omitted). Alternatively, "the defendant must have 'purposefully availed itself of the privilege of conducting activities with the forum.'" Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  "Physical entrance is not required." Id. (citing Burger King, 471 U.S. at 476; Grand Entm't Grp., Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 482 (3d Cir. 1993)).  But importantly, "what is necessary is a deliberate targeting of the forum."  Id.

In determining whether a defendant has sufficient contacts with the forum state to justify an assertion of jurisdiction, the unilateral activity of another party or a third person is not an appropriate consideration.  Walden, 134 S. Ct. at 1122; O'Connor, 496 F.3d at 317 ("'unilateral activity of those who claim some relationship with a nonresident defendant' is insufficient") (citing Hanson, 357 U.S. at 253).  Furthermore, "contacts with a state's citizens that take place outside the state are not purposeful contacts with the state itself."  Id. (citing Gehling v. St. George's Sch. of Med. Ltd., 773 F.2d 539, 542-43 (3d Cir. 1985)).

RMLC's principal theory of specific jurisdiction over GMR is that GMR used RMLC as a "conduit" to impose licensing requirements on RMLC's members and in doing so, specifically targeted radio stations nationwide, including radio stations in Pennsylvania.  RMLC argues that GMR intended for RMLC to convey to its member stations the anticompetitive demands for supra-competitive license fees, as well as implicit threats of copyright infringement claims.

RMLC further argues that GMR knew that many of those stations were located in Pennsylvania; thus, GMR knowingly and intentionally imposed a tortious anticompetitive scheme on hundreds of radio stations in Pennsylvania.

"[T]he critical finding that the defendant purposefully availed itself of the privilege of conducting activities within the forum requires contacts that amount to a deliberate reaching into the forum state to target its citizens." D'Jamoos v. Pilatus Aircraft Ltd., 566 F.3d 94, 104 (3d Cir. 2009) (citing Burger King, 471 U.S. at 475-76; O'Connor, 496 F.3d at 317-18). See also IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 265-66 (3d Cir. 1998) ("Simply asserting that the defendant knew that the plaintiff's principal place of business was located in the forum would be insufficient in itself to meet the requirement [of deliberate targeting of the forum].").

RMLC's theory that GMR used RMLC as a "conduit" masks the fact that GMR never affirmatively did or said anything targeted to citizens or residents of Pennsylvania. RMLC is a Tennessee trade association. GMR negotiated and interacted with RMLC's representatives only in their capacity as executives and officers of RMLC. Indeed, RMLC emphasizes that it does not purchase licenses, and disavows any authority to bind its members to negotiated license terms, rates, forms, or fees. At most, the record shows that GMR aggressively pitched the benefits of its license to RMLC, hoping that RMLC would favorably present the GMR license to its members, who might (or might not) operate radio stations in Pennsylvania, and who might (or might not) decide to purchase GMR's license.

GMR directly offered and sold licenses to only two of RMLC's members—one to iHeart and the other to Townsquare. All of the meetings and negotiations for the licenses sold to these companies took place outside of Pennsylvania. Copies of the licensing agreements are not part of the record currently before the Court, but nothing suggests that the contracts were formed

under or are governed by Pennsylvania law.  Both iHeart and Townsquare were organized under the laws of states other than Pennsylvania.  Both maintained headquarters in states other than Pennsylvania.  Importantly, the record shows that representatives of iHeart and Townsquare selected the radio stations that would be licensed to publicly perform the musical works in GMR's repertory.  The record is devoid of any evidence that GMR had anything to do with where the companies' representatives decided to use a license.  In other words, representatives of iHeart and Townsquare unilaterally chose to purchase GMR's licenses, and to use them for their radio stations broadcasting in Pennsylvania.

GMR is not subject to personal jurisdiction wherever one of its licensees unilaterally and fortuitously chooses to do business.  See Walden, 134 S. Ct. at 1124 (ruling that personal jurisdiction could not be exercised over defendants who "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to" the forum state); Kehm Oil Co. v. Texaco, Inc., 537 F.3d 290, 301 (3d Cir. 2008) (whereas use of the trademark at issue was geographically tied to the physical location of the gas stations in Pennsylvania, defendant's cease and desist letters to the gas stations did not create personal jurisdiction) (citing Red Wing Shoe Co., Inc. v. Hockerson–Halberstadt, Inc., 148 F.3d 1355, 1361 (Fed. Cir. 1998) (holding that a "patentee [does] not subject itself to personal jurisdiction in a forum solely by informing a party who happens to be located there of suspected infringement," because "[g]rounding personal jurisdiction on such contacts alone would not comport with principles of fairness")).

Furthermore, an "offer to license is more closely akin to an offer for settlement of a disputed claim than an arms-length negotiation in anticipation of a long-term continuing business relationship."  Red Wing, 148 F.3d at 1361 (citing Burger King, 471 U.S. at 479) (distinguishing between negotiations that culminate in a contract creating continuing obligations and those that

do not).  A license is "a covenant not to sue."  Id. at 1362.  Here, the current record does not

suggest that GMR created any continuing obligations between itself and the forum,

Pennsylvania.  GMR, through agreements with its affiliated songwriters and publishers, acquires

exclusive rights to grant licenses to publicly perform copyrighted musical compositions owned

by its affiliates. [10]  GMR's rights are exclusive in nature because GMR's affiliates do not retain

the right to separately grant permission to a particular music user for the public performance of

their works.  In contrast, GMR licenses or grants owners or operators of radio stations non-

exclusive rights to publicly perform or broadcast the works in GMR's repertory.  In other words,

GMR retains the right to grant permission to publicly perform the works in its repertory to other

licensees.  The record is devoid of any evidence that either GMR or its licensees have any

continuing obligations other than some licensees' obligation pay the license fee on a monthly or

annual basis.  RMLC does not argue that GMR's licensees have any continuing obligations that

are significant for purposes of asserting personal jurisdiction over GMR.

 In sum, the record establishes:  Neither GMR nor RMLC is a citizen of or resides in

Pennsylvania.  Neither maintains a business office in Pennsylvania.  Neither employs a person

who is a citizen of, or resides in, Pennsylvania.  None of the songwriters and publishers affiliated

with GMR is based, or has a primary residence, in Pennsylvania.  GMR does not own property in

Pennsylvania.  GMR's and RMLC's representatives did not conduct any meetings in

Pennsylvania.  GMR conducted every phone conference of record with RMLC from GMR's

headquarters in Los Angeles.  Before GMR offered and sold the interim licenses, GMR did not

conduct any business in Pennsylvania.  GMR did not offer or sell a license to any RMLC

---

  [10]  The Copyright Act gives the owner of a copyright the exclusive right to publicly
perform, or authorize others to perform, the copyrighted work.  17 U.S.C. § 106(4).  Any person
who violates this exclusive right is an infringer.  Id. § 501(a).

member or radio station that had a substantial place of business in Pennsylvania, or that was formed under the laws of Pennsylvania.  The record is devoid of any evidence that GMR's representatives travelled to, visited, or physically entered Pennsylvania at any time).  GMR did not send any communications to Pennsylvania companies, citizens, or residents.  GMR has not sent any cease and desist letters to Pennsylvania companies, citizens, or residents.  GMR has not filed a lawsuit for copyright infringement in Pennsylvania—or any other cause of action or proceeding of record.

GMR has no jurisdictionally significant contacts, ties, or relations with Pennsylvania. The Amended Complaint does not allege -- and the record does not contain any evidence of -- a single affirmative act through which GMR purposefully directed any of its activities at the forum state, or purposefully availed itself of the privilege of conducting activities within the forum state.  GMR has not invoked the benefits and protections of Pennsylvania's laws.  Accordingly, there is no need to consider the other two factors for evaluating specific personal jurisdiction— whether RMLC's claims arise out of or relate to at least one of GMR's activities in the forum and whether an exercise of jurisdiction over GMR would otherwise comport with fair play and substantial justice.

### D.   The Calder "Effects Test" Is Not Applicable

RMLC maintains that the requirement for minimum contacts with the forum state is met under the "effects test" set forth in Calder v. Jones, 465 U.S. 783 (1984).  RMLC Resp. at 1, 20-23.  Calder held that in some circumstances, personal jurisdiction can be asserted over a non-resident defendant that committed an intentional tort outside the forum state, the unique effects of which caused damage or injury to the plaintiff within the forum.  Calder applies only if the record contains sufficient facts to support an affirmative finding as to each of three requirements:

> First, the defendant must have committed an intentional tort. Second, the plaintiff must have felt the brunt of the harm caused by that tort in the forum such that the forum can be said to the focal point of the harm suffered by the plaintiff as a result of the tort. Third, the defendant must have expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.

IMO Indus., 155 F.3d at 256, 261, 265-66 (citing Calder, 465 U.S. at 788-90). Antitrust violations can be intentional torts under the test. See, e.g., In re Fasteners Antitrust Litig., No. 08-md-1912, 2011 WL 3563989, at *12 (E.D. Pa. Aug. 12, 2011); In re Bulk (Extruded) Graphite Prods. Antitrust Litig., No. 02-6030, 2007 WL 2212713, at *5 (D.N.J. July 30, 2007).

RMLC posits that "GMR's monopolistic scheme satisfies all three elements." RMLC Resp. at 20. However, RMLC's analysis focuses primarily on Calder's second requirement. RMLC contends that jurisdiction in Pennsylvania and venue in this judicial district follow from the antitrust injuries that GMR has intentionally imposed on radio station companies operating in Pennsylvania. Id.

On the other hand, GMR primarily focuses on Calder's third requirement. GMR maintains that the test does not apply here because "[t]here was no action that was expressly aimed at Pennsylvania," and "there is no showing that Pennsylvania has a unique relationship with the radio industry or with GMR's alleged conduct." GMR Suppl. Br. at 21-22; GMR Reply at 3-4.

The Calder test is a specialized form of specific jurisdiction that applies to intentional tort claims. However, the same due process principles that constrain a state's authority to bind a non-resident defendant to a judgment of its courts apply when intentional torts are involved. Walden, 134 S. Ct. at 1123. The assertion of jurisdiction "must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." Id.; see also IMO Indus.,

155 F.3d at 265 ("<u>Calder</u> did not carve out a special intentional torts exception to the traditional specific jurisdiction analysis.").

Applying the test to the present facts, GMR's negotiations, interactions, and transactions with RMLC, iHeart, and Townsquare show GMR's business strategy to sell its licenses in a national marketplace.  It is not disputed that RMLC, iHeart, and Townsquare each conducted some business in Pennsylvania, and that GMR likely knew that these entities conducted business in Pennsylvania.  Whether GMR's conduct rises to the level of the pled antitrust violations is not decided here.  Nonetheless, the <u>Calder</u> test does not apply here as follows.

RMLC repeatedly asserts that radio stations operating in Pennsylvania were injured because of GMR's intentional and anticompetitive conduct.  This is not enough to establish GMR's contact with the forum state, Pennsylvania:

> <u>Calder</u> made clear that mere injury to a forum resident is not a sufficient connection to the forum.  Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as its shows that the defendant formed a contact with the forum State.  The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.

<u>Walden</u>, 134 S. Ct. at 1125.  "<u>Calder</u> requires more than a finding that the harm caused by the defendant's intentional tort is primarily felt within the forum."  <u>IMO Indus.</u>, 155 F.3d at 265.

It will be accepted as true (for purposes of the present dismissal motion only) that RMLC has pled and shown an intentional violation of the antitrust laws by GMR.  It will also be accepted as true (for purposes of the present dismissal motion only) that RMLC has pled and shown that radio station companies operating in Pennsylvania felt the brunt of the harm caused by the alleged monopoly.  Even assuming those facts, personal jurisdiction cannot be asserted over GMR in Pennsylvania.  This is so because RMLC has not met <u>Calder's</u> third requirement— that is, RMLC has not demonstrated that GMR "expressly aimed" the pled tortious conduct at

Pennsylvania.  "Only if this requirement is satisfied need we consider whether the brunt of the harm was actually suffered by [RMLC's members] in the forum."  IMO Indus., 155 F.3d at 266.

In addition, it will be accepted as true for present purposes that RMLC has pled and shown that GMR intended that RMLC convey to its member stations the alleged anticompetitive demands for supra-competitive license fees, as well as implicit threats of copyright infringement claims.  Nonetheless, "[s]imply asserting that the defendant knew that plaintiff's principal place of business was located in the forum would be insufficient in itself to meet this requirement."  IMO Indus., 155 F.3d at 265 & n.8, 260 n.3.  Again, "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."  Walden, 134 S. Ct. at 1123.  "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State."  Id.  (quoting Burger King, 471 U.S. at 475) (quotation marks omitted).  See also Jamoos, 566 F.3d at 104 (ruling that the defendant's "efforts to exploit a national market necessarily included Pennsylvania as a target, but those efforts simply do not constitute the type of deliberate contacts within Pennsylvania that could amount to purposeful availment of the privilege of conducting activities in that state"); Remick v. Manfredy, 238 F.3d 248, 259 (3d Cir. 2001) (declining to assert personal jurisdiction where there was no showing that Pennsylvania had a unique relationship with the boxing industry).

Because RMLC has not shown any specific conduct or activity by GMR even suggesting, let alone establishing, that GMR expressly aimed the alleged tortious conduct at Pennsylvania, the Calder test does not apply here.  IMO Indus., 155 F.3d at 265-66.  There is no need to

consider whether in fact there was an antitrust violation, or whether the brunt of the antitrust

harm was actually suffered by radio stations operating in Pennsylvania.  Id. at 266.

### E.        Transfer Under Section 1404(a)

"For the convenience of the parties and witnesses, in the interest of justice, a district court

may transfer any civil action to any other district or division where it might have been brought or

to any district or division to which all parties have consented."  28 U.S.C. § 1404(a); see also id.

§ 1406(a) (permitting transfer of a case laying venue in the wrong district or division).  The

general purpose of the procedural remedy of transfer is "removing whatever obstacles may

impede an expeditious and orderly adjudication of cases and controversies on their merits."

Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466-67 (1962).  Jurisdiction over the person of the

defendant is not a prerequisite to the power of a district court to transfer the case.  Id.; United

States v. Berkowitz, 328 F.2d 358, 361 (3d Cir. 1964); Cumberland Truck Equip. Co. v. Detroit

Diesel Corp., 401 F. Supp. 2d 415, 419-20 (E.D. Pa. 2005) (citing Goldlawr and Berkowitz).

Here, personal jurisdiction cannot be asserted over GMR in Pennsylvania and venue is

improperly laid in the Eastern District of Pennsylvania.  The action cannot be further prosecuted

in the Eastern District of Pennsylvania because the Court does not have personal jurisdiction

over GMR.  But this Court need not transfer this action in order to serve the interests of justice.

RMLC has not requested transfer to the Central District of California, or any other

district court.  Instead, RMLC exclusively argues that its choice of forum in the Eastern District

of Pennsylvania should be preserved.  Since RMLC has not requested a transfer, RMLC has not

cited any hardship or prejudice that it might suffer in the absence of a transfer.  See RMLC Resp.

at 31-36.

The recommended dismissal without prejudice does not effectively terminate this dispute. As previously noted, on December 6, 2016, GMR commenced an action in the United States District Court for the Central District of California, <u>Global Music Rights, LLC v. Radio Music License Comm., Inc., et al.</u>, No. 2:16-cv-09051–BRO–AS (C.D. Cal.).  GMR asserted claims against RMLC under Section 1 of the Sherman Act, 15 U.S.C. § 1; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26; and California's unfair competition laws.  On January 6, 2017, GMR filed an amended complaint (ECF 23)  On January 27, 2017, RMLC filed a motion to dismiss the amended complaint (ECF 34)  On April 27, 2017, the California district court found that the California action and this Pennsylvania action "are substantially similar as both address the same facts, namely, whether Plaintiff and Defendant have each violated the antitrust laws while attempting and failing to negotiate a licensing agreement for Plaintiff's repertory."  Order, dated Apr. 7, 2017 (ECF 40 at 10, 9-11).  "Though each action may focus on the conduct and business practices of one party more than the other, ultimately both actions involve the same facts, the same set of negotiations, and overlapping evidence."  <u>Id.</u> at 10.  The California action was stayed pending the outcome GMR's dismissal motions filed here.  <u>Id.</u>  Neither party has identified any impediment to RMLC's assertion of a counterclaim in the California action.  Once the California District Court judge lifts the stay of the California action, RMLC may seek to assert a counterclaim, if it so chooses.  RMLC has not argued, and nothing in the present record suggests, that a dismissal without prejudice of this action would result in RMLC losing a substantial part of its cause of action under the applicable rules and statutes of limitations.

**V.       CONCLUSION**

Having reviewed the parties' submissions and the record evidence, I find that the assertions of Plaintiff RMLC, even if viewed as true, do not establish personal jurisdiction over GMR in the forum state, Pennsylvania or venue in this judicial district.  Because dismissal of the Amended Complaint without prejudice is recommended, there is no need to consider GMR's alternative request under 28 U.S.C. § 1404(a), that the venue of this action be transferred to the Central District of California.

## RECOMMENDATION

AND NOW, this __29th__ day of November, 2017, it is RESPECTFULLY

RECOMMENDED that Plaintiff RMLC's motion to supplement the record be DENIED, that

Defendant GMR's motion to dismiss for lack of personal jurisdiction and improper venue be

GRANTED, and that the First Amended Complaint be DISMISSED, without prejudice.


BY THE COURT:


   /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE